## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

SECURITIES AND EXCHANGE
COMMISSION,
                                        Plaintiff,

    v.

HARRY ZHABILOV,
BILLY V. RAY, JR.,
CHARLES DILLUVIO,
STEPHEN APOLANT,
DANNIE ZHABILOV,
JONATHAN FARBER,
CAMELOT NEVADA TRUST,
SEACOR CAPITAL, INC.,
SKY-DIRECT LLC, and
WEXFORD INDUSTRIES LTD.,
                                        Defendants,

    and

NY FARMS GROUP, INC. and
EQUITY MARKETS ADV LLC,
                                        Relief Defendants.

Civil Action No. 1:24-cv-7362 (ALC)

---

## PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS
## BY DEFENDANTS CAMELOT NEVADA TRUST AND BILLY V. RAY, JR.

---

SECURITIES AND EXCHANGE COMMISSION
Rua M. Kelly
Marc J. Jones

*Attorneys for Plaintiff Securities
and Exchange Commission*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................................... iii

PRELIMINARY STATEMENT ................................................................................... 1

STANDARD OF REVIEW .......................................................................................... 2

FACTUAL BACKGROUND ........................................................................................ 3

ARGUMENT ............................................................................................................... 7

I.    SCHEME LIABILITY ............................................................................. 7

II.   MISREPRESENTATION LIABILITY .................................................. 10

III.  THE COMMISSION NEED NOT ESTABLISH CONTROL IN THE COMPLAINT, BUT DOES ANYWAY ..................................................... 13

IV.   THIS COURT HAS PERSONAL JURISDICTION OVER RAY AND CAMELOT ..... 16

V.    VENUE IS PROPER HERE ................................................................... 20

VI.   THE 2018 FAIRNESS HEARING DOES NOT CONTROL ANYTHING HERE ......... 22

VII.  DISGORGEMENT ................................................................................. 24

CONCLUSION ......................................................................................................... 26

## TABLE OF AUTHORITIES

**Cases**

*Abeloff v. Barth*, 119 F.R.D. 315 (D. Mass. 1988) ........................................................ 20

*Acito v. IMCERA Grp., Inc.,* 47 F.3d 47 (2d Cir. 1995) ................................................. 9

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ........................................................................... 2

*Atuahene v. City of Hartford*, 10 Fed. Appx. 33 (S.D.N.Y. May 31, 2001) .................... 18

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ........................................................... 2

*Burger King Corp. v. Rudzewicz*, 471 U.S. 462  (1985) .................................................. 18

*Celotex Corp. v. Edwards*, 514 U.S. 300 (1995) ............................................................ 23

*Como v. Com. Oil Co.*, 607 F. Supp. 335 (S.D.N.Y. 1985) ............................................. 21

*Danuri Tex Co. v. Yoco Inc., et al.*, 19 Civ. 9187 (NRB), 2020 WL 4735190 (S.D.N.Y. Aug. 14, 2020) ............................................................................................................................ 18

*Duling v. Gristede's Operating Corp.*, 265 F.R.D. 91  (S.D.N.Y. 2010) ........................ 18

*ECA v. JP Morgan Chase Co.*, 553 F.3d 187 (2d Cir. 2009) ........................................... 9

*Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co. of N.Y.*, 375 F.3d 168 (2d Cir. 2004) 10

*Greenwood Partners v. New Frontier Media Inc.*, 2000 WL 278086 (S.D.N.Y. March 14, 2000) ............................................................................................................................................ 20

*Gulf Ins. v. Glasbrenner*, 417 F.3d 353 (2d Cir. 2005) ............................................. 2, 20

*Janus Cap. Grp., Inc. v. First Derivative Traders,* 564 U.S. 135 (2011) ...................... 11

*Kassner v. 2nd Ave. Delicatessen, Inc.*, 496 F.3d 229 (2d Cir. 2007) ............................ 2

*Loreley Financing (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160 (2d Cir. 2017).. 10

*Metro. Life Ins. v. Robertson-Ceco Corp.*, 84 F.3d 560  (2d Cir. 1996) ......................... 17

*Mitchell v. Texas Gulf Sulphur Co.*, 446 F.2d 90 (10th Cir. 1971) ................................. 21

*Novak v. Kasaks,* 216 F.3d 300 (2d Cir. 2000) ............................................................... 9

*Oxford First Corp. v. PNC Liquidating Corp*, 372 F. Supp. 191 (E.D. Pa. 1974) ......... 21

*Pennaluna & Co. v. SEC*, 410 F.2d 861 (9th Cir. 1969) ................................................ 14

*Rombach v. Chang*, 355 F.3d 164 (2d Cir. 2004) ............................................................. 2

*SEC v. Am. Beryllium & Oil Corp.*, 303 F. Supp. 912 (S.D.N.Y. 1969) ........................ 13

*SEC v. Apuzzo*, 689 F.3d 204 (2d Cir. 2012) .................................................................. 2

*SEC v. Autochina Intern. Ltd.*, 2013 WL 265974 (D. Mass. Jan. 24, 2013)................................ 21

*SEC v. Caledonian Bank Ltd.*, 145 F. Supp. 3d 290 (2015) .......................................... 25

*SEC v. Collector's Coffee, Inc.*, 697 F. Supp. 3d 138 (S.D.N.Y. 2023) ........................ 7

*SEC v. Contrarian Press*, LLC, 2017 WL 4351525 (S.D.N.Y. Sept. 29, 2017) ........................ 21

*SEC v. Fiore*, 416 F. Supp. 3d 306 (S.D.N.Y. 2019)...................................................... 13

*SEC v. Ginder*, 752 F.3d 569 (2d Cir. 2014) ............................................................... 10

*SEC v. Govil*, 86 F.4th 89 (2d Cir. 2023)...................................................................... 25

*SEC v. Kern*, 425 F.3d 143 (2d Cir. 2005)................................................................... 13

*SEC v. Lefkowitz, et al.*, 2013 WL 12170295 (M.D. Fla. Sept. 17, 2013)................................... 24

*SEC v. Longfin*, 316 F. Supp. 3d 743 (S.D.N.Y. 2018) ........................................... 14, 15

*SEC v. MiMedx Grp., Inc.*, 2022 WL 902784 (S.D.N.Y. Mar. 28, 2022) ..................... 13

*SEC v. One or More Unknown Traders in Sec. of Onyx Pharm., Inc.*, 2014 WL 5026153 (S.D.N.Y. Sept. 29, 2014)........................................................................................ 9

*SEC v. Platforms Wireless Intern. Corp.*, 617 F.3d 1072 (9th Cir. 2010)................................... 13

*SEC v. Ray et al.*, 14-cv-61195 (S.D. Fl., Sept. 3, 2014)................................................ 3

*SEC v. Rio Tinto plc*, 41 F.4th 47 (2d Cir. 2022)........................................................... 7

*SEC v. Rust*, 2017 WL 239381 (S.D.N.Y. Jan. 17, 2017) ............................................ 20

*SEC v. Sason*, 433 F. Supp. 3d 496 (S.D.N.Y. 2020) .................................................. 7

*SEC v. Sharef*, 924 F. Supp. 2d 539 (S.D.N.Y. 2013) ................................................. 17

*SEC v. Sourlis*, 851 F.3d 139 (2d Cir. 2016) ................................................................ 10

*SEC v. Straub*, 921 F. Supp. 2d 244 (S.D.N.Y. 2013).............................................. 17, 18

*SEC v. Syron*, 934 F. Supp. 2d 609 (S.D.N.Y. 2013) ................................................. 12

*SEC v. Tourre*, 2013 WL 2407172 (S.D.N.Y. June 4, 2013) ...................................... 12

*SEC v. Unifund SAL*, 910 F.2d 1028 (2d Cir. 1990) ................................................................... 17

*SEC v. Verdiramo*, 890 F. Supp. 2d 257 (S.D.N.Y. 2011) ................................................ 14, 16

*SEC v. Wall St. Communications, Inc.*, 2009 WL 2579310 (M.D. Fla. Aug. 19, 2009) ............. 25

*SEC v. Wolfson*, 539 F.3d 1249 (10th Cir. 2008) ........................................................ 12

*SEC v. Wyly*, 788 F. Supp. 2d 92 (S.D.N.Y. 2011) ......................................................... 2

*Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124 (2d Cir. 1994) .................................... 9

*Teamsters Loc. 445 Freight v. Dynex Cap.*, 531 F.3d 190 (2d Cir. 2008) ................................. 11

*Travelers Indem. Co. v. Bailey*, 557 U.S. 137 (2009) ................................................... 23

*United States v. Corr*, 543 F.2d 1042 (2d Cir. 1976) ..................................................... 13

*United Student Aid Funds, Inc. v. Espinosa*, 559 U.S. 260 (2010) .................................... 23

*Wellman v. Dickinson*, 682 F.2d 355 (2d Cir. 1982) .................................................... 16

**Rules**

Federal Rule of Civil Procedure 12(b)(3) ..................................................................... 2

Federal Rule of Civil Procedure 12(b)(6) ..................................................................... 2

Federal Rule of Civil Procedure 9(b) ...................................................................... 2, 10

**Regulations**

17 C.F.R. § 230.144 ................................................................................................. 14

17 C.F.R. § 230.405 ............................................................................................. 1, 16

17 C.F.R. § 240.10b-5 ................................................................................................ 7

## PRELIMINARY STATEMENT

Defendants Camelot Nevada Trust ("Camelot") and Billy V. Ray, Jr. ("Ray")[1] seek to dismiss the Commission's claims against them.  Their arguments lack merit and Defendants' characterizations of the Commission's allegations both conflict with the Complaint and ignore the review standards for a motion to dismiss.

The Complaint pleads with particularity Ray's fraudulent acts and misrepresentations and significant involvement in the actions of a "Control Group" that engaged in a fraudulent scheme that generated millions of dollars in profit through the accumulation and sale of unregistered shares of Enzolytics.  Though he tried to conceal it by acting through the entity Camelot Nevada Trust and under "consulting agreements," Ray was an affiliate of Enzolytics and he, along with the entities he controlled, including Camelot Nevada Trust, and with others, controlled Enzolytics' actions and statements.  An affiliate "directly, or indirectly through one or more intermediaries, controls or is controlled by, or is under common control with" an issuer.  17 C.F.R. § 230.405.  "Control" is the "possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." *Id.*

Throughout this scheme, executed with the Apolant-Dilluvio Defendants and Defendant Harry Zhabilov (collectively, "the Control Group,") Camelot and Ray, among other things, obtained large quantities of Enzolytics shares for Ray's "consulting" work, made misrepresentations about Ray and Camelot's affiliate status in order to obtain Enzolytics shares for the Control Group, and received a so-called "commission" for facilitating Dannie Zhabilov's

---

[1] In opposing both Camelot and Ray's motions, the Commission addresses the arguments made both separately and jointly, but as to Ray, certain of his arguments are not addressed because they are untethered to the Complaint (*e.g.*, citations to cases on extraterritorial application of federal securities laws and arguments about the PSLRA).

sale of Enzolytics shares to the investing public through complex, multilayered transactions, including with Jonathan Farber ("Farber") and Wexford Industries, Ltd. ("Wexford"). Defendants Camelot and Ray thus violated Section 17(a) of the Securities Act of 1933 ("Securities Act"), Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 thereunder, and Sections 5(a) and (c) of the Securities Act, and generated ill-gotten gains for Defendants and Relief Defendants.  Accordingly, the Court should deny their motions.

## STANDARD OF REVIEW

When considering a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), a court must accept all well-pleaded factual allegations as true and draw all reasonable inferences for the plaintiff.  *SEC v. Apuzzo*, 689 F.3d 204, 207 (2d Cir. 2012); *SEC v. Wyly*, 788 F. Supp. 2d 92, 101 (S.D.N.Y. 2011).  A motion to dismiss should be granted only if the complaint does not articulate "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also Ashcroft v. Iqbal*, 556 U.S. 662 (2009).  "Consideration is limited to the facts alleged in the complaint and any documents attached to the complaint or incorporated by reference."  *Rombach v. Chang*, 355 F.3d 164, 169 (2d Cir. 2004).  That said, when considering dismissal for improper venue under Rule 12(b)(3), the Court can consider facts and documents outside the four corners of the complaint.  *See Gulf Ins. v. Glasbrenner*, 417 F.3d 353, 355 (2d Cir. 2005).  Further, courts must accept as true all factual allegations in the complaint and draw all reasonable inferences in plaintiff's favor.  *Kassner v. 2nd Ave. Delicatessen, Inc.*, 496 F.3d 229, 237 (2d Cir. 2007). Federal Rule of Civil Procedure 9(b) requires that allegations of fraud "must state with particularity the circumstances constituting fraud," but the rule allows that "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally."

## FACTUAL BACKGROUND

The Commission's complaint alleges that from in or about 2017 through 2022, Defendant Ray, a then-resident of Marietta, Georgia, was part of a control group engaged in a scheme to defraud investors to profit from accumulating Enzolytics stock while concealing its control of the company and the stock, and that Ray made misrepresentations and omissions in connection with that scheme. *See, e.g.*, Compl. ¶¶1-3, 5, 10-11. At various times throughout the scheme, Ray operated under the auspices of Defendant Camelot Nevada Trust[2] (which purportedly had a consulting agreement with Enzolytics) in order to obtain unrestricted shares of Enzolytics despite his integral role with the company, which made him an affiliate of Enzolytics. *See id*. ¶¶1-3, 5, 10-11, 22, 38, 49, 61-85, 98-102.

The Commission's allegations against Ray and Camelot center on their involvement in a thinly traded Delaware public company called Enzolytics, Inc. Defendant Harry Zhabilov was President, CEO, and sole board member of Enzolytics until late 2020, when he became Chief Science Officer. Compl. ¶¶16, 58, 87, 89. Enzolytics was a development stage company, *i.e.*, a pre-revenue, early-stage company, and was quoted and traded on OTC Link whose parent company is OTC Markets Group Inc. ("OTC Link"). *Id*. ¶28.

In May 2014, the Commission sued Ray and others, alleging that they violated the antifraud provisions of the securities laws. *See* Compl. ¶17. In September 2014, Ray settled the Commission's claims. *See* Exhibit A to the Declaration of Rua M. Kelly ("Kelly Decl.") (final judgment in *SEC v. Ray et al*., 14-cv-61195 (S.D. Fl., Sept. 3, 2014)). Under the settlement, Ray was permanently barred from participating in an offering of penny stock,[3] as well as from acting

---

[2] Defendant Camelot Nevada Trust had a predecessor called Camelot Financial Group LLC, which also entered into a consulting agreement with Enzolytics, and which was also controlled at all times by Defendant Ray. The complaint alleges that Camelot Financial Group, LLC never existed as a corporate entity. *See* Compl. ¶70.

[3] As the Complaint alleges, Enzolytics "was a penny stock" at all times relevant to the Complaint. *Id*. ¶35.

as an officer or director of certain companies that issued shares of stock.  Compl., p. 3.

In July 2014, shortly after he was sued by the SEC, Ray entered into a one-year contract with Enzolytics, through which he was supposed to provide "business development and general business consulting services" in exchange for payment of $8,500 and 2 million shares of Enzolytics.  *Id.* ¶¶69, 71.  The contract was not in Ray's actual name, but in the name of "Camelot Financial Group, LLC" ("Camelot Contract").  *Id.*  By the fall of 2014, Ray was working with Zhabilov to obtain funding for Enzolytics.  *See id.* ¶¶28, 61.  But while Ray continued working closely with Enzolytics for several years in exchange for some amount of compensation ranging from $5,500 to $7,000 per month, the Camelot Contract had lapsed by February 2015, and there does not appear to have been a contract covering Ray's services to Enzolytics between February 2015 and July 2017.  *See id.* ¶72.

Ray functioned as the de facto Chief Financial Officer of Enzolytics, including functions such as liaising with the accountant and soliciting funding.  *See id.* ¶49.  Ray also drafted and edited OTC Link filings for Enzolytics.  *See id.* ¶28.  Along with Zhabilov, Dilluvio, and Apolant, Ray controlled day-to-day operations and strategic decision making at Enzolytics.  *Id.* ¶46.  Ray also had an especially close relationship with Dilluvio and recommended to Zhabilov that he engage Dilluvio as a project manager for Enzolytics.  *Id.* ¶50.  Ray also took part in the execution of the consulting agreements between Enzolytics and Defendants Seacor and Sky-Direct (controlled by Dilluvio and Apolant), believing that in exchange for signing those agreements, Apolant and Dilluvio would provide Enzolytics with funding.  *Id.* ¶103.  Apolant and Dilluvio's entities paid Ray about $25,000 from February 2017 to June 2018.  *Id.* ¶51.  And, Dilluvio, Ray, and Zhabilov were in frequent communication about key topics concerning Enzolytics, such as potential mergers, whether to make certain filings, communications with

4

corporate counsel, liability faced by the company, and more. *Id.* ¶53.

Despite the end of the Camelot Contract in early 2015, Ray continued to play an integral role at Enzolytics through the fall of 2017, when he and Zhabilov began negotiations with Apolant and Dilluvio regarding the purchase of debt that Enzolytics purportedly owed to the Camelot entity, which was now called the "Camelot Nevada Trust." *Id.* ¶64. (The Complaint incorrectly described Camelot Nevada Trust as a "sole proprietorship operating in Georgia," (*id.*, ¶22) when it is a business trust, as discussed below, but correctly alleged that the Trust was controlled by Defendant Ray.) These negotiations ultimately led to the execution of a 2018 claim purchase agreement[4] ("Claim Purchase Agreement") between Camelot and a third party ("Entity A") through which Entity A bought the $525,000 debt owed by Enzolytics to Camelot for $100,000. *Id.* ¶¶66-68. Although the transaction on its face seemed to make little economic sense – since Camelot sold the debt for pennies on the dollar – Ray authorized the signing of the Claim Purchase Agreement on behalf of Camelot. Entity A then successfully obtained court approval for Enzolytics to issue unrestricted shares of stock to Entity A as payment for debt that Ray sold via Camelot through the Section 3(a)(10) exemption of the Securities Act of 1933. *Id.* Through this exemption, a third-party investor (upon court approval at a "fairness hearing") can buy outstanding debts of a company from creditors in exchange for unregistered shares of stock. *See* Securities Act of 1933 §3(a)(10), 15 U.S.C. §77c(a)(10)(2012).

While Ray authorized "Camelot" to execute the Claim Purchase Agreement, the entity was now dubbed "Camelot Nevada Trust," not "Camelot Financial Group, LLC." *See id.* ¶68;

---

[4] The Claim Purchase Agreement (Kelly Decl., Ex. B) was filed in the Section 3(a)(10) proceeding in the District of Maryland and attaches invoices submitted by Camelot to Enzolytics for Ray's "consulting" services and a trust agreement for Camelot. The invoices make plain that Defendant Camelot Nevada Trust was controlled by, and a vehicle for payment to, Ray. For example, the April 1, 2018 invoice is from Camelot "for services in accordance with consulting agreement" from Enzolytics in either cash or shares. *See id.* at 31. But the invoice instructs Enzolytics to "make cash payments to Camelot Nevada Trust at the above address, if stock option is elected, ***please deliver shares to 3597 B[redacted] Ct. Marietta, GA 30062 Attn. B. Ray***." *Id.* (***emphasis added***)

*see also* Kelly Decl., Ex. B (showing invoices to Enzolytics from "Camelot Nevada Trust" and "Camelot Financial Group, LLC"). More critically, the Claim Purchase Agreement – which was the linchpin for the Section 3(a)(10) process through which the Control Group obtained millions of unrestricted shares in Enzolytics – included multiple false representations by Camelot Nevada Trust. *Id.* ¶75. Those misstatements included:

> • "Within the past ninety (90) days, [Camelot] has not been directly or indirectly through one or more intermediaries in control, controlled by, or under common control with, [Enzolytics] and is not an affiliate of Enzolytics as defined under Rule 144."
>
> • "[Camelot] has no present intention to utilize any of the proceeds to be received from [Entity A] to directly or indirectly, provide any consideration to or invest in any manner in [Enzolytics] or any affiliate of [Enzolytics]."
>
> • "[Camelot] will not, directly or indirectly, receive any consideration from or be compensated in any manner by [Enzolytics], or any affiliate of [Enzolytics], in exchange for or in consideration for selling the [Debt]."

These representations were false because Camelot Nevada Trust was an affiliate of Enzolytics, controlled at all relevant times by Ray, who was a de facto officer performing "consulting" services to Enzolytics as "Camelot" and was thus an affiliate receiving proceeds from the Claims Purchase Agreement, in violation of the agreement's plain terms. *See id.* ¶¶17, 49; *see also* Kelly Decl., Ex. B.

As alleged in the Complaint, Ray's involvement with Enzolytics continued for several years. In early 2021, both Ray and Camelot helped Dannie Zhabilov in selling unrestricted shares in Enzolytics. *Id.* ¶98. This was not a charitable endeavor; Ray (along with Dilluvio) connected Dannie Zhabilov with Defendant Farber, and after Farber (through Wexford) sold shares on her behalf, Camelot received one million shares as a "commission" for serving as a "consultant and financial advisor" to Dannie Zhabilov. *Id.* ¶98. After Dannie Zhabilov had generated about $7 million from selling Enzolytics shares, she overpaid her taxes and the refund

of \$726,372 was sent to Camelot. *Id.* ¶¶101-02.

## ARGUMENT

### I.    SCHEME LIABILITY

Securities Act Section 17(a)(1) prohibits a person from "employ[ing] any device, scheme, or artifice to defraud," and Section 17(a)(3) of the Securities Act prohibits "engag[ing] in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser." 15 U.S.C. § 77q(a)(1), (a)(3). Exchange Act Section 10(b) and Rule 10b-5(a) and (c) thereunder similarly make it unlawful for any person "in connection with the purchase or sale of any security," 15 U.S.C. § 78j(b), to "employ any device, scheme, or artifice to defraud," or to "engage in any act, practice, or course of business which operates or would operate as a fraud or deceit." 17 C.F.R. § 240.10b-5(a), (c). Taken together, these statutes and rules "create what courts have called 'scheme liability' for those who, with scienter, engage in deceitful conduct." *SEC v. Sason*, 433 F. Supp. 3d 496, 508 (S.D.N.Y. 2020) (internal citations omitted). To prove liability, the Commission must show "that defendants: (1) committed a deceptive or manipulative act; (2) in furtherance of the alleged scheme to defraud; (3) with scienter." *SEC v. Collector's Coffee, Inc.*, 697 F. Supp. 3d 138, 157 (S.D.N.Y. 2023) (internal citations omitted); *see also SEC v. Rio Tinto plc*, 41 F.4th 47, 49 (2d Cir. 2022) (actionable scheme liability claim requires conduct beyond misstatements and omissions, such as dissemination of misstatements).

Camelot asserts that it is not liable because the Complaint does not allege a deceptive act by Camelot. (Memo. at 14.) But Camelot fails to acknowledge one critical fact alleged in the Complaint: Ray controlled Camelot and Ray took his actions through Camelot. *See* Compl. ¶¶17, 22. Camelot also argues that it is not liable for the alleged scheme, because the "documentary record… severs Camelot from the scheme" and that Camelot's role was limited to

the sale of a so-called "receivable" in 2018.  (Memo. at 7.)  Putting to one side that a motion to dismiss concerns the Complaint itself – not the "documentary record" – Camelot's argument ignores vast swaths of the Complaint that allege Camelot's participation in a scheme to defraud, including the sale of debt, brokering the sale of unregistered shares obtained through deceptive means, and concealing Ray's involvement in Enzolytics using Defendant Camelot.  *See, e.g.*, Compl. ¶1 (Defendant Camelot Nevada Trust engaged in scheme with the Control Group to profit from stock sales); ¶2 (Ray "purportedly consulted for the company through Camelot"); ¶5 (Camelot received $726,000 in proceeds from sale of unregistered shares); ¶17 (Ray controlled Camelot); ¶22 (Camelot debt sold to generate unrestricted shares that the control group could sell); ¶38 (Ray sold debt allegedly owed to Camelot to Dilluvio and an associate of Apolant); ¶65 (Zhabilov and Ray confirmed in email that proceeds from Camelot debt sale would be used to fund Enzolytics); ¶68 (Ray authorized signing of claim purchase agreement on behalf of Camelot); ¶75 (Camelot, with Ray's authorization, made false representations in claims purchase agreement); ¶98 (Camelot retained by Dannie Zhabilov as "consultant and financial advisor" in exchange for one million unrestricted Enzolytics shares for helping to broker the sale of Dannie Zhabilov's shares).  In short, the Complaint alleges a variety of deceptive actions and misstatements by Camelot, and certainly by Ray himself, who controlled Camelot.  The Court should thus reject Camelot's argument that the Complaint does not adequately allege scheme liability, which rests on an overly cramped view of the Complaint that ignores Ray.

Camelot and Ray also argue that the Complaint does not sufficiently allege their scienter. Scienter is a fact-specific inquiry, and courts are typically hesitant to grant a motion to dismiss on scienter grounds because intent is a classic issue for the factfinder.[5]  *See*, *e.g.*, *SEC v. One or*

---

[5] Throughout the Complaint, the Commission alleges Defendants Ray and Camelot's states of mind in the alternative because certain claims require a lesser state of mind than scienter to establish a violation.  For

*More Unknown Traders in Sec. of Onyx Pharm., Inc*., 2014 WL 5026153, at *4 (S.D.N.Y. Sept. 29, 2014) ("a complaint subject to Rule 9(b) should be allowed to survive a motion to dismiss based on 'fairly tenuous inferences' of intent, because intent is a fact that a jury should find.") (citations and quotation omitted).  To be adequate, the allegations must "give rise to a strong inference of fraudulent intent." *Novak v. Kasaks,* 216 F.3d 300, 307 (2d Cir. 2000).   A plaintiff can establish this intent "'either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness.'"  *Acito v. IMCERA Grp., Inc.,* 47 F.3d 47, 52 (2d Cir. 1995) (quoting *Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1128 (2d Cir. 1994)).

The Complaint amply pleads motive and opportunity to commit fraud by Ray and Camelot.  The very first paragraph of the Complaint alleges that Ray, Camelot, and others "engaged in a fraudulent scheme to profit from accumulating Enzolytics stock while concealing their control of the company and the stock, then selling that stock to retail investors."  Compl. ¶1 (noting that the scheme generated "about $92 million" in illicit profits).  And, as described above, the Complaint details many deliberate acts taken by Ray and Camelot in furtherance of this fraudulent scheme.  The Complaint also meets the alternative prong for demonstrating scienter:  strong circumstantial evidence of conscious misbehavior or recklessness.  *See ECA v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009).  The Complaint provides detailed factual allegations that constitute strong circumstantial and direct evidence of Camelot and Ray's conscious misbehavior or recklessness.  *See*, *e.g.*, Compl. ¶75 (Ray authorized the execution of Claim Purchase Agreement, which included false representations made by Camelot).

Defendants Ray and Camelot fail to establish any deficiency in the Commission's scheme

---

simplicity's sake, the Commission will refer to Defendants' knowing or intentional misconduct, but that conduct also constitutes the negligence required to establish violations of Section 17(a)(2) and (a)(3) of the Securities Act.

allegations under either Section 10(b) or Section 17(a), and their motion on these charges should thus be denied.  As shown in the next section, their argument on the Commission's additional theory of liability—misrepresentations—fares no better.

## II.    MISREPRESENTATION LIABILITY

The Commission alleges that Defendants Ray and Camelot violated Section 10(b) and Rule 10b-5(b) by making misrepresentations and fraudulent omissions.  Compl., ¶¶ 135-138 (First Claim for Relief).  To do so, the Commission must allege that a defendant (1) made a material misstatement or omission, (2) with scienter, and (3) in connection with the purchase or sale of securities.  *See SEC v. Sourlis*, 851 F.3d 139, 144 (2d Cir. 2016).  The Commission further alleges [Compl., ¶¶ 139-42 (Second Claim for Relief)] that Camelot and Ray intentionally or negligently made misrepresentations in violation of Section 17(a)(2) of the Securities Act, because they obtained money or property through an untrue statement of a material fact or any omission to state a material fact necessary to make the statements made, in light of the circumstances under which they were made, not misleading.  *See SEC v. Ginder*, 752 F.3d 569, 574 (2d Cir. 2014); *SEC v. Wey*, 246 F. Supp. 3d 894, 913 (S.D.N.Y. 2017) (same allegations that support claims under Section 10(b) can also support claims under Section 17(a)(2), which only requires negligent conduct).

To comport with Fed. R. Civ. P. 9(b), the Second Circuit requires that the plaintiff "(1) detail the statements (or omissions) that … are fraudulent, (2) identify the speaker, (3) state where and when the statements (or omissions) were made, and (4) explain why the statements (or omissions) are fraudulent."  *Loreley Financing (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 171 (2d Cir. 2017) (quoting *Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co. of N.Y.*, 375 F.3d 168, 187 (2d Cir. 2004)).

The Commission could not have been more explicit about Camelot's misstatements.  The

Complaint has a section entitled "Zhabilov and Ray Made Multiple Misrepresentations in Debt Sale Transaction." Compl., p. 16. While the topic heading does not use the name "Camelot," the next paragraphs explicitly discuss misrepresentations Ray made through Camelot. Indeed, the debt sale transaction was for debt purportedly owed to Camelot, which was just a vehicle for Ray to receive "consulting" payments from Enzolytics (concealing his involvement in a publicly-traded company and his status as an affiliate). *Id.* ¶¶22, 61-65. Paragraph 75 of the Complaint alleges that "the following false representations [were] made by Camelot" and then lists six separate bullet points of misrepresentations.

Camelot also asserts that it cannot be liable for misstatements made by Ray – whom it refers to in the third person as a "Georgia consultant" (Memo. at 7) – and theorizes that Camelot is not a "maker" with "ultimate authority" over the statement under *Janus Cap. Grp., Inc. v. First Derivative Traders,* 564 U.S. 135 (2011). But this argument also fails. Ray controlled Camelot because Ray's actions and his statements, made with scienter or negligence, are attributable to Camelot. *See Teamsters Loc. 445 Freight v. Dynex Cap.*, 531 F.3d 190, 195 (2d Cir. 2008) (scienter of corporation's agent imputed to corporation). Indeed, Camelot seems to concede this point, perhaps mistakenly believing that the Trustee's state of mind is relevant: "Testimony confirms that the Camelot Trustee's role was purely clerical – limited to formatting and accounting support – while Billy [Ray] did the actual work." (Memo. at 7.) Well, yes. The Complaint alleges that Camelot was controlled by Ray, and in his capacity as "consultant"/de facto CFO for Enzolytics, Ray made misstatements both individually and through Camelot. Both Defendants are thus "makers" under *Janus*, and liable for the alleged misstatements. Later, in discovery, Camelot gets the chance to seek evidence to prove that it was not, in fact, controlled by Ray, but for now the Commission has pled with particularity specific

misstatements by both Ray and Camelot in alleging violations of Section 17(a)(2) and Section 10(b) and Rule 10-b5(b) thereunder.

Camelot also contends that the Complaint does not allege that Camelot "ever obtained investor funds or property by means of a misstatement." Memo., p. 10. Not so. Through Camelot and Ray's misrepresentations detailed above, they obtained money (their sale profits) and property (unrestricted Enzolytics shares). *Id.*, *e.g.*, ¶2 ("… Ray (who purportedly consulted for the company through Camelot) made a series of misrepresentations to transfer agents, attorneys, and the public in the course of selling Enzolytics shares" and stating that the sales resulted in $100,000 shared between Ray and Zhabilov); ¶3 ("The Control Group obtained unrestricted Enzolytics shares it could sell to the public …. The Control Group then used a series of misrepresentations … to convert the debt … into unrestricted shares they could, and did, sell"); ¶5 (Ray and Camelot received money for fraudulent Dannie Zhabilov shares sale); ¶¶61-85 (Camelot and Ray made multiple misrepresentations in debt sale transaction and received money as a result); and ¶¶ 103-115, 128, 130 (Ray and Camelot paid so-called "commission" from proceeds of stock sales obtained through misrepresentations by Dannie Zhabilov).

Camelot also gets the law wrong. There is no requirement—and Camelot cites no authority for its contention—that the money or property received must come from "investor funds or property." And it ignores the statutory language "directly *or indirectly* … obtain money or property by means of any untrue statement." 15 U.S.C. § 77q(a)(2) (emphasis added). Memo., p. 10. *See SEC v. Wolfson*, 539 F.3d 1249, 1264 (10th Cir. 2008) ("obtaining money" element satisfied when defendant received fee for preparing fraudulent offering documents); *SEC v. Tourre*, 2013 WL 2407172, at *11 (S.D.N.Y. June 4, 2013) ("defendants need not personally offer or sell securities to be liable under" Section 17(a)(2)); *SEC v. Syron*, 934 F.

Supp. 2d 609, 639-40 (S.D.N.Y. 2013) ("The statute clearly creates liability where a defendant 'indirectly' obtains money or property, and several cases have recognized liability where a defendant was the final link in a chain of possession of the proceeds of the fraud").[6] In addition, Camelot improperly attempts to use out-of-context transcript excerpts to try to make its point, which the Court should reject. Memo., p. 11.[7] *See SEC v. Fiore*, 416 F. Supp. 3d 306, 330 (S.D.N.Y. 2019) (denying motion to dismiss where the "defense would require the Court to consider facts outside the complaint").

## III.   THE COMMISSION NEED NOT ESTABLISH CONTROL IN THE COMPLAINT, BUT DOES ANYWAY

Camelot then pivots to argue that the Complaint does not allege facts sufficient to establish Camelot's affiliate status or control of Enzolytics. Determining whether a person or group exercises sufficient control to be an affiliate is "a question of fact which depends upon the totality of the circumstances including an appraisal of the influence upon management and policies of a corporation by the person" or group involved. *United States v. Corr*, 543 F.2d 1042, 1050 (2d Cir. 1976) (citing *SEC v. Am. Beryllium & Oil Corp.*, 303 F. Supp. 912, 915 (S.D.N.Y. 1969)); *see also SEC v. Kern*, 425 F.3d 143, 149 (2d Cir. 2005); *SEC v. Platforms Wireless Intern. Corp.*, 617 F.3d 1072, 1087 (9th Cir. 2010) (control is a fact-intensive inquiry "to be determined from the particular circumstances of the case."). That "totality of the circumstances" determination cannot be made at the outset of litigation, before fact discovery.

That said, the Complaint amply alleges that Camelot and Ray exercised control over

---

[6] Camelot also incorrectly explains the law about whether the defendant *itself* must obtain the money or property from the misrepresentations. There is a split in this District as to whether that is the case. *See SEC v. MiMedx Grp., Inc.*, 2022 WL 902784, at *10 (S.D.N.Y. Mar. 28, 2022) (discussing district split and finding sufficient that defendant obtained money or property for employer when acting as its agent).

[7] Camelot also argues that the Complaint does not adequately plead aiding and abetting. Memo., pp. 11-14. The Complaint does not charge Camelot with aiding and abetting. Compl., ¶¶135-146 (alleging Ray and Camelot engaged in *direct* violations). The Commission need not meet the pleading standards for claims it hasn't alleged.

Enzolytics and acted as part of a "control group."  Control can be shown through "[a]ctive participation in and influence over the management and policies" of Enzolytics, including in concert with Defendant Harry Zhabilov, making them "'person[s] that directly, or indirectly through intermediaries, control[led] … [the] issuer.'"  *SEC v. Verdiramo*, 890 F. Supp. 2d 257, 270 (S.D.N.Y. 2011) (quoting Rule 144, 17 C.F.R. § 230.144(a)(1)).  The "test for control is sometimes framed as a question of fact in each case whether that person has enough influence within the group to be able to obtain the issuer's signature on a registration statement."  *SEC v. Longfin*, 316 F. Supp. 3d 743, 759 (S.D.N.Y. 2018) (internal quotation omitted).  It "is not necessary that one be an officer, director, manager, or even shareholder to be a controlling person.  Further, control may exist although not continuously and actively exercised."  *Pennaluna & Co. v. SEC*, 410 F.2d 861, 866 (9th Cir. 1969) (discussing SEC Rule 405, which contains the same definition as Rule 144 and defines "control").

The Complaint amply alleges control of Enzolytics by Ray and Camelot, both individually and together with the Control Group.  *See, e.g.*, Compl. ¶1 (alleging the existence of the group, its control of Enzolytics, and the group's involvement in a fraudulent scheme); ¶3 (the control group obtained shares by arranging for Enzolytics to enter into sham consulting agreements and using misrepresentations about their affiliate status to obtain shares); ¶17 (Ray controlled Camelot, which he used to do business with and about Enzolytics); ¶22 ("Debt owed to Camelot by Enzolytics was sold to generate unrestricted shares that the Control Group could sell"); ¶28 (Ray drafted and edited Enzolytics company filings and obtained financing for the company); ¶37 (Ray, with Harry Zhabilov, "had historically been the decision makers for Enzolytics"); ¶38 (Ray and Zhabilov share profits of sale of Enzolytics debt); ¶¶39, 44 (control group's concealment of control); ¶42 (Ray shares in profits from stock sale resulting from sham

consulting agreement); ¶43 (Ray shares in profits distributed to Control Group from stock sale by Wexford); ¶46 (Defendants, including Ray, "controlled both the day-to-day operations of the company and strategic decision making"); ¶48 (Camelot was an Enzolytics affiliate because it was controlled by Enzolytics affiliates); ¶50 (other Control Group members communicated with Ray about Enzolytics matters and Ray arranged for Dilluvio to be engaged supposedly as a "project manager"); ¶53 (Ray's involvement with Enzolytics business including mergers and other corporate transactions and company filings); ¶58 (Dilluvio and Apolant signed off on merger target); ¶59 (Defendants were affiliates because of the large amount and large percentage of free-trading stock they held; including 30 percent of the free-trading stock[8] held by Apolant and Dilluvio alone); ¶60 (Defendants "used their influence over Enzolytics to obtain a large number of shares"); ¶¶61-85 (detailing part of fraudulent scheme conducted by Ray, Camelot, and Zhabilov using misrepresentations in an Enzolytics debt sale transaction, in which Ray, Camelot, and Zhabilov collectively represent and control Enzolytics actions); ¶¶69-71 (Ray used non-existent "Camelot Financial Group" to contract with Enzolytics for his management services); ¶¶ 86, 98, 102 (Ray and Zhabilov use Dannie Zhabilov to circumvent stock sale limitations and share in sale proceeds); ¶¶103, 106, 108 (Ray arranged for shares for Apolant and Dilluvio through consulting agreements giving them Enzolytics shares in exchange for them providing funding for the company); ¶¶110,115 (Ray drafting disclosures for Enzolytics, and communicating about their content with Dilluvio); ¶¶133-34 (defendants, including Ray, were affiliates based on their "roles in the management, funding, and operations of the company, and their control of the Enzolytics stock float.").

---

[8] *See SEC v. Longfin*, 316 F. Supp. 3d 743, 759 (S.D.N.Y. 2018) (using control of large portion of the public "float" (the free-trading shares) and the resulting "influence on and domination of the market for Longfin shares" as a factor in finding defendant was an affiliate).

Taken together, these allegations show individual and collective "participation in and influence over the management and policies" of Enzolytics by Ray and Camelot. *See Verdiramo*, 890 F. Supp. 2d at 270. In short, the Complaint makes plain that Ray and Camelot worked hand-in-glove with Enzolytics management, and particularly Zhabilov, for years, making them affiliates of the company under the federal securities laws. *See* 17 C.F.R. § 230.405.

In addition, the fraudulent scheme alleged in the Complaint does not require the Commission to show that Ray or Camelot *themselves* met the Securities Act Section 5-related control standards. The Complaint alleges that they were working in close coordination with the other members of the Control Group. While "group" is not defined in Section 5, the rules promulgated under Securities Act Section 13 (requiring disclosure by an individual or group owning more than 5% of an issuer's securities) provides one. A group exists "[w]hen two or more persons agree to act together for the purpose of acquiring, holding, voting, or disposing of equity securities of an issuer[.]" 17 C.F.R. § 240.13d-5(b)(1). The definition of "group" is broad; it includes any members who have "combined in furtherance of a common objective." *Wellman v. Dickinson*, 682 F.2d 355, 363 (2d Cir. 1982). So for Ray and Camelot to be considered affiliates, it is not necessary that they themselves exercised control. The Commission need only plead that they worked as part of a "group" that collectively exerted control over Enzolytics. The Complaint makes those allegations (*e.g.*, ¶¶ 1, 39, 55, 133). And, as detailed above, the Complaint establishes the control of the Control Group.

## IV.    THIS COURT HAS PERSONAL JURISDICTION OVER RAY AND CAMELOT

Defendant Camelot is wrong that the Commission's Complaint failed to establish specific personal jurisdiction over it. Defendant Camelot asserts that personal jurisdiction is lacking because (a) the Complaint describes Camelot Nevada Trust as a "sole proprietorship in Georgia" rather than a Nevada spendthrift trust; (b) the Complaint fails to allege that Camelot violated the

federal securities laws, because the only "security" was a "$100,000 commercial receivable" sold by Camelot; and, (c) the Complaint insufficiently alleges conduct directed at the Southern District of New York.[9]   Memo. at 1.  Camelot also intersperses arguments about service of process, which are misplaced when there is no dispute that Camelot was served with the summons and complaint (*see* ECF No. 65 (Dec. 21, 2024 return of service to agent of Camelot Nevada Trust)) and where the Commission has nationwide service of process.  Camelot and Ray's arguments are wrong as a matter of law and Camelot's 12(b)(2) motion should be denied.

To begin with, Camelot fails to mention or analyze the applicable standard for the exercise of personal jurisdiction in cases involving violations of the federal securities laws. "[T]he Securities Exchange Act permits the exercise of personal jurisdiction to the limit of the Due Process Clause of the Fifth Amendment."  *SEC v. Unifund SAL*, 910 F.2d 1028, 1033 (2d Cir. 1990).  The Due Process Clause of the Fifth Amendment "has two related components: the 'minimum contacts inquiry' and the 'reasonableness' inquiry."  *Metro. Life Ins. v. Robertson-Ceco Corp.*, 84 F.3d 560, 567 (2d Cir. 1996).  When the Commission alleges violations of the federal securities laws, "'the minimum-contacts test ... **looks to contacts with the entire United States rather than with the forum state**.'"  *SEC v. Straub*, 921 F. Supp. 2d 244, 253 (S.D.N.Y. 2013) (citation omitted)(emphasis added); *see SEC v. Sharef*, 924 F. Supp. 2d 539, 544 (S.D.N.Y. 2013) ("A nonresident defendant sued under the Exchange Act need not have minimum contacts with the state seeking to exercise personal jurisdiction; rather the only contacts required are with the United States as a whole.").

This Court need go no further.  Defendant Camelot is a domestic entity subject to the

---

[9] Confusingly, Camelot tries to argue that "impermissible group pleading" defeats specific personal jurisdiction as to Camelot.  Memo., p. 3.  As discussed above, the Complaint is filled with allegations that are specific and detailed to Ray and Camelot and, taken in the light most favorable to the Commission, sufficiently allege that Ray and Camelot engaged in a scheme to defraud and made actionable misrepresentations, in violation of the federal securities laws.

jurisdiction of the federal courts in a securities enforcement action brought by the Commission.

And Camelot fails to cite to any cases in the Second Circuit that say otherwise. While there are

cases in this District that consider whether personal jurisdiction "may be defeated" if there is a

"compelling case that … other considerations would render jurisdiction unreasonable[,]" *see,*

*e.g.*, *Straub*, 921 F. Supp. 2d at 258 (*citing Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477

(1985)), such cases uniformly involve *foreign* defendants, for whom the burden of appearing in

U.S. courts could be "severe" or "gravely difficult." *Id.* at 259.

      While Camelot is wrong about personal jurisdiction, and while there should be no dispute

that Camelot Nevada Trust is properly named and is a real party in interest under FRCP 17(b),

Camelot is right that the description of its legal status in the Complaint is inaccurate. *See* Compl.

¶22. That does not divest the Court of personal jurisdiction over Camelot, nor does it warrant

dismissal of the case with prejudice.[10] Nor does Camelot provide any authority suggesting that

dismissal with prejudice is warranted, other than an unpublished opinion (*Atuahene v. City of*

*Hartford*, 10 Fed. Appx. 33 (S.D.N.Y. May 31, 2001)) that Camelot cites for the proposition that

"legal entities cannot be conflated for personal jurisdiction." (Memo. at 2). But *Atuahene* was

not a case about personal jurisdiction at all – the plaintiff had appealed the dismissal of his

complaint as vague and conclusory, and the judge rejected the appeal, because the complaint did

not give the defendants fair notice of the plaintiff's claim. *Id.* at *34. Importantly, the Second

Circuit affirmed the decision in part because the district court gave the plaintiff "several

opportunities to correct [the] manifest flaws" in the complaint before dismissing. *Id. See, e.g.*,

*Danuri Tex Co. v. Yoco Inc., et al.*, 19 Civ. 9187 (NRB), 2020 WL 4735190, at *1 (S.D.N.Y.

---

[10] As the Court is aware, Camelot was unrepresented until August 2025. The Commission has now had preliminary discussions with Camelot and will meet and confer on a technical amendment to the Complaint to correct the legal description of Camelot. *See generally Duling v. Gristede's Operating Corp.*, 265 F.R.D. 91, 95 (S.D.N.Y. 2010) (granting motion for leave to make technical amendments to complaint more than two years after original filing).

Aug. 14, 2020) (permitting unopposed motion to amend complaint to change corporate name of plaintiff as a "mere technicality").

Moreover, not only are Camelot's myriad arguments about service of process[11] and the applicability of the securities laws irrelevant to personal jurisdiction, they are also wrong. While Camelot suggests that it had no connection to the purchase and sale or offer and sale of securities, even a cursory reading of the Complaint shows that the Camelot allegations involve the offering and sale and purchase or sale of securities and go well beyond "the sale of a $100,000 commercial receivable" (Memo., p. 2). Among other things, the Complaint alleges that Ray consulted for Enzolytics through Camelot (Compl. ¶¶2, 9), that Camelot received $726,000 from the sale of Enzolytics shares from another defendant, Dannie Zhabilov (*Id.* ¶5), that debt owed to Camelot by Enzolytics was sold to generate unrestricted shares that the control group could sell, (*Id.* ¶22), that Ray sold debt purportedly owed to Camelot to Dilluvio and an associate of Apolant, (*Id.* ¶38), and that Camelot made false representations in connection with the Section 3(a)(10) process in the District of Maryland. (*Id.* ¶¶75-76 et seq).

As to the notion that the Complaint does not sufficiently allege "New York-directed conduct," (Memo. at 3) Camelot is simply conflating personal jurisdiction and venue, which is discussed below. *Cf., United States ex rel. Rudick v. Laird*, 412 F.2d 16, 20 (2d Cir. 1969) ("The concepts of personal jurisdiction and venue are closely related but nonetheless distinct.").

---

[11] While Camelot tries to argue that the Commission does not have nationwide service of process (it does), Camelot was served with the summons and complaint at the location listed as the Camelot business address in Camelot's correspondence. The Commission submits that this was valid service of process for a business trust under both New York and Texas (where Camelot is located) law. NY CPLR §311 (2023) (business corporations may be served by delivery of process to an "office, director, managing or general agent…"); *see also* NY CPLR §310 (2023) (partnership may be served by deliver to a partner); Tex. Bus. Org. Code §5.255 (2006) (designating as agents for service of process each partner of a general partnership, each manager of a limited liability company, and each governing person of an entity other than a corporation, limited liability company or partnership).

## V.    VENUE IS PROPER HERE

In moving to dismiss for improper venue, Camelot correctly notes that venue is governed by 28 U.S.C. § 1391.  Camelot fails, however, to explain the venue provisions in federal securities actions.  Under all applicable statutes, venue is proper in this District.

First, the case against both Camelot and Ray can be brought in the Southern District of New York under 28 U.S.C. § 1391(b):  civil actions may be brought in "a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated[.]"  Venue may be proper in "multiple judicial districts as long as 'a substantial part' of the underlying events took place in those districts[.]"  *Gulf Ins. v. Glasbrenner*, 417 F.3d 353, 356 (2d Cir. 2005).

Second, venue in this District is also proper under the federal securities laws.  For the Securities Act, there is venue "in the district where the offer or sale took place, if the defendant participated therein."  15 U.S.C. § 77v(a).  For the Exchange Act, venue is proper "in the district wherein any act or transaction constituting the violation occurred," 15 U.S.C. § 78aa, and – importantly – "any non-trivial act in the forum district which helps to accomplish a securities law violation is sufficient to establish venue."  *See SEC v. Rust*, 2017 WL 239381, at *1 (S.D.N.Y. Jan. 17, 2017) (internal citations omitted) (finding venue proper where defendants executed and cleared securities trades through broker-dealers in the district and made materially false and misleading statements to those broker-dealers).  The Exchange Act offers the broader standard and is designed to provide plaintiffs with broad access to the federal courts to adjudicate claims of securities fraud.  *Abeloff v. Barth*, 119 F.R.D. 315, 319 (D. Mass. 1988).

 "[A]cts such as a transfer agent merely mailing dividends from New York City, press releases being sent into a district, and making a phone call or mailing into a district have all been held sufficient to confer venue."  *Greenwood Partners v. New Frontier Media Inc.*, 2000 WL

278086, at *6 (S.D.N.Y. March 14, 2000).  "The act or transaction committed within the district need not constitute the core of the violation, but should be an important step in the scheme."  *Como v. Com. Oil Co.*, 607 F. Supp. 335, 341 (S.D.N.Y. 1985).  "Venue will be sustained in a securities case where a defendant causes false or misleading information to be transmitted into a judicial district, even if the defendant never has been physically present in that district."  *Oxford First Corp. v. PNC Liquidating Corp*, 372 F. Supp. 191, 197 (E.D. Pa. 1974) (citing *Mitchell v. Texas Gulf Sulphur Co.*, 446 F.2d 90, 106 (10th Cir. 1971).

Defendants allegedly engaged in a deceptive scheme and made misrepresentations to obtain unrestricted shares in a publicly-traded company.  Acts and transactions in furtherance of that scheme took place in the Southern District of New York.  The Complaint alleges that "several individuals residing in the Southern District of New York bought Enzolytics stock during the time when Defendants were selling their stock."  Compl. ¶15.  *See, e.g.*, *SEC v. Autochina Intern. Ltd.*, 2013 WL 265974, at *1 (D. Mass. Jan. 24, 2013) (venue proper in D. Mass. where Boston-based Fidelity was market-maker for company and Mass.-based investor was large shareholder).  Several defendants and relief defendants have addresses in the District, including Farber (¶21), Seacor Capital, Inc. (¶23), NY Farms Group, Inc. (¶26), and Equity Markets (¶27).  And Enzolytics traded on OTC Link (in New York), and Ray drafted and edited OTC Link filings (which consequently were filed in New York) (¶28).  *See generally SEC v. Contrarian Press*, LLC, 2017 WL 4351525, at *2 (S.D.N.Y. Sept. 29, 2017) (finding venue where "Manhattan-based OTC Bulletin Board and OTC Link were 'key instruments in the fraud,' and that investors in this District purchased … shares after the promotions.").

The Complaint's allegations suffice for venue.  Still, a cursory review of extrinsic evidence – which a Court may consider on a 12(b)(3) motion to dismiss for improper venue –

shows Defendant Camelot's argument must fail.  For example, the Trustee of the Camelot

Nevada Trust testified that Ray "had gone to New York with Harry [Zhabilov] on several

occasions because [an associate] had people that were going to finance the company [i.e.,

Enzolytics]."  *See* Kelly Decl., Ex. C (testimony excerpts), 150:5-8.  The Trustee also testified

that she paid for the trip, noting that she had to "pay for his hotel room on one of my credit cards

… we didn't have enough money to get him a cab to get to the meeting."  *Id*. at 150:8-12.  Harry

Zhabilov also testified that many of his meetings related to Enzolytics occurred in the Southern

District of New York:  the "first time [he] met with … Steve Apolant, with Charlie [Dilluvio] …

we went to New York to do the presentation in front of them."  *See* Kelly Decl., Ex. D

(testimony excerpts), 124:14-17.  Zhabilov referenced visiting Apolant's New York office and

when asked: "Do you remember … you said you went to New York.  Was it in… New York City

or outside of New York City," Zhabilov replied: "No, no, no.  Manhattan."  *Id*. at 160:12-17.

There is no real dispute that the Southern District of New York is an appropriate venue

here.  Defendants fail to meet their burden to show improper venue and, while they propose

"transfer" of the case, counsel is conspicuously silent about what other district would be the

appropriate venue for this complaint.  Nor do they mention that every other defendant believes

S.D.N.Y. is the proper venue.  This Court should deny their venue motion.[12]

## VI.    THE 2018 FAIRNESS HEARING DOES NOT CONTROL ANYTHING HERE

Camelot tries to characterize all of the Commission's allegations against it as a "collateral

attack on final judgments entered by the District of Maryland in a §3(a)(10) proceeding"—a

proceeding that finished in 2018.  Memo., p. 8; Compl, ¶80.  Camelot's assertion that "every

---

[12] While the Commission submits that Camelot has not met its burden to show improper venue, the Commission
reserves the right to submit evidence – including, but not limited to, emails between the Defendants and other parties
and bank records — should the Court deem it necessary to conduct an evidentiary hearing on this issue.

allegation against Camelot is 'inextricably intertwined' with re-litigating the Maryland judgment" (*Id.*) ignores most of the allegations against it. It ignores, for instance, the role Ray played for years, through Camelot, as de facto CFO of Enzolytics, and Ray and Camelot's actions and representations (including in 2019 through 2021) "for the next wave of transactions that would put large quantities of unrestricted stock in [the Control Group's] control." *E.g.*, Compl. ¶¶55, 57. It ignores Ray and Camelot's actions in 2020 through 2022 to accomplish the Dannie Zhabilov transactions and their sharing in the proceeds of those transactions. *Id.*, ¶¶86-102. It ignores their role in the sham consulting agreements with Apolant and Dilluvio and the series of notes created starting in September 2020. *Id.*, ¶¶103-15. And it ignores the culmination of Defendants' fraudulent scheme through stock sales by the Control Group from January 2021 to January 2022. *Id.*, ¶¶ 116-24.

But Camelot also misses the point of the allegations that touch on the Section 3(a)(10) proceeding. The Commission does not attack the final judgment in that "fairness" hearing—the Complaint does not say, for instance, that the Court's reasoning was wrong. It says that Camelot, Ray, and the other Defendants, made misrepresentations in documents they used (including used in the fairness hearing) to get millions of unrestricted Enzolytics shares into the hands of the Control Group. Compl., ¶75. The Commission does not seek to overturn or alter the Maryland court's findings. It seeks to hold Defendants responsible for frauds they committed, including in misrepresentations and fraudulent acts to obtain and sell the shares they received in relation to the Section 3(a)(10) proceeding.

The cases cited by Camelot do not support Camelot's argument. *Travelers Indem. Co. v. Bailey*, 557 U.S. 137 (2009); *Celotex Corp. v. Edwards*, 514 U.S. 300, 314 (1995); and *United Student Aid Funds, Inc. v. Espinosa*, 559 U.S. 260 (2010) are each about collateral attacks on a

bankruptcy court's orders in another court. Each holds that the challenge to that order must originate in the issuing court and proceed through the appellate process. The Commission here has not filed suit to challenge the Maryland court's findings or order—this case involves the determination of liability and remedies for the Defendants' fraudulent statements and actions. The Maryland fairness hearing was about whether it would be fair to shareholders to issue shares to extinguish a debt. The Commission does not seek to undo that court's order. It seeks to hold accountable the Defendants for their securities law violations. Nothing about the Commission's actions require a review of the Maryland court's order. In fact, the one case Camelot cites involving the Commission, *SEC v. Lefkowitz, et al.*, 2013 WL 12170295 (M.D. Fla. Sept. 17, 2013), involved misrepresentations in multiple Section 3(a)(10) proceedings that were filed in the state court in Florida. The Commission sued in federal court, the Middle District of Florida, and litigated there through the case's conclusion even though the Florida state court proceedings were "at the center of each of the … registration violations." *Id.* at *3. There is no basis for Camelot's assertion that this case must be transferred to Maryland just because Defendants' fraud involved, in part, a Section 3(a)(10) transaction that touched that court.

## VII.   DISGORGEMENT

Finally, Camelot claims the Commission must plead "Camelot-specific net profits or victim pecuniary loss traceable to Camelot," to obtain disgorgement.[13] But it cites no case requiring that specific disgorgement amounts for specific defendants be alleged in the

---

[13] Camelot cursorily cites two pages of testimony of Camelot's Trustee that appear to reference expenses she paid with funds from a third party. Nothing in this excerpt bears on disgorgement. Camelot's disjointed argument about "payments mapped to ordinary personal expenses" is premature as well. "Once the SEC has met the burden of establishing a reasonable approximation of the profits casually related to the fraud" in the remedies phase of the litigation, after a determination of liability, "the burden shifts to defendant to show that his gains were unaffected by his offenses." *SEC v. Razmilovic*, 738 F.3d 14, 31 (2d Cir. 2013); *see SEC v. Fowler*, 6 F.4th 255, 267 (2d Cir. 2021) (burden is on the defendant to identify legitimate business expenses that must be deducted from disgorgement). Finally, as mentioned above, on a Fed. R. Civ. P. 12(b)(6) motion Camelot may not resort to extrinsic evidence not referenced in the Complaint to try to disprove the Commission's claims.

Complaint.  Camelot is correct that the SEC must show that investors "suffered pecuniary loss" to obtain disgorgement under *Govil*.  But they are wrong about *when* the SEC must make such a showing.  Disgorgement is an equitable remedy to be decided *after* liability has been established, not a cause of action that must be pled.  *SEC v. Govil*, confirms this, as the parties there had already resolved the liability claims.  86 F.4th 89, 97-98 (2d Cir. 2023) (addressing standard to award disgorgement at the remedies phase).  Camelot is also wrong when it suggests that the Complaint does not allege Camelot-specific ill-gotten gains.  It does.  For instance, it states that "Farber … sold stock on behalf of Dannie (who was sharing profits with Zhabilov, Camelot, and Ray)…." (Compl., ¶128), that the proceeds of the sale were "transferred … back to the Control Group…." (*Id.*, ¶130), and that the Control Group sought a promoter "[t]o persuade enough retail investors to buy the hundreds of millions of shares of Enzolytics stock the Control Group intended to sell (and to do so without greatly depressing the stock price)" and explicitly states that it sought "to increase investor interest[.]" (*Id.*, ¶125.)

The parties should have the opportunity to evaluate and apply the facts here before seeking a ruling on the appropriate remedies for the alleged violation, including both equitable and monetary relief.  *See*, *e.g.*, *SEC v. Caledonian Bank Ltd.*, 145 F. Supp. 3d 290, 310 (S.D.N.Y. 2015) (denying pre-liability determination motion to preclude SEC from seeking disgorgement as "premature"); *SEC v. Wall St. Communications, Inc.*, 2009 WL 2579310, *3 (M.D. Fla. Aug. 19, 2009) (rejecting motion to dismiss arguments seeking to preclude remedies, including disgorgement, finding them "premature at this stage").  After discovery and a determination of liability, the parties will quantify that harm for purposes of relief.

**CONCLUSION**

For the reasons above, the Commission asks this Court to deny Defendants Camelot and

Ray's Motions to Dismiss.


Dated: September 16, 2025                    SECURITIES AND EXCHANGE COMMISSION

                                            */s/ Marc J. Jones*
                                            Marc J. Jones (*pro hac vice*)
                                            Rua M. Kelly (*pro hac vice*)
                                            33 Arch Street, 24th Floor
                                            Boston, MA 02110
                                            jonesmarc@sec.gov
                                            (617) 573-8900



**CERTIFICATE OF SERVICE**

I hereby certify that, on September 16, 2025, a true and correct copy of the foregoing
document was filed through the Court's CM/ECF system, and accordingly, the document will be
sent electronically to all participants registered to receive electronic notices in this case.

                                            */s/ Marc J. Jones*