# EXHIBIT B



EXHIBIT

3

8-03453  1-31-23

## CLAIM PURCHASE AGREEMENT

This Claim Purchase Agreement ("Agreement") is entered into effective as of the date of full execution ("Effective Date"), by and between Livingston Asset Management LLC ("Purchaser"), and the Creditor identified below ("Creditor"). Purchaser and Creditor (each, a "Party" and, together, the "Parties") agree as follows with respect to the outstanding debt owed to Creditor by the Company named below ("Company"):

Company Name:          Enzolytics, Inc.

Creditor Name:          Camelot Nevada Trust

Claim Amount:           $525,000.00

Purchase Price:          $100,000.00 payable $10,000.00 at execution and three $30,000.00 tranches on the periods ending thirty, sixty and ninety day following the entry and full effectuation of a court order approving the settlement of the claim.

Documentation of Claim (complete copies of all documentation attached): [X] Written contract(s)/ Promissory Notes attached as Exhibit A [X] Invoice(s) attached as Exhibit B

    1.    Purchase and Sale.    Purchaser hereby purchases from Creditor, and Creditor hereby sells, transfers, conveys and assigns to Purchaser, for the consideration set forth herein, all right, title and interest of Creditor in and to one or more claims of Creditor against Company described herein and attached hereto (the "Claim").  Creditor hereby sells, transfers and assigns all right, title and interest of Creditor in the Claim to Purchaser.

    2.    Settlement Approval. No later than the tenth (10th ) business day after the Effective Date, Purchaser shall file an action against Company in the United States District Court or state court of trial jurisdiction in the State of _Maryland_____ (the "Action") seeking payment of the Claim. Purchaser shall seek to resolve the Action on terms acceptable to Purchaser in its sole discretion and, by appropriate motion or other pleading, shall seek approval from the Court of such settlement.

    3.    Payment of Purchase Price. The Purchase Price will be paid to Creditor by Purchaser in up to three (3) monthly installments, the first installment to be made following entry and full effectuation of a Court order approving settlement of the Claim in form and substance acceptable to Purchaser ("Approval Date"), and subsequent installments to be made each calendar month thereafter until paid in full; *provided however,* that Purchaser shall not be obligated to pay any

1

portion of such Purchase Price in the event of a Default by the Company under any settlement agreement entered into between the Company and Purchaser in respect of the settlement of the Claim that is the subject of this Agreement, of if any settlement shares issued by Company pursuant to such settlement agreement cannot be cleared for sale by Purchaser for any reason whatsoever. If such event of default occurs and is not cured within the prescribed time period, the Purchaser shall cause to be transferred to Creditor any portion of the Claim not already paid for pursuant to this Section 3, and this Agreement shall be null and void, unless otherwise agreed by written agreement of the parties.

4.      Cooperation. Creditor will furnish Purchaser with all documentation and evidence supporting the Claim, and reasonably cooperate in providing any other information and taking any other action that Purchaser deems necessary or appropriate to prosecute the action to collect the Claim. Upon Purchaser's reasonable request, Creditor will duly execute and deliver, or cause to be duly executed and delivered to Purchaser such further instruments and do and cause to be done such further acts as may be necessary or proper in the reasonable opinion of Purchaser to effectuate the provisions and purposes of this Agreement.

5.      Termination. If the Approval Date has not occurred within ninety (90) days after the date hereof, either Party shall have the right to terminate and cancel this Agreement by providing written notice of termination to the other Party at any time after such date and prior to Court Approval. If termination is so effected, this Agreement shall be deemed void *ab initio* and of no further force and effect, no sale or assignment of the Claim shall have occurred, and Purchaser shall dismiss the Action. In the event of termination, the Purchase Price shall not be payable.

6.      Representations, Warranties and Covenants. Creditor hereby represents, warrants and covenants to Purchaser as follows:

(a)      (i) The Claim is a bona fide outstanding claim against Company, and is an enforceable obligation arising in the ordinary course of business, for goods and/or services rendered to Company by Creditor in good faith. The Claim is currently due and owing and is payable in full.

(ii) The Claim [___] is, [x] is not secured by any security interest in any property of the Company or an affiliate of the Company or by a guarantee of the Company or of an affiliate of The Company .

(b)      Creditor did not enter into the transaction giving rise to the Claim in contemplation of any sale or distribution of Company's common stock or other securities.

(c)      The Claim Amount is the total amount due to Creditor with respect to the Claim, net of any applicable discounts, allowances or other deductions to which Company is

2

lawfully entitled. The documents attached hereto are true, correct and complete copies of all documentation underlying the Claim.

(d)    The Claim is not reasonably subject to dispute and Company is unconditionally obligated to pay the full Claim Amount without defense, counterclaim or offset. To the knowledge of Creditor, the Company's failure to pay is due solely and exclusively to financial inability.

(e)    Creditor is the sole owner of the Claim, free and clear of all liens, encumbrances and rights of third parties. Creditor has not previously sold, transferred, encumbered or released any part of the Claim.

(f)    There has been no modification, compromise, forbearance, or waiver (written or oral) entered into or given with respect to the Claim. There is no action based on the Claim that is currently pending in any court or other legal venue, and no judgments based upon the Claim have been previously entered in any legal proceeding.

(g)    There are no taxes due, payable or withholdable as an incident of Creditor's Claim; no taxes will be due, payable or withholdable as a result of settlement of the Claim; and Creditor may at all times promptly withhold (if applicable) and pay when due any federal, state, local and/or foreign taxes due as a result of payment of the Purchase Price.  Creditor has all necessary power and authority to (i) execute, deliver and perform all of its obligations under this Agreement, and (ii) sell, convey, transfer and assign the Claim to Purchaser. Creditor has such knowledge and experience in business and financial matters that it is able to protect its own interests and evaluate the risks and benefits of entering into this Agreement. Credit acknowledges and agrees that it has had an opportunity to conduct its own due diligence and consult with its own legal counsel, and tax, financial and other advisors, and that Creditor is not relying in that regard on Purchaser. Creditor acknowledges that Purchaser is not making any representations or warranties whatsoever, including, without limitation, about the Company.

(h)    The execution, delivery and performance of this Agreement by Creditor has been duly authorized by all requisite action on the part of Creditor. This Agreement has been duly executed and delivered by Creditor and constitute the legal, valid and binding obligation of Creditor, enforceable against Creditor in accordance with its terms, except as may be limited by applicable bankruptcy, insolvency or similar laws affecting creditors' rights generally or the availability of equitable remedies.

(i)    Within the past ninety (90) days, Creditor [__] has, [x] has not been, directly or indirectly through one or more intermediaries in control, controlled by, or under common control

with, the Company and is an affiliate of the Company as defined in Rule 144 promulgated under the Act. Creditor is not a broker or dealer in securities.

(j)     The execution and delivery of this Agreement by Creditor and the performance of all of its obligations hereunder (i) do not and will not violate, conflict with, breach, or constitute a default under, any material contract, agreement or commitment binding upon such Creditor, and (ii) do not and will not conflict with or violate any applicable law, rule, regulation, judgment, order or decree of any court or other government authority having jurisdiction over such Creditor or the Claim.

(k)     There is no action, suit, inquiry, notice of violation, proceeding or investigation pending or, to the knowledge of Creditor, threatened against or affecting Creditor or any of its assets before or by any court, arbitrator, governmental or administrative agency, or regulatory authority that adversely affects or challenges the legality, validity or enforceability of, or that could have or reasonably be expected to result in a material adverse effect on this Agreement.

(l)     Creditor has no present intention to utilize any of the proceeds to be received from Purchaser to directly or indirectly, provide any consideration to or invest in any manner in the Company or any affiliate of the Company.

(m)     Creditor will not, directly or indirectly, receive any consideration from or be compensated in any manner by the Company, or any affiliate of the Company, in exchange for or in consideration for selling the Claim.

(n)     Creditor will immediately advise Purchaser if any of the foregoing cease to be fully true and accurate at any time up to and including the Approval Date.

(o)     Creditor acknowledges that Purchaser may submit other Claims Purchaser has against the Company in the Action.

7.     <u>Fees and Expenses.</u> Each party shall pay the fees and expenses of its advisers, counsel, accountants and other experts, if any, and all other expenses incurred by such party incident to the negotiation, preparation, execution, delivery and performance of this Agreement. Creditor understands that Purchaser shall not be liable for any commissions, selling expenses, orders, purchases, contracts, taxes, withholding, or obligations of any kind resulting from any or arising out of settlement of the Claim.

8.     <u>Choice of Law.</u> This Agreement shall be governed by and construed according to the laws of the State of <u>Maryland</u>, without giving effect to its choice of law principles.

4

Any actions and proceedings arising out of or relating directly or indirectly to this Agreement or any ancillary agreement or any other related obligations shall be litigated solely and exclusively in the state or federal courts located in Baltimore, Maryland_____, and that such courts are convenient forums. Each Party hereby submits to the personal jurisdiction of such courts for purposes of any such actions or proceedings.

9.    **Limitation of Damages.** Each of the Parties hereby waives any rights which it may have to claim or recover any incidental, special, exemplary, punitive or consequential damages or any damage other than, or in addition to, actual damages. Purchaser shall have the right, in Purchaser's sole discretion, to determine which rights, liens, security interests or remedies Purchaser may at any time pursue, relinquish, subordinate, or modify or to take any other action and incur any costs or expenses with respect thereto and such determination will not in any way modify or affect any of Purchaser's rights hereunder. Purchaser shall have no liability hereunder for any delay in or failure to obtain Approval, or for any other causes beyond Purchaser's control. Any liability of Purchaser for any default hereunder, including default in any payment to Creditor pursuant to Section 3 above, shall be limited solely to a return of the Claim to Creditor.

10.    **Notices.** All notices and other communications shall be in writing and shall be provided to the recipient Party to the addresses set forth on the page following the signature page hereof. All notices and communications shall be deemed made and effective as follows: (a) if transmitted for overnight delivery via a nationally recognized delivery service, the first business day after being delivered by the transmitting Party to such overnight delivery service, (b) if faxed, when transmitted in legible form by facsimile machine to the recipient Party's correct facsimile machine number, (c) if by e-mail, when transmitted by e-mail, or (d) if mailed via regular U.S. mail, upon delivery. Any Party may designate a superseding notice contact name, street address, e-mail address or fax number by providing the other Parties with written notice pursuant to the provisions hereof.

11.    **Amendments and Waivers.** No provision of this Agreement may be waived or amended except in a written instrument signed, in the case of an amendment, by the Parties, or, in the case of a waiver, by the Party against whom enforcement of such waiver is sought. No waiver of any default shall be deemed to be a continuing or a waiver of any subsequent default or a waiver of any other provision, condition or requirement hereof, nor shall any delay or omission of any Party to exercise any right hereunder in any manner impair the exercise of any such right.

12.    **Construction; Survival.** The headings herein are for convenience only, do not constitute a part of this Agreement and shall not be deemed to limit or affect any of the provisions hereof. The language used in this Agreement will be deemed to be the language chosen by the Parties to express their mutual intent, and no rules of strict construction will be applied against

any party. The representations and warranties contained herein shall survive the closing of the transactions contemplated herein and the assignment of the Claim.

      13.    <u>No Third Party Beneficiaries.</u> This Agreement is intended for the benefit of Creditor and Purchaser and their respective successors and permitted assigns and is not for the benefit of, nor may any provision hereof be enforced by any other person.

      14.    <u>Entire Agreement.</u> This Agreement, together with the exhibits hereto, contains the entire agreement and understanding of the Parties, and supersedes all prior and contemporaneous agreements, letters, discussions, communications and understandings, both oral and written, concerning the sale, transfer, conveyance and assignment of the Claim, which the Parties acknowledge have been merged into this Agreement.

      15.    <u>Signature.</u> This Agreement may be executed in counterparts and by facsimile, portable document format or other electronic means, each of which shall constitute an original and all of which when taken together shall constitute one document.

      16.    <u>Payment of Purchase Price.</u> Purchaser may pay the Purchase Price to Creditor by check or wire transfer.  Wire instructions for the Purchase Price are as follows:

_____

_____

_____

ABA No_____

_____

Account _____

[BALANCE OF PAGE INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, the parties hereto have caused this Claim Purchase Agreement to be duly executed, to be effective as of the Effective Date set forth above.

CREDITOR:

Camelot Nevada Trust

By: _Laura Imbach_

Name: Laura Imbach

Title: Trustee

ADDRESS: ███████████
CITY: Marietta, Ga 30062
Telephone No. ███████
Fax No.
E-mail: ████████████

PURCHASER:

Livingston Asset Management LLC

By: _____

Name: Stephen Hicks

Title: Mgr

ADDRESS: ███████████████
CITY: Naples, Florida 34110
Telephone No. ███████████
Fax No. ████████
E-mail: _____

May 3, 2018
Date

7

## AMENDMENT TO CONTRACT FOR SERVICES

This **Amendment** pertains to the **AGREEMENT** originally entered into on July 14, 2014 is hereby amended as of July 1, 2017 between **The Camelot Nevada Trust**, with its principal place of business located at 2851 South Valley View, Las Vegas Nevada 89102 (hereinafter "**CONSULTANT**"), and **Immunotech Laboratories, Inc. a Nevada Corporation** with it principal place of business located at 120 W. Pomona Ave, Monrovia CA, 91016 by Harry H. Zhabilov, its President (hereinafter "**IMMB**" and or the "Company") and **Eco-Petroleum Solutions, Inc. a Delaware Corporation and Parent of IMMB** located at 120 W. Pomona Ave, Monrovia CA, 91016 also represented by Harry Zhabilov for the legal and business consulting services of **CONSULTANT** and its independent contractors.

## 1. NATURE OF CONTRACT SERVICES:

**a.** The parties agree that **IMMB** will continue to retain the general business consulting services of **CONSULTANT** which will generally include transactional work (negotiating and drafting contracts) and advising on the following matters: intellectual property (including trademark and copyright filings); business development; the formation or maintenance of business entities; labor issues; coordination and general supervision or engagement of professionals, consultants or experts; and other related services involving the development and furtherance of your intellectual property and treatment in the pharmaceutical industry;

**b.** The parties agree that **IMMB** may retain through **CONSULTANT** one or more representatives as an independent contractor (the "Independent Contractor" or "Contractor") to provide the services described above. market, promote and develop business opportunities as directed by **IMMB**. The **Company** may request specific Independent Contractors and **CONSULTANT** will cause such request to be honored on an as available basis. The primary Independent Contractor ("Contractor") initially selected by **IMMB** to provide such services will be made available on a priority basis to **IMMB** by **CONSULTANT** for the term of this agreement;

**c. CONSULTANT** shall be directly accountable to **IMMB**.

## 2. RESPONSIBILITIES OF THE PARTIES ARE AS FOLLOWS:

**IMMB Responsibilities:**

**a. IMMB** agrees to supply the **CONSULTANT** with the necessary information and support from management necessary to perform the Services as directed by the **IMMB**. **IMMB** agrees to remit the Contract payment for such services in full on the first of every month of the term of this contract. The first Contract payment will be due upon shipment of the first order of the **Company's** immunotherapy product.

**b.** If the **Company** fails to remit payment in cash or stock within 30 days of demand by **Consultant** the agreement will be in default and the Company will have a 60 day cure period from the date of default.

**Consultant's Responsibilities:**

**a. CONSULTANT** and any Independent Contractor selected by **IMMB** under this Agreement will treat all information as confidential. The Independent Contractor selected by **IMMB** and will for all intents and purposes be considered an insider during the term of the Agreement.

CONSULTANT will not be considered an insider until and unless non-public information is disclosed to CONSULTANT inadvertently or as part of the performance of duties by the Independent Contractor.

c. CONSULTANT agrees to assist IMMB in compiling the information and assist in filing the necessary documents to maintain a current status with all regulatory agencies.

d. CONSULTANT agrees to provide additional services including but not limited to the following;

   1. Analysis of capital structure of the company; debt/equity. Monitoring the issuance of shares into the market and analysis of shares outstanding
   2. Filing for listing on the National Markets.
   3. Communicating publicly available information to potential specialty groups of investors.
   4. Recommendation for infrastructure additions, including Directors, SEC attorney and GAAP Auditors.
   5. Merger/Acquisition/Divestitures

e. Other potential services determined and mutually-agreed upon during the performance of the contract.

## 3. FORM OF PAYMENT:

a. Fees. For Services rendered since the original contract date or services rendered in the future for the matters set forth in paragraph 1 IMMB shall pay to CONSULTANT as "Fees", at the Company's sole discretion, a quarterly rate of Twenty-Seven Thousand Five Hundred US Dollars ($27,500.00) or the equivalent value in Restricted Shares of Eco-Petroleum Solutions, Inc. ("ECPO") issued at $.005 per share to CONSULTANT. Fees for services are subject to change based upon thirty-day written notice. The per share price of the stock will be reset upon the occurrence of a lower conversion rate being exercised or shares being issued at a rate lower than $.005 to any other.

## 4. NONDISCLOSURE, CONFIDENTIALITY AND NON-COMPETITION:

a. At all times while this Agreement is in force and after its expiration or termination, CONSULTANT agrees to keep secret and refrain from disclosing or making personal use of any confidential information concerning IMMB business which may have become known to CONSULTANT during the course of its engagement with IMMB to any other persons, firms, organizations or entities of any type or nature. "Confidential Information" is defined as the personal, financial or other affairs of IMMB including and not limited to its customer lists, trade secrets or any of the Client Companies provided to CONSULTANT by IMMB. CONSULTANT acknowledges that the foregoing is and shall remain the exclusive property of IMMB, and is confidential and of great value to IMMB. CONSULTANT agrees to take reasonable security measures to prevent accidental disclosure and industrial espionage.

b. Nothing contained in this Agreement shall be construed as granting to or conferring upon CONSULTANT any rights by license or otherwise in any information disclosed, except for the limited right to use the information for the purposes set forth in this Agreement.

## 5. INDEMNIFICATION:

a. **CONSULTANT** shall indemnify, defend and hold **IMMB** harmless against any claims brought against **IMMB** or its client to the extent of **IMMB's** use of **CONSULTANT** work product generated in accordance with this Contract.

## Conditions to Indemnification:

b. The foregoing obligations are conditioned upon: (a) prompt written notice by the indemnified party to the indemnifying party of any claim, action or demand for which indemnity is claimed; (b) complete control of the defense and settlement of thereof by the indemnifying party, provided that no settlement of an indemnified claim shall be made without the consent of the indemnified party, such consent not to be unreasonably withheld or delayed; and (c) reasonable cooperation by the indemnified party in the defense as the indemnifying party may request. The indemnified party shall have the right to participate in the defense against the indemnified claims with counsel of tis choice at its own expense.

## Definition of "Claims":

c. **For** the purposes of indemnification above, "Claims" means losses, actions, liabilities, damages, expenses and reasonable attorneys' fees and court costs.

## 6. ARBITRATION:

a. In the event a dispute, any controversy or claim arising out of or relating to this Contract shall arise between the parties, it is hereby agreed that the dispute shall be referred to an Arbitrator to be designated by the American Arbitration Association for Arbitration in accordance with the applicable Commercial Finance Arbitration Rules. The Arbitrator's Decision shall be final and legally binding on all parties and Judgment may be entered thereon. Each party shall be responsible for its share of the Arbitration fees in accordance with the applicable Rules of Arbitration. In the even a party fails to proceed with Arbitration, unsuccessfully challenges the Arbitrator's Award, or fails to comply with the Arbitrator's Award, the other party is entitled to cost of suit, including any reasonable attorney's fee for having to compel Arbitration or defend or enforce the Award. **THIS CONTACT CONTAINS A BINDING ARBITRATION PROVISION THAT AFFECTS YOUR LEGAL RIGHTS AND MAY BE ENFORCED BY ALL PARTIES.** However, in the event of noncompliance or violation or breach or threatened breach, as the case may be, of the Contract and, in particular, Paragraphs 1, 2, 3 and/or 4 of this Contract relating to either the nature of this Agreement and/or of the Parties hereto responsibilities, nondisclosure, confidentiality, non-competition and indemnification and any other restrictive stipulations contained in this Agreement and the irreparable injury and incalculable harm that has or can result therefrom, each of the parties to this Contract alternatively shall be entitled to apply to any court of competent jurisdiction for a Temporary Restraining Order, injunction, specific performance and/or such other legal and equitable remedies as may be appropriate, since the aggravated Party would have no adequate remedy at law for such violation on non-compliance, breach or threatened breach. Any resort to such equitable relief shall not be deemed to be a waiver or limit in anyway or respect by any other right or remedy that any such aggrieved party may have for a breach of this provision.

## 7. TERM:

a. This Agreement shall become effective on the date set forth above ("Commencement Date") and shall continue until terminated in writing by either **IMMB** or by **CONSULTANT** subject to continuing payment for Services rendered under paragraph 3 (as defined in paragraph 1.c).

CONSULTANT acknowledges the obligation to protect the confidential nature of the information received prior to such termination and that it shall survive the termination of this Agreement.

## 8. CHOICE OF LAW:

a. This Agreement in all matters and issues collateral thereto shall be governed by laws of the State of California applicable to this Contract with respect to the determination of any claim, dispute or disagreement, which may arise out of the interpretation, performance or breach of this Agreement, and will be subject to enforcement and interpretation solely in the appropriate Courts of the State of California.

## 9. CHANGES, ADDITIONS, DELETIONS OR AMENDMENTS:

a. No change, addition, deletion or amendment of this Agreement shall be valid or binding upon either Party unless in writing and signed by the Parties hereto. Both Parties acknowledge that there are no oral or other agreements or understandings between the Parties affecting this Agreement.

## 10. SEVERABILITY, WAIVER AND ASSIGNMENT:

a. If any portion of this Contract shall be deemed invalid or unenforceable for any reason, the remaining provisions shall continue to be valid and enforceable. If a Court finds that any provision of this Contract is invalid or unenforceable, but that by limiting such provision it would become valid and enforceable, then such provision shall be deemed to be written, construed and enforced as so limited. CONSULTANT shall not construe the waiver by IMMB of a breach of any of the provisions of this Contract by CONSULTANT as a waiver of any subsequent breach. The Parties agree that the rights, duties and obligations contained in this Agreement are not assignable by either Party.

## 11. NOTICES:

a. All notices required or permitted to be given hereunder shall be in writing and shall be deemed to have been given when mailed by certified or registered mail, return receipt requested, addressed to the intended recipient at the addresses set forth above or at such other address as is provided by either party to the other.

## 12. HEADINGS:

a. The Paragraph headings are not a substantive part of this Agreement, are used for convenience only and are not intended to expand or restrict the scope of substance of the provisions of this Agreement in any way.

## 13. MISCELLANEOUS:

a. Whenever used herein, the singular shall include the plural, the plural shall include the singular, and pronouns shall be read as masculine, feminine or neuter as the context requires.

b. The contract is assignable as well as any amounts due to Consultant for current or past due amounts without approval of the Company.

c. This agreement supersedes all other agreements written or oral between the parties.

14. CONFLICTS OF INTEREST. If a conflict arises of which CONSULTANT becomes aware they shall promptly advise IMMB and try to assist in revolving such conflicts. If such conflict cannot be

resolved CONSULTANT will have the right to represent you, to represent others, or to withdraw completely. In any case it maybe necessary to engage separate counsel.

**IN WITNESS WHEREOF,** the Parties have executed this Contract.

**The Camelot Nevada Trust**

By:_____
Kelli Austin, Trustee

Date: July 1, 2017

**Immunotech Laboratories, Inc.**

By:_____
Harry H. Zhabilov, Chairman

Date: July 1, 2017

**ECO-PETROLEUM SOLUTIONS, INC.**

By:_____

Harry H. Zhabilov, Chairman

Date: July 1, 2017

# The Camelot Nevada Trust

## 2851 South Valley View Las Vegas Nevada 89102

01/01/2015

Immunotech Laboratories, Inc.

120 W Pomona Ave

Monrovia, CA 91016

Phone: (818) 409-9091

Attn: Harry H. Zhabilov

Invoice for compensation for accounting services in accordance with description of item c under Consultants Responsibilities in the consulting agreement dated July 14, 2014 for the Quarter Ended 3/31/2015.

Contract Payment due 1/01/2015 - $12,500.00 per month or 2,000,000 restricted shares of Immunotech Laboratories, Inc. common stock per month. As discussed between the parties, the lowest bid price of .0001 was due to the temporary suspension issue and parties agreed that the stock is not fairly valued so until the Temporary suspension has been resolved the payment option for stock will be 2,000,000 shares per month and the cash option will increase to $12,500.00.

Payment options for First Quarter of 2015 contractual payment due as of 01/01/2015:

Total Compensation paid in Shares 6,000,000

Or

Cash $37,500.00


Shares are to be issued as Tenants in entirety with right of survivorship to The Camelot Nevada Trust and a designee of The Camelot Nevada Trust to be furnished. For this billing period the designee will be furnished at time of issuance.


Please make cash payments to The Camelot Nevada Trust at the above address, if stock option is elected please deliver shares to 4110 Azurite St. Cumming GA, 30040

# The Camelot Nevada Trust

## 2851 South Valley View Las Vegas Nevada 89102

**Federal ID #** ████████

Statement of Account as of January 31, 2018                    Page 1 of 2

| Invoice for Period: | Amount | Paid in Stock | Cert # | Paid in Cash | Balance due |
|---|---|---|---|---|---|
| 9/30/2014 | $ 17,000.00 | 3,766,120 | 3093 | $ 0 | $    0 |
| 12/30/2014 | $25,500.00 | 6,000,000 | 3106 | $ 0 | $    0 |
| 1/01/2015 | $37,500.00 | 0   *, ** | | $ 0 | $37,500.00 |
| 4/01/2015 | $37,500.00 | 0   ** | | $ 0 | $37,500.00 |
| 7/01/2015 | $37,500.00 | 0 | | $ 0 | $37,500.00 |
| 10/01/2015 | $37,500.00 | 0 | | $ 0 | $37,500.00 |
| 1/01/2016 | $37,500.00 | 0 | | $ 0 | $37,500.00 |
| 4/01/2016 | $37,500.00 | 0 | | $ 0 | $37,500.00 |
| 7/011/2016 | $37,500.00 | 0 | | $ 0 | $37,500.00 |
| 10/31/2016 | $37,500.00 | 0 | | $ 0 | $37,500.00 |
| 1/01/2017 | $37,500.00 | 0 | | $ 0 | $37,500.00 |
| 4/01/2017 | $37,500.00 | 0 | | $ 0 | $37,500.00 |
| 7/01/2017 | $37,500.00 | 0 | | $ 0 | $37,500.00 |
| 10/01/2017 | $37,500.00 | 0 | | $ 0 | $37,500.00 |
| Subtotal for Page 1 | | | | | $450,000.00 |

Page 2 of 2

# The Camelot Nevada Trust

## 2851 South Valley View Las Vegas Nevada 89102

**Federal ID #** ███████

Statement of Account as of January 31, 2018                    Page 1 of 2

| Invoice for Period Ended: | Amount | Paid in Stock | Cert # | Paid in Cash | Balance due |
|---|---|---|---|---|---|
| | | | | | |
| Balance Forward from Page #1 | | | | | $450,000.00 |
| | | | | | |
| 1/01/2018 | $37,500.00 | 0 | | $ 0 | $ 37,500.00 |
| | | | | | |
| | | | | | |
| Total Due as of 1-31-2018 | | | | | $487,500.00 |

\*Board Resolution was approved for 6 million shares but stock was never issued due to Skull and Crossbones symbol

\*\*Contract was amended to have a fixed conversion price of .004 subject to a reset if a lower conversion price is granted on other debt

# The Camelot Nevada Trust

## 2851 South Valley View Las Vegas Nevada 89102

**Federal ID #** ███████

Statement of Account as of April 30, 2018                                   Page 1 of 2

| Invoice for Period: | Amount | Paid in Stock | Cert # | Paid in Cash | Balance due |
|---|---|---|---|---|---|
| 9/30/2014 | $ 17,000.00 | 3,766,120 | 3093 | $ 0 | $     0 |
| 12/30/2014 | $25,500.00 | 6,000,000 | 3106 | $ 0 | $     0 |
| 1/01/2015 | $37,500.00 | 0   *, ** | | $ 0 | $37,500.00 |
| 4/01/2015 | $37,500.00 | 0   ** | | $ 0 | $37,500.00 |
| 7/01/2015 | $37,500.00 | 0 | | $ 0 | $37,500.00 |
| 10/01/2015 | $37,500.00 | 0 | | $ 0 | $37,500.00 |
| 1/01/2016 | $37,500.00 | 0 | | $ 0 | $37,500.00 |
| 4/01/2016 | $37,500.00 | 0 | | $ 0 | $37,500.00 |
| 7/011/2016 | $37,500.00 | 0 | | $ 0 | $37,500.00 |
| 10/31/2016 | $37,500.00 | 0 | | $ 0 | $37,500.00 |
| 1/01/2017 | $37,500.00 | 0 | | $ 0 | $37,500.00 |
| 4/01/2017 | $37,500.00 | 0 | | $ 0 | $37,500.00 |
| 7/01/2017 | $37,500.00 | 0 | | $ 0 | $37,500.00 |
| 10/01/2017 | $37,500.00 | 0 | | $ 0 | $37,500.00 |
| Subtotal for Page 1 | | | | | $450,000.00 |

Page 2 of 2

## Camelot Nevada Trust

## 2851 South Valley View Las Vegas Nevada 89102

**Federal ID #** ▮▮▮▮▮▮

Statement of Account as of April 30, 2018                                      Page 1 of 2

| Invoice for Period Ended: | Amount | Paid in Stock | Cert # | Paid in Cash | Balance due |
|---|---|---|---|---|---|
| Balance Forward from Page #1 | | | | | $450,000.00 |
| 1/01/2018 | $37,500.00 | 0 | | $ 0 | $ 37,500.00 |
| 4/01/2018 | $37,500.00 | 0 | | $ 0 | $ 37,500.00 |
| Total Due as of 4-30-2018 | | | | | $525,000.00 |

*Board Resolution was approved for 6 million shares but stock was never issued due to Skull and Crossbones symbol

**Contract was amended to have a fixed conversion price of .004 subject to a reset if a lower conversion price is granted on other debt

# The Camelot Nevada Trust

## 2851 South Valley View Las Vegas Nevada 89102

**Federal ID #** ████████

04/01/2015

Immunotech Laboratories, Inc.

120 W Pomona Ave

Monrovia, CA 91016

Phone: (818) 409-9091

Attn: Harry H. Zhabilov

Invoice for compensation for accounting services in accordance with description of item c under Consultants Responsibilities in the consulting agreement dated July 14, 2014 for the Quarter Ended 6/30/2015.

Contract Payment due 4/01/2015 - $12,500.00 per month or 2,000,000 restricted shares of Immunotech Laboratories, Inc. common stock per month. As discussed between the parties, the lowest bid price of .0001 was due to the temporary suspension issue and parties agreed that the stock is not fairly valued so until the Temporary suspension has been resolved the payment option for stock will be 2,000,000 shares per month and the cash option will increase to $12,500.00.

Payment options for Second Quarter of 2015 contractual payment due as of 04/01/2015:

Total Compensation paid in Shares 6,000,000

Or

Cash $37,500.00


Shares are to be issued as Tenants in <u>entirety</u> with right of survivorship to The Camelot Nevada Trust and a designee of The Camelot Nevada Trust to be furnished. For this billing period the designee will be furnished at time of issuance.


Please make cash payments to The Camelot Nevada Trust at the above address, if stock option is elected please deliver shares to 4110 Azurite St. Cumming GA, 30040

# The Camelot Nevada Trust

## 2851 South Valley View Las Vegas Nevada 89102

Federal ID # █████████

07/01/2015

Immunotech Laboratories, Inc.

120 W Pomona Ave

Monrovia, CA 91016

Phone: (818) 409-9091

Attn: Harry H. Zhabilov

Invoice for compensation for accounting services in accordance with description of item c under Consultants Responsibilities in the consulting agreement dated July 14, 2014 for the Quarter Ended 9/30/2015.

Contract Payment due 7/01/2015 - $12,500.00 per month or 2,000,000 restricted shares of Immunotech Laboratories, Inc. common stock per month. As discussed between the parties, the lowest bid price of .0001 was due to the temporary suspension issue and parties agreed that the stock is not fairly valued so until the Temporary suspension has been resolved the payment option for stock will be 2,000,000 shares per month and the cash option will increase to $12,500.00.

Payment options for Third Quarter of 2015 contractual payment due as of 07/01/2015:

Total Compensation paid in Shares 6,000,000

Or

Cash $37,500.00


Shares are to be issued as Tenants in entirety with right of survivorship to The Camelot Nevada Trust and a designee of The Camelot Nevada Trust to be furnished. For this billing period the designee will be furnished at time of issuance.


Please make cash payments to The Camelot Nevada Trust at the above address, if stock option is elected please deliver shares to 2340 His Way, Lawrenceville GA, 30042

# The Camelot Nevada Trust

## 2851 South Valley View Las Vegas Nevada 89102

**Federal ID #** ████████

10/01/2015

Immunotech Laboratories, Inc.

120 W Pomona Ave

Monrovia, CA 91016

Phone: (818) 409-9091

Attn: Harry H. Zhabilov

Invoice for compensation for accounting services in accordance with description of item c under Consultants Responsibilities in the consulting agreement dated July 14, 2014 for the Quarter Ended 12/31/2015.

Contract Payment due 10/01/2015 - $12,500.00 per month or 2,000,000 restricted shares of Immunotech Laboratories, Inc. common stock per month. As discussed between the parties, the lowest bid price of .0001 was due to the temporary suspension issue and parties agreed that the stock is not fairly valued so until the Temporary suspension has been resolved the payment option for stock will be 2,000,000 shares per month and the cash option will increase to $12,500.00.

Payment options for Fourth Quarter of 2015 contractual payment due as of 10/01/2015:

Total Compensation paid in Shares 6,000,000

Or

Cash $37,500.00


Shares are to be issued as Tenants in <u>entirety</u> with right of survivorship to The Camelot Nevada Trust and a designee of The Camelot Nevada Trust to be furnished. For this billing period the designee will be furnished at time of issuance.


Please make cash payments to The Camelot Nevada Trust  at the above address, if stock option is elected please deliver shares to 2340 His Way, Lawrenceville Ga 30042

# The Camelot Nevada Trust

## 2851 South Valley View Las Vegas Nevada 89102

**Federal ID #** ████████

01/01/2016

Immunotech Laboratories, Inc.

120 W Pomona Ave

Monrovia, CA 91016

Phone: (818) 409-9091

Attn: Harry H. Zhabilov

Invoice for compensation for accounting services in accordance with description of item c under Consultants Responsibilities in the consulting agreement dated July 14, 2014 for the Quarter Ended 3/31/2016.

Contract Payment due 1/01/2016 - $12,500.00 per month or 2,000,000 restricted shares of Immunotech Laboratories, Inc. common stock per month. As discussed between the parties, the lowest bid price of .0001 was due to the temporary suspension issue and parties agreed that the stock is not fairly valued so until the Temporary suspension has been resolved the payment option for stock will be 2,000,000 shares per month and the cash option will increase to $12,500.00.

Payment options for First Quarter of 2016 contractual payment due as of 01/01/2016:

Total Compensation paid in Shares 6,000,000

Or

Cash $37,500.00

Shares are to be issued as Tenants in <u>entirety</u> with right of survivorship to The Camelot Nevada Trust and a designee of The Camelot Nevada Trust to be furnished. For this billing period the designee will be furnished at time of issuance.

Please make cash payments to The Camelot Nevada Trust at the above address, if stock option is elected please deliver shares to 2340 His Way, Lawrenceville GA, 30042

# The Camelot Nevada Trust

## 2851 South Valley View Las Vegas Nevada 89102

**Federal ID #** █████████

04/01/2016

Immunotech Laboratories, Inc.

120 W Pomona Ave

Monrovia, CA 91016

Phone: (818) 409-9091

Attn: Harry H. Zhabilov

Invoice for compensation for accounting services in accordance with description of item c under Consultants Responsibilities in the consulting agreement dated July 14, 2014 for the Quarter Ended 6/30/2016.

Contract Payment due 4/01/2016 - $12,500.00 per month or 2,000,000 restricted shares of Immunotech Laboratories, Inc. common stock per month. As discussed between the parties, the lowest bid price of .0001 was due to the temporary suspension issue and parties agreed that the stock is not fairly valued so until the Temporary suspension has been resolved the payment option for stock will be 2,000,000 shares per month and the cash option will increase to $12,500.00.

Payment options for Second Quarter of 2016 contractual payment due as of 04/01/2016:

Total Compensation paid in Shares 6,000,000

Or

Cash $37,500.00


Shares are to be issued as Tenants in <u>entirety</u> with right of survivorship to The Camelot Nevada Trust and a designee of The Camelot Nevada Trust to be furnished. For this billing period the designee will be furnished at time of issuance.


Please make cash payments to The Camelot Nevada Trust at the above address, if stock option is elected please deliver shares to 2340 His Way, Lawrenceville GA, 30042

# The Camelot Nevada Trust

## 2851 South Valley View Las Vegas Nevada 89102

**Federal ID #** ███████

07/01/2016

Immunotech Laboratories, Inc.

120 W Pomona Ave

Monrovia, CA 91016

Phone: (818) 409-9091

Attn: Harry H. Zhabilov

Invoice for compensation for accounting services in accordance with description of item c under Consultants Responsibilities in the consulting agreement dated July 14, 2014 for the Quarter Ended 9/30/2016.

Contract Payment due 7/01/2016 - $12,500.00 per month or 2,000,000 restricted shares of Immunotech Laboratories, Inc. common stock per month. As discussed between the parties, the lowest bid price of .0001 was due to the temporary suspension issue and parties agreed that the stock is not fairly valued so until the Temporary suspension has been resolved the payment option for stock will be 2,000,000 shares per month and the cash option will increase to $12,500.00.

Payment options for Third Quarter of 2016 contractual payment due as of 07/01/2016:

Total Compensation paid in Shares 6,000,000

Or

Cash $37,500.00


Shares are to be issued as Tenants in underline entirety with right of survivorship to The Camelot Nevada Trust and a designee of The Camelot Nevada Trust to be furnished. For this billing period the designee will be furnished at time of issuance.


Please make cash payments to The Camelot Nevada Trust at the above address, if stock option is elected please deliver shares to 2340 His Way, Lawrenceville GA, 30042

# The Camelot Nevada Trust

## 2851 South Valley View Las Vegas Nevada 89102

**Federal ID #** ███████

10/01/2016

Immunotech Laboratories, Inc.

120 W Pomona Ave

Monrovia, CA 91016

Phone: (818) 409-9091

Attn: Harry H. Zhabilov

Invoice for compensation for accounting services in accordance with description of item c under Consultants Responsibilities in the consulting agreement dated July 14, 2014 for the Quarter Ended 12/31/2016.

Contract Payment due 10/01/2016 - $12,500.00 per month or 2,000,000 restricted shares of Immunotech Laboratories, Inc. common stock per month. As discussed between the parties, the lowest bid price of .0001 was due to the temporary suspension issue and parties agreed that the stock is not fairly valued so until the Temporary suspension has been resolved the payment option for stock will be 2,000,000 shares per month and the cash option will increase to $12,500.00.

Payment options for Fourth Quarter of 2016 contractual payment due as of 10/01/2016:

Total Compensation paid in Shares 6,000,000

Or

Cash $37,500.00


Shares are to be issued as Tenants in <u>entirety</u> with right of survivorship to The Camelot Nevada Trust and a designee of The Camelot Nevada Trust to be furnished. For this billing period the designee will be furnished at time of issuance.


Please make cash payments to The Camelot Nevada Trust at the above address, if stock option is elected please deliver shares to 2340 His Way, Lawrenceville Ga 30042

# The Camelot Nevada Trust

## 2851 South Valley View Las Vegas Nevada 89102

**Federal ID #**████████

01/01/2017

Immunotech Laboratories, Inc.

120 W Pomona Ave

Monrovia, CA 91016

Phone: (818) 409-9091

Attn: Harry H. Zhabilov

Invoice for compensation for accounting services in accordance with description of item c under Consultants Responsibilities in the consulting agreement dated July 14, 2014 for the Quarter Ended 3/31/2017.

Contract Payment due 1/01/2017 - $12,500.00 per month or 2,000,000 restricted shares of Immunotech Laboratories, Inc. common stock per month. As discussed between the parties, the lowest bid price of .0001 was due to the temporary suspension issue and parties agreed that the stock is not fairly valued so until the Temporary suspension has been resolved the payment option for stock will be 2,000,000 shares per month and the cash option will increase to $12,500.00.

Payment options for First Quarter of 2017 contractual payment due as of 01/01/2017:

Total Compensation paid in Shares 6,000,000

Or

Cash $37,500.00


Shares are to be issued as Tenants in underentirety with right of survivorship to The Camelot Nevada Trust and a designee of The Camelot Nevada Trust to be furnished. For this billing period the designee will be furnished at time of issuance.


Please make cash payments to The Camelot Nevada Trust at the above address, if stock option is elected please deliver shares to 3597 Bluff Ct, Marietta GA, 30066

# The Camelot Nevada Trust

## 2851 South Valley View Las Vegas Nevada 89102

**Federal ID #** █████████

04/01/2017

Immunotech Laboratories, Inc.

120 W Pomona Ave

Monrovia, CA 91016

Phone: (818) 409-9091

Attn: Harry H. Zhabilov

Invoice for compensation for accounting services in accordance with description of item c under Consultants Responsibilities in the consulting agreement dated July 14, 2014 for the Quarter Ended 6/30/2017.

Contract Payment due 4/01/2017 - $12,500.00 per month or 2,000,000 restricted shares of Immunotech Laboratories, Inc. common stock per month. As discussed between the parties, the lowest bid price of .0001 was due to the temporary suspension issue and parties agreed that the stock is not fairly valued so until the Temporary suspension has been resolved the payment option for stock will be 2,000,000 shares per month and the cash option will increase to $12,500.00.

Payment options for Second Quarter of 2017 contractual payment due as of 04/01/2017:

Total Compensation paid in Shares 6,000,000

Or

Cash $37,500.00


Shares are to be issued as Tenants in <u>entirety</u> with right of survivorship to The Camelot Nevada Trust and a designee of The Camelot Nevada Trust to be furnished. For this billing period the designee will be furnished at time of issuance.


Please make cash payments to The Camelot Nevada Trust at the above address, if stock option is elected please deliver shares to 3597 Bluff Ct, Marietta GA, 30066

# The Camelot Nevada Trust

## 2851 South Valley View Las Vegas Nevada 89102

**Federal ID #** ███████

7/01/2017

Immunotech Laboratories, Inc.

120 W Pomona Ave

Monrovia, CA 91016

Phone: (818) 409-9091

Attn: Harry H. Zhabilov

Invoice for compensation for services in accordance with consulting agreement dated July 14, 2014 for the Quarter Ended 9/30/2017.

Contract Payment due 7/01/2017 - $37,500.00 or restricted shares calculated at .004 per share or 9,375,000 shares of Eco-Petroleum Solutions, Inc. (ECPO) the parent of IMMB. This calculation is retroactive for all outstanding invoices.  As previously agreed to between IMMB and Camelot,  because the lowest bid price  of .0001 was due to the temporary suspension issue and parties agreed that the stock was not fairly valued, the payment option for stock was set at 2,000,000 shares per month and the cash payment option increased to $12,500.00. As of July 1st based on the acquisition of IMMB by ECPO Camelot, ECPO and IMMB have amended the contract to set a conversion price of .004 for stock payments made at the election of IMMB and to include a payment default provision with a 60 day cure period. The default provision is to take effect after the shipping of the first order of its IPF treatment.

Payment options at the election of ECPO for the Quarter ending September 30, 2017 contractual payment due as of 07/01:

Total Compensation paid in Shares of ECPO  9,375,000

Or

Cash $37,500.00


Shares are to be issued as Tenants in <u>entirety</u> with right of survivorship to The Camelot Nevada Trust and a designee of The Camelot Nevada Trust to be furnished at time of issuance.

Please make cash payments to The Camelot Nevada Trust at the above address, if stock option is elected please deliver shares to 3597 Bluff Ct. Marietta, GA 30062

# Camelot Financial Group, LLC

## 2851 South Valley View Las Vegas Nevada 89102

**Federal ID #** ███████

10/01/2017

Immunotech Laboratories, Inc.

120 W Pomona Ave

Monrovia, CA 91016

Phone: (818) 409-9091

Attn: Harry H. Zhabilov

Invoice for compensation for services in accordance with consulting agreement dated July 14, 2014 for the Quarter Ended 12/31/2017.

Contract Payment due 10/01/2017 - $37,500.00 or restricted shares calculated at .004 per share or 9,375,000 shares of Eco-Petroleum Solutions, Inc. (ECPO) the parent of IMMB. This calculation is retroactive for all outstanding invoices.  As previously agreed to between IMMB and Camelot,  because the lowest bid price  of .0001 was due to the temporary suspension issue and parties agreed that the stock was not fairly valued, the payment option for stock was set at 2,000,000 shares per month and the cash option increased to $12,500.00. As of July 1st based on the acquisition of IMMB by ECPO Camelot, ECPO and IMMB have amended the contract to set a conversion price of .004 for stock payments made at the election of IMMB and to include a payment default provision with a 60 day cure period. The default provision is to take effect after the shipping of the first order of its IPF treatment.

Payment options at the election of ECPO for the quarter ending December 31, 2017 contractual payment due as of 10/01:

Total Compensation paid in Shares of ECPO  9,375,000

Or

Cash $37,500.00


Shares are to be issued as Tenants in <u>entirety</u> with right of survivorship to The Camelot Nevada Trust and a designee of The Camelot Nevada Trust be furnished at time of issuance.

Please make cash payments to The Camelot Nevada Trust the above address, if stock option is elected please deliver shares to 3597 Bluff Ct. Marietta, GA 30062

## The Camelot Nevada Trust

## 2851 South Valley View Las Vegas Nevada 89102

Federal ID # ███████

1/01/2018

Immunotech Laboratories, Inc.

120 W Pomona Ave

Monrovia, CA 91016

Phone: (818) 409-9091

Attn: Harry H. Zhabilov

Invoice for compensation for services in accordance with consulting agreement dated July 14, 2014 for the Quarter Ended 3/31/2018.

Contract Payment due 1/01/2018 - $37,500.00 or restricted shares calculated at .004 per share or 9,375,000 shares of Eco-Petroleum Solutions, Inc. (ECPO) the parent of IMMB. This calculation is retroactive for all outstanding invoices.  As previously agreed to between IMMB and Camelot,  because the lowest bid price  of .0001 was due to the temporary suspension issue and parties agreed that the stock was not fairly valued, the payment option for stock was set at 2,000,000 shares per month and the cash option increased to $12,500.00. As of July 1st based on the acquisition of IMMB by ECPO Camelot, ECPO and IMMB have amended the contract to set a conversion price of .004 for stock payments made at the election of IMMB and to include a payment default provision with a 60 day cure period. The default provision is to take effect after the shipping of the first order of its IPF treatment.

Payment options at the election of ECPO for December 31, 2017 contractual payment due as of 01/01/18:

Total Compensation paid in Shares of ECPO  9,375,000

Or

Cash $37,500.00


Shares are to be issued as Tenants in <u>entirety</u> with right of survivorship to The Camelot Nevada Trust and a designee of The Camelot Nevada Trust to be furnished at time of issuance.

Please make cash payments to Camelot Nevada Trust at the above address, if stock option is elected please deliver shares to 3597 Bluff Ct. Marietta, GA 30062

# Camelot Nevada Trust

## 2851 South Valley View Las Vegas Nevada 89102

Federal ID # ████████

4/01/2018

Immunotech Laboratories, Inc.

120 W Pomona Ave

Monrovia, CA 91016

Phone: (818) 409-9091

Attn: Harry H. Zhabilov

Invoice for compensation for services in accordance with consulting agreement dated July 14, 2014 for the Quarter Ended 6/30/2018.

Contract Payment due 4/01/2018 - $37,500.00 or restricted shares calculated at .004 per share or 9,375,000 shares of Enzolytics, Inc.. This calculation is retroactive for all outstanding invoices.  As previously agreed to between IMMB and Camelot, because the lowest bid price  of .0001 was due to the temporary suspension issue and parties agreed that the stock was not fairly valued, the payment option for stock was set at 2,000,000 shares per month and the cash option increased to $12,500.00. As of July 1st based on the acquisition of IMMB by ECPO Camelot, ECPO and IMMB have amended the contract to set a conversion price of .004 for stock payments made at the election of IMMB and to include a payment default provision with a 60 day cure period. The default provision is to take effect after the shipping of the first order of its IPF treatment. The Debt was assumed by Enzolytics, Inc. as part of the Asset Purchase dated March 26, 2018.

Payment options at the election of ENZC for December 31, 2017 contractual payment due as of 01/01/18:

Total Compensation paid in Shares of ENZC  9,375,000

Or

Cash $37,500.00

Shares are to be issued as Tenants in entirety with right of survivorship to Camelot Nevada Trust and a designee of Camelot Nevada Trust to be furnished at time of issuance.

Please make cash payments to Camelot Nevada Trust at the above address, if stock option is elected please deliver shares to 3597 Bluff Ct. Marietta, GA 30062

Attn. B. Ray

# Trust Agreement
# of the
# Camelot Nevada Trust
**(Federal ID # 47-1314979)**


# (A Nevada Spendthrift Trust)

## TABLE OF CONTENTS

**ARTICLE I**
**ADDITIONS TO TRUST** ................................................................................ **1**

**ARTICLE II**
**BENEFICIARIES AND TRUST NAME** ...................................................... **1**

**ARTICLE III**
**DISTRIBUTION OF INCOME AND PRINCIPAL**
**DURING THE LIFE OF THE TRUSTORS** ................................................. **2**

**ARTICLE IV**
**DISTRIBUTION AND ADMINISTRATION**
**AFTER THE DEATH OF A TRUSTOR** ....................................................... **5**

**ARTICLE V**
**DISTRIBUTION AND ADMINISTRATION**
**AFTER THE DEATH OF BOTH TRUSTORS** ............................................. **9**

**ARTICLE VI**
**TRUSTEE'S DISCRETION ON DISTRIBUTION**
**TO PRIMARY BENEFICIARIES** ................................................................ **10**

**ARTICLE VII**
**DISTRIBUTIONS IN KIND** ........................................................................ **12**

**ARTICLE VIII**
**IRREVOCABLE TRUST** ............................................................................. **12**

**ARTICLE IX**
**ADDITIONAL PROPERTIES** .................................................................... **12**

**ARTICLE X**
**INCOMPETENCY OF BENEFICIARIES** .................................................. **12**

**ARTICLE XI**
**PROVISIONS RELATING TO TRUSTEESHIP** ....................................... **13**

**ARTICLE XII**
**TRUST CONSULTANT'S LIMITED POWER OF AMENDMENT** .......... **16**

**ARTICLE XIII**
**TRUSTEE POWERS AND LIMITATIONS** ............................................... **17**

**ARTICLE XIV**
**MERGER OF TRUSTS** ............................................................................... **28**

**ARTICLE XV**
**GENERAL PROVISIONS** ........................................................................... **29**

# TRUST AGREEMENT
# OF THE

THIS TRUST AGREEMENT made this 15th day of October, 2011, by and between Mary Lou Ray (hereinafter sometimes referred to as "Trustors" or "Grantors"), Kelli Austin (hereinafter referred to as "Investment Trustee"); Laura Imbach (hereinafter referred to as "Distribution Trustee").  For purposes of this Trust Agreement the Investment Trustees may also sometimes hereinafter collectively be referred to as "Trustee";

## Witnesseth:

WHEREAS, the Trustors desire by this Trust Agreement to establish an **Irrevocable** Trust upon the conditions and for the purposes set forth in this instrument.

NOW, THEREFORE, the Trustors hereby give, grant and deliver **Irrevocably**, IN TRUST, unto the Investment Trustees, the properties described in the Asset Inventory, TO HAVE AND TO HOLD THE SAME IN TRUST, and to manage, invest, and reinvest the same, and any later additions thereto, subject to the terms and conditions thereto.

## ARTICLE 1
## ADDITIONS TO TRUST

Additional property may be accepted by the Investment Trustees at a later time.  The Trust shall be on a calendar year, ending December 31st of each year, for Trust tax and accounting purposes.  Property subject to this instrument is referred to as the "Trust estate."

## ARTICLE 2
## BENEFICIARIES AND TRUST NAME

a)  **Beneficiaries**.  The Trust shall be for the benefit of Annabelle Grace Aislyn Kelly-Ray (distributions may be a maximum of 100% and a minimum of 45%), Aidan Williams (distributions may be a maximum of 25% and a minimum of 0%), David Ray (distributions may be a maximum of 5% and a minimum of 0%), Brandon Ray (distributions may be a maximum of 5% and a minimum of 0%), Rebecca Ray (distributions may be a maximum of 5% and a minimum of 0%), Jonathan Ray (distributions may be a maximum of 15% and a minimum of 0%), Alanna Coker (distributions may be a maximum of 5% and a minimum of 0%) and Alex Edwards (distributions may be a maximum of 5% and a minimum of 0%) and for other beneficiaries named herein.  This

Trust may also be for the benefit of any tax-exempt charities, which qualify as such under the laws of the United States of America by the Internal Revenue Service or other agency of the government of the United States of America for which contributions to such qualified charity may qualify for the charitable income tax deduction under Code Section 170, or any successor legislation thereto.

      b)    **Name**.  The Trust created in this instrument may be referred to as the CAMELOT NEVADA TRUST.

## ARTICLE 3
## DISTRIBUTION OF INCOME AND PRINCIPAL
## DURING THE LIFE OF THE TRUSTORS

      a)    **Distribution of Income and Principal**.  During the lifetime of the Trustors, and until the death of both Trustors, any property which is directed to be held in accordance with the terms and conditions set forth in this Article shall be held, by the Trustees, IN TRUST, for the following use and purposes:  To manage, invest and reinvest the same, to collect the income thereof, and to pay over or apply the net income and/or principal thereof, and in such amounts and proportions, including all to one to the exclusion of the others, and at such time or times as the Trustees, in their sole and absolute discretion, shall determine, to or for the benefit of such one or more members of the class consisting of both Trustors and the Trustors' issue, and other beneficiaries named herein or as described in Section 2.1 above, until the death of the Trustors.  Any net income (which may be the whole of such income) not so paid over or applied shall be accumulated and added to the principal of the trust at least annually and thereafter shall be held, administered and disposed of as part thereof.

      b)    **Trustor's Veto Right**.  During the lives of the Trustors, at least ten (10) days prior to making any payment or application of income or principal to any beneficiary other than a Trustor, the Distribution Trustees shall advise the Trustors of the Investment Trustees' intention to pay over or apply income or principal to a beneficiary other than the Trustors and the Trustors may veto any such intended payment or application by directing the Distribution Trustees in writing not to make and/or authorize the payment or application, and, if such veto is exercised by the Trustors, the Distribution Trustees shall not make and/or authorize the intended payment or application to the intended beneficiary.  The Trustors retain the right to renounce the veto power granted to the Trustors in this Article III by delivery of an acknowledged written instrument to the Trustees renouncing such veto power.  Upon the death or incapacity of either Trustor, the surviving Trustor or the Trustor who is not incapacitated, as the case may be, shall have the sole right to exercise the veto power described herein.

c)      **Distributions to a Trustor**. Notwithstanding anything in this Trust Agreement to the contrary, any decision to make a distribution to a Trustor may not be made by a Trustor, even though a Trustor may be serving as a Trustee hereunder.  Prior to any distribution to either Trustor of either income or principal of the Trust estate, a meeting of a majority of the Trustees, which majority must also include a majority of the Distribution Trustees, shall be held.  At such meeting, the Trustees shall discuss the advisability of making a distribution of the Trust estate to the Trustors. Upon the vote of the Distribution Trustees and a majority of the Investment Trustees, which vote must in all events include the affirmative vote of a majority of the Distribution Trustees, the Trustees may authorize and carry out the distribution of Trust income and/or principal to the Trustors.

Notwithstanding the foregoing, a meeting of the Investment Trustees and the Distribution Trustees shall be effective whether held in person, by telephone or by other electronic means.  In addition, the Trustees may also affect a valid meeting hereunder by execution of a written consent in lieu of the Trustees' meeting, which shall specifically state the amount of the Trust estate to be distributed to Trustors.  However, for any written consent to be effective, it must be by written consent, subscribed to by a majority of the Investment Trustees and by all Distribution Trustees.

d)      **Unauthorized Distributions to a Trustor**.  In the event any distribution of any of the Trust estate shall be made to either or both Trustors, and if such distribution is not previously authorized pursuant to Section 3.3 above, then such distribution made to the Trustors or either of them shall be void and the Distribution Trustees shall have a lien against the Trust estate distributed to the Trustors and such lien shall also extend, if necessary to make the Trust estate whole, to any or all other assets of the Trustors.  For as long as any portion of the Trust estate has passed without proper authorization out of Trust to either Trustor, upon return of the unauthorized distribution, the Trustors shall return to the Trust estate the value of the unauthorized distribution plus interest on the value of such unauthorized distribution, at a rate of One Percent (1%) per month, compounded monthly.  In the event of any such unauthorized distribution, the Distribution Trustees shall give notice of the unauthorized distribution to the other named non-charitable beneficiaries hereunder as set forth in Section 2.1 above.  Furthermore, the Distribution Trustees shall have all other rights and powers as shall be necessary to recover from the Trustors the unauthorized distributions and to make the Trust estate whole.

e)      **Power of Appointment**. While both Trustors are living, they shall have the testamentary power to direct the Trustee to pay over and distribute trust principal from the Trust estate in the manner provided in a special testamentary power of appointment signed by the Trustors and delivered to the Trustee.  The Trustors' power to appoint beneficiaries of the Trust shall be unlimited; provided, however, that the Trustors may not appoint the Trust estate, or any part thereof,

Page 3

to the Trustors, the estates of the Trustors, the Trustors' creditors, or to creditors of the Trustors' estates.  The power of appointment shall not be limited with regard to the shares or proportions to be allocated or with regard to whether a distribution shall be outright or held in trust.  If the Trustors have failed to appoint beneficiaries as provided above, then the remaining assets of the Trust shall be distributed as provided for in Article IV below.  Upon the death of one Trustor, the other then surviving Trustor, with respect to the Nevada Survivor's Trust only, shall retain the right to exercise the special testamentary power of appointment, signed by the surviving Trustor and delivered to the Trustee.  The surviving Trustor's power to appoint beneficiaries of the Nevada Survivor's Trust shall be unlimited; provided, however, that the Trustor may not appoint the Trust estate, or any part thereof, to the surviving Trustor, the estate of the surviving Trustor, the surviving Trustor's creditors, or to the creditors of the surviving Trustor's estate.  The power of appointment shall not be limited with regard to the shares or proportions to be allocated or with regard to whether a distribution shall be outright or held in trust.  If the surviving Trustor has failed to appoint beneficiaries as provided above, then the remaining assets of the Nevada Survivor's Trust shall be distributed as provided for in Article V below.

f) **Trustors' Retained Powers of Administration**.  Notwithstanding any provisions contained herein to the contrary, either Trustor, whether or not acting in capacity as an Investment Trustee hereunder, shall have the power to reacquire the Trust corpus by substituting therefore other property of an equivalent value.  This power may be exercised by a Trustor in a nonfiduciary capacity without the approval or consent of any Trustee, Co-Trustee or other person acting in a fiduciary capacity with respect to the Trusts created hereunder other than the right in the Trustee(s) to require fair appraisals of property received from Trustors or transferred to Trustors in such substitution.  This power of substitution shall apply only to a Trustor, and shall not override N.R.S. 163.050 with respect to a trustee's acts of buying from or selling to an affiliate other than as specifically provided herein with respect to transfers between the Trustees and Trustors for fair value.  Trustors understand that retention of such powers shall cause the Trust income to be taxable to them under Subchapter J, Subpart E of the Internal Revenue Code of 1986, as amended, and agree to pay all income taxes attributable to such Trust income.  A Trustor may irrevocably relinquish this power of substitution at any time by a writing given to the Trustee.

g) **Applicability of N.R.S. Chapter 166 on Death of First Trustor to Die**.  Upon the death of the first Trustor to die, the Nevada Exemption Trust(s) shall be established solely with the Decedent's separate property and/or with the Decedent's one-half (1/2) share of the community property.  N.R.S. Chapter 166 provides that the settlor of a Nevada trust may not make distributions of any of the trust estate to the settlor.  Because the Survivor is not the settlor of the Nevada Exemption Trust, the N.R.S. Chapter 166 prohibitions against a settlor (Trustor) making distributions of any of the Trust estate to himself or herself is not applicable.  Therefore, with

Page 4

respect to the appointment of Trustees hereunder, following the death of the first Trustor to die (i.e. the "Decedent"), the Distribution Trustees shall not act as Trustee of any of the Trusts created pursuant to Subsection 4.3(b)(2), and the powers of the Distribution Trustees shall only be applicable to the Nevada Survivor's Trust, as created pursuant to Subsection 4.3(b)(1) and as to be administered pursuant to Section 4.4.

## ARTICLE 4
## DISTRIBUTION AND ADMINISTRATION
## AFTER THE DEATH OF A TRUSTOR

a)  **Decedent and Survivor Defined**.  Reference to the "Decedent" shall refer to either of the Trustors whose death shall first occur and reference to the "Survivor" shall refer to the surviving Trustor.

b)  **Simultaneous Death**.  If the Trustors' deaths occur simultaneously or in unknown order, then Laura Imbach shall be deemed to have died first and Kelli Austin shall be deemed to be the Survivor.

c)  **Division of Trust Assets**.  After the death of the Decedent, the Investment Trustee shall administer and divide the Trust estate, including all property received by the Trustee by reason of Decedent's death as follows:

i)  The Investment Trustee may, in the Investment Trustee's sole discretion, pay from the income and/or principal of Decedent's one-half of the community property, which is a part of this Trust estate, the administrative expenses for the Decedent's estate.  The Investment Trustee may also pay the expenses of the funeral of the Decedent.

ii)  The remainder of the Trust estate and the property received by the Investment Trustee by reason of Decedent's death shall be divided into two separate trusts and administered as hereinafter provided:

(1)  **The Nevada Survivor's Trust**.  The Investment Trustee shall allocate to the Nevada Survivor's Trust (i) the Survivor's separate property interest in the Trust estate and (ii) the Survivor's one-half interest in the community property of the Trust estate.

(2)  **The Nevada Exemption Trust**.  The Investment Trustee shall next allocate to the Nevada Exemption Trust, from (i) the Decedent's separate property interest in the Trust estate and (ii) the Decedent's interest in the community property of the Trust estate, a sum not to exceed the maximum amount that can pass to the Trust free of Federal Estate Tax, after taking into account all available deductions, the unified credit and the state death tax credit (provided use of this credit does not result in an increase in the state death taxes paid) allowable to the Decedent's estate, and after also taking account

Page 5

of property disposed of by previous articles in this Trust and property passing outside of this Trust which is includible in the Decedent's gross estate and which does not qualify for the marital or charitable deduction, and after taking account of charges to principal that are not allowed as deductions in computing the deceased spouse's Federal Estate Tax. This allocation may be satisfied in cash or in kind, including undivided interests in property. In allocating assets to this Trust, the Investment Trustee shall first allocate to it any separate property of the Decedent.

(3)    **Residue**. If the Survivor survives the Decedent by a period of 180 days, all other property of the Decedent shall be allocated to the Nevada Survivor's Trust. If the Survivor does not so survive, then all other property of the Decedent shall be distributed to the Nevada Exemption Trust.

iii)    The values to be used in computing the property to be allocated to the Nevada Exemption Trust shall be those finally used in determining the federal estate tax. The property to be allocated by the Investment Trustee to the Nevada Exemption Trust shall be selected by the Investment Trustee and, subject to the limitation set out hereinbelow, the values of the assets so allocated shall be those above directed to be used in computing the amount of the exemption equivalent. In selecting property for allocation to the Nevada Exemption Trust, the Investment Trustee shall comply with the following rule: The value of the property, including cash, so allocated shall be selected in such a manner as to have an aggregate fair market value fairly representative of appreciation or depreciation in value, to the date or dates of each allocation, of all property then available for such allocation in satisfaction of this devise and bequest to the Investment Trustee of the Nevada Exemption Trust. In selecting assets to comply with the above rule, the Investment Trustee is authorized to allocate property in appropriate undivided interests. It is not intended that the Nevada Exemption Trust shall qualify for the marital deduction under federal revenue laws then in force at the Decedent's death.

iv)    In the event the Investment Trustee receives property by inter vivos or testamentary transfer and directions are contained in the instrument of transfer for allocation to or among the respective trusts contained herein, the Investment Trustee shall make allocations in accordance with such directions, anything to the contrary herein notwithstanding.

v)    Any property which the Investment Trustee receives by reason of the Survivor's death shall be allocated directly to the Trusts created by Article V and shall be treated as if received through the Nevada Survivor's Trust.

d)    **Nevada Survivor's Trust**. The Investment Trustee shall hold, manage, invest and reinvest the Nevada Survivor's Trust and shall collect the income thereof and dispose of the net income and principal in the same manner as provided for in ARTICLE III above, for the same beneficiaries as named in Section 2.1 above. Upon the death of the Survivor, the Investment

Trustee may, in the Investment Trustee's sole discretion, pay from the income and/or principal of the Nevada Survivor's Trust, the administrative expenses and the expenses of the last illness and funeral of the Survivor.  Following such payments, the principal and undistributed income of the Nevada Survivor's Trust shall be administered as provided in Article V.

e) **Nevada Exemption Trust**.  The Investment Trustees shall hold, manage, invest and reinvest the Nevada Exemption Trust estate and shall collect the income therefrom and dispose of the net income and principal as follows:

i)      During the lifetime of the Survivor, the Investment Trustees, in his or her absolute discretion, shall pay to the Survivor such amounts of the net income of the Nevada Exemption Trust estate as shall be necessary for the health, education, maintenance, and support of the Survivor.

ii)     The Survivor shall have the discretionary power during the Survivor's lifetime or upon the Survivor's death to direct the Trustee to pay over and distribute trust principal from the Nevada Exemption Trust in the manner provided in a power of appointment signed by the Survivor and delivered to the Investment Trustees.  The Survivor's power to appoint beneficiaries of the Nevada Exemption Trust shall be limited to the issue of children of the beneficiaries originally listed above in Article 2 a) and any charitable organization designated by the majority of the beneficiaries eligible to receive distributions and the Biological Mothers of any Beneficiary approved by the Survivor and shall exclude the Survivor, the Survivor's estate, creditors of the Survivor, and creditors of the Survivor's estate.  The power of appointment shall not be limited with regard to the shares or proportions to be allocated or with regard to whether a distribution shall be outright or held in trust.  If the Survivor has failed to appoint beneficiaries as provided above, then the remaining assets of the Nevada Exemption Trust shall be distributed as provided for below.

iii)    If, in the opinion of the Investment Trustee, the income from all sources of which the Investment Trustee has knowledge shall not be sufficient for the health, education, support and maintenance of the Survivor, the Investment Trustee is authorized to use and expend such part of the Trust principal as is necessary to meet such needs.

iv)     If some or all of the Decedent's generation-skipping exemption is allocated to the property (or exempt portion of the property) that is otherwise to constitute the Nevada Exemption Trust and if that Trust would thereby have an inclusion ratio greater than zero, the Investment Trustee shall instead establish two separate trusts so that each has a generation-skipping inclusion ratio of either zero (the "Exempt Nevada Exemption Trust") or one (the "Nonexempt Nevada Exemption Trust"), and the Investment Trustee shall accomplish this by allocating to the Nonexempt Nevada Exemption Trust the maximum fractional portion of the property (described in paragraph (2) above) that is necessary to establish that trust with an inclusion ratio of one, while leaving the Exempt Nevada Exemption Trust with an inclusion ratio of zero.

v)      The Investment Trustees' duty to report information or account to the beneficiaries of the Nevada Exemption Trust, other than the Survivor, is hereby waived.

vi)     Upon the death of the Survivor, the Investment Trustees shall administer the entire remaining income and principal of this Trust in accordance with Article V.

f)     **Payment of Taxes**.  The Investment Trustee of the Nevada Exemption Trust shall respect and comply with any directions given and provisions made by the Decedent's Will for the payment of debts of the Decedent and the expenses and other obligations of his or her estate, and for the payment and allocation of any death taxes resulting from his or her death.  To the extent these matters are not covered by the Decedent's Will, the Investment Trustee of the Nevada Exemption Trust shall (without charge to any beneficiary) pay all federal, state and foreign death taxes payable on or with respect to any property which passes or has passed under this agreement, under the Decedent's Will or otherwise and which qualifies for the federal estate tax marital deduction;  in all other respects the liability for and burden of federal, state and foreign death taxes imposed by reason of the Decedent's death, shall be paid by the person or from the property upon which an inheritance tax is specifically imposed or, in the case of estate or other taxes, shall be allocated or apportioned in accordance with federal and Nevada law; and the Trustee of the Nevada Exemption Trust may, in the Trustee's discretion, pay debts, last illness and funeral expenses of the Decedent and the administrative expenses and other obligations of his or her estate.  If, however, what would otherwise have been the Nevada Exemption Trust is instead established as two separate trusts under paragraph 4.5(d) above, the payments to be made from the Nevada Exemption Trust under this paragraph (a) shall be made first from the Nonexempt Nevada Exemption Trust.

## ARTICLE 5
## DISTRIBUTION AND ADMINISTRATION
## AFTER THE DEATH OF BOTH TRUSTORS

a)     **Distribution of Trust Assets**. Upon the death of both Trustors, any remaining unappointed property, both income and principal of this Trust estate, shall be distributed to Annabelle Grace Aislyn Kelly-Ray (50%), Adian Williams (20%), David Ray (5%), Brandon Ray (5%), Rebecca Ray (5%), Jonathan Ray (5%), Alanna Coker (5%) and Alex Edwards (5%) if they are then living.  If Annabelle Grace Aislyn Kelly-Ray, Adian Williams, David Ray, Brandon Ray, Rebecca Ray, and Jonathan Ray are not then living, the remaining Trust estate, allocable as described, in the previous sentence, shall be divided into as many equal Trust shares as there are children of Annabelle Grace Aislyn Kelly-Ray, Adian Williams, David Ray, Brandon Ray, Rebecca Ray, and Jonathan Ray who are then living, (hereinafter referred to as "grandchildren of the Trustors" or "great-grandchild of the Trustors") and great-grandchildren of the Trustors who are deceased leaving issue then living, and these shares shall be distributed or retained as follows:

(1)     If any great-grandchild of the Trustors is then over the age of Thirty (30) years, his or her share shall be distributed to him or her, outright and free of Trust.

ii)     For each great-grandchild of the Trustors who is then under the age of Thirty (30) years, his or her share shall be retained in a separate Trust and, until the great-grandchild attains the age of Thirty (30) years, the net income and principal from each Trust share shall be distributed to the great-grandchild as is necessary, in the discretion of the Trustee, for the support, maintenance, education or health needs of the great-grandchild. Any excess income that is not distributed for these purposes shall be accumulated and added to principal.

iii)     Upon attaining the age of Thirty (30) years, the entire remaining balance of the great-grandchild's Trust share shall be distributed to the great-grandchild, outright and free of Trust.

iv)     If prior to full distribution a great-grandchild becomes deceased, his or her remaining share shall be distributed outright equally to his or her issue who are then living under the same terms and conditions as set forth in this section or, if there are no then living issue of the great-grandchild, his or her remaining share shall be distributed to the issue of any living descendant of Annabelle Grace Aislyn Kelly-Ray, Adian Williams, David Ray, Brandon Ray, Rebecca Ray, and Jonathan Ray by right of representation. However, if any such distributee is one for whom a Trust is then being administered under this Article V, the share of such distributee shall, instead of being distributed outright, be added to that Trust and administered and distributed in accordance with its terms.

b)     **<u>Last Resort Clause</u>**. In the event that the principal of the Trust administered under this Article V is not disposed of under the foregoing provisions, the remainder, if any, shall be distributed, outright and free of Trust, equally to the heirs at law of Mary Lou Ray and any subsequent Grantor and one-half their identities and shares to be determined according to the laws of the State of Nevada then in effect relating to the intestate succession of separate property.

### <u>ARTICLE 6</u>
### <u>TRUSTEE'S DISCRETION ON DISTRIBUTION</u>
### <u>TO PRIMARY BENEFICIARIES</u>

Notwithstanding the distribution provisions of this Trust Agreement, with respect to the distributions provided for above, the following powers and directions are given to the Distribution Trustees:

i)     If, upon any of the dates described herein, the Trustee for any reason described below determines, in the Trustee's sole discretion, that it would not be in the best interest of the beneficiary that a distribution take place, then in that event the said distribution shall be totally or partially postponed until the reason for the

postponement has been eliminated.  During the period of postponement, the Trustee shall have the absolute discretion to distribute income or principal to the beneficiary as the Trustee deems advisable for the beneficiary's welfare.

ii)    If said causes for delayed distribution are never removed, then the Trust share of that beneficiary shall continue until the death of the beneficiary and then be distributed as provided in this Trust Instrument.  The cases of such delay in the distribution shall be limited to any of the following:

(1)    The current involvement of the beneficiary in a divorce proceeding or a bankruptcy or other insolvency proceedings.

(2)    The existence of a large judgment against the beneficiary.

(3)    Chemical abuse or dependency, or the conviction of the beneficiary of a felony, involving drugs or narcotics, unless a five-year period has followed said conviction.

(4)    The existence of any event that would deprive the beneficiary of complete freedom to expend the distribution from the Trust estate according to his or her own desires.

(5)    In the event that a beneficiary is not residing in the United States of America at any given time, then the Trustee may decline to transmit to him or her any part or all of the income and shall not be required to transmit to him or her any of the principal if, in the Trustee's sole and uncontrolled judgment, the political and/or economic conditions of such place of residence of the beneficiary are such that it is likely the money would not reach him or her, or upon reaching him or her, would be unduly taxed, seized, confiscated, appropriated, or in any way taken from him or her in such a manner as to prevent his or her use and enjoyment of the same.

(6)    The judicially declared incompetency of the beneficiary.

iii)    The Trustee shall not be responsible unless the Trustee has knowledge of the happening of any event set forth above.

iv)    To safeguard the rights of the beneficiary, if any distribution from his or her Trust share has been delayed for more than one (1) year, he or she may apply to the District Court in Las Vegas, Nevada, for a judicial determination as to whether the Trustee has reasonably adhered to the standards set forth herein.  The Trustee shall not have any liability in the event the Court determines the Trustee made a good faith attempt to reasonably follow the standards set forth above.


## ARTICLE 7
## DISTRIBUTIONS IN KIND

The Trustee is authorized and empowered, in the Trustee's sole discretion, to make distributions in kind, or partly in cash and partly in kind, or by granting, transferring or assigning an undivided interest.  The judgment of the Trustee concerning the valuation for the purposes of such distribution of the property or security shall be binding and conclusive on all parties interested herein.

## ARTICLE 8
## IRREVOCABLE TRUST

The Trust is irrevocable and may not be altered, amended or revoked. Should any power or interest be held, retained or hereafter acquired by the Trustors or Trustee which would cause or appear to cause the Trust estate for any reason to be subject to the claims of any creditors, then the Trustors and Trustee shall be permitted to abandon or release any such powers or interests.

## ARTICLE 9
## ADDITIONAL PROPERTIES

It is agreed by and between the parties hereto that the Trustors shall have the right, at any time, to devise, bequeath, grant, convey, give or transfer additional real, personal or mixed properties to the Trust by inter vivos act or by will, subject to the same terms and conditions as the original provisions of this Trust Agreement, and said additions shall be evidenced by receipt therefore signed by the Trustee.

## ARTICLE 10
## INCOMPETENCY OF BENEFICIARIES

During any period in which a beneficiary may be declared judicially incompetent, or if in the sole judgment of the Trustees the beneficiary is unable to care for himself or herself, the Trustees may pay over to, or use for the benefit of such beneficiary the net income or any part or all of the principal of the Trust estate which has been set aside for that beneficiary, in such manner as the Trustees shall deem necessary or desirable for such beneficiary's best interests.

## ARTICLE 11
## PROVISIONS RELATING TO TRUSTEESHIP

a)      **Trustee Defined**.  Except where specific powers are given to the Distribution Trustees as provided herein, wherever the term "Trustee" is used, it shall be deemed to mean the Investment Trustee.

b)      **Successor Investment Trustee**.  Upon the death or resignation of Laura Imbach then Kelli Ausitn shall serve as the Successor Investment Trustee hereunder.

c)      **Successor Distribution Trustees**.  Upon the death, resignation or removal of Kelli Austin then Laura Imbach shall serve as the Successor Distribution Trustees hereunder; provided, however, that in the event of the death of both Trustors, the Distribution Trustees shall cease to serve as Trustee hereunder, and the administration and distribution of the Trust estate shall

Page 11

thereupon be under the exclusive control of the Investment Trustee(s).  In no event shall a Trustor serve as a Distribution Trustees.

d)      **Trust Consultant**. BVR, Inc. (herein known as the "Consultant" to the Trust), shall have the right and power by giving ten (10) days written notice to the Trustee to remove any Trustee named herein (except the Trust Consultant may not remove the Trustor as a Trustee hereunder), and/or any Successor Trustee, and to appoint any persons to serve as Trustee(s) or as Co-Trustees of the Trusts created hereunder.  In the event of the death, resignation, incompetency, dissolution or failure to serve of any Trustee, then the Trust Consultant shall have the power to appoint a Successor Trustee as provided above.  In the event he shall fail to appoint a Successor Trustee, then a majority of the Adult Beneficiaries may appoint any person to so serve.  At all times at least one Trustee serving shall be a Nevada Trustee, as defined below, unless the Trustees shall choose to administer the Trust under a jurisdiction outside the State of Nevada.

e)      **Resignation Of Trustee and Accounting**.  Any Trustee named herein, and any Successor Trustees, shall have the right to resign at any time by giving five (5) days written notice to the Trustors, during their lifetimes, or to the Beneficiaries after the death of both Trustors.

f)      **Liability Of Successor Trustee**.  No Successor Trustee shall be liable for the acts, omissions, or default of the prior Trustees.  Unless requested in writing by an adult beneficiary of a Trust hereunder within sixty (60) days of appointment, no Successor Trustee shall have any duty to audit or investigate the accounts or administration of any such Trustee, and may accept the accounting records of the predecessor Trustee showing assets on hand without further investigation and without incurring any liability to any person claiming or having an interest in the Trust.

g)      **Acceptance By Trustee**.  A Trustee shall become Trustee or Co-Trustee jointly with any remaining or surviving Co-Trustees, and assume the duties thereof, immediately upon delivery of written acceptance to the Trustors, during their lifetimes and thereafter to any Trustees hereunder, or to any beneficiary hereunder, if for any reason there shall be no Trustee then serving, without the necessity of any other act, conveyance, or transfer.

h)      **Majority**.  Subject to any limitations stated elsewhere in this Trust Indenture, all decisions affecting any of the Trust estate shall be made in the following manner: While three or more Investment Trustees are in office, the determination of a majority shall be binding.  If only one or two Investment Trustees are in office, they must act unanimously.  While three or more Distribution Trustees are in office, the determination of a majority shall be binding.  If only one or two Distributions Trustees are in office, they must act unanimously.

i)      **Expenses and Fees**.  Any Trustee, while serving hereunder, shall be entitled to be reimbursed for expenses incurred on behalf of the Trust and to reasonable compensation for services

rendered on behalf of the Trust.  In no event, however, shall the fees exceed those fees that would have been charged by state or federal banks in the jurisdiction in which the Trust is being governed.

j)        **Acknowledgment By Trustee of Trust Property**.  The Investment Trustees hereby acknowledge receipt of, and accept the property and the Trusts created hereunder on the terms and conditions stated and agree to care for, manage and control the same in accordance with directions herein specified; to furnish the Trustors and the Distribution Trustees no more frequently than annually if requested to do so, in writing, a statement showing the condition of their respective Trust properties, the character and amounts of the investments and liabilities and the receipts, expenses and disbursements since the last previous statement.  The books of account of the Investment Trustees in connection with the investment and the books of account of the Distribution Trustees shall at all times be open to the reasonable inspection of the Trustors while living and to the other beneficiaries after the death of both Trustors, or their duly qualified representatives and such person or persons as they may designate for that purpose.

k)        **Trustee Actions**.  Any Trustee may freely act under all or any of the powers of this agreement given to the Trustee in all matters concerning the Trust, after forming judgment based upon all the circumstances of any particular situation as to the wisest and best course to pursue in the interest of the Trust and the beneficiaries hereunder, without the necessity of obtaining the consent or permission of any person interested herein (subject to the Trustors' veto power granted pursuant to Section 3.2 above and subject to the distribution authorizations as provided for in Section 3.3 above), or the consent or approval of any court, and notwithstanding that the Trustee may also be acting individually, or as Trustee of other Trusts, or as agents of other persons or corporations interested in the same matters, or may be interested in connection with the same matters as stockholders, directors or otherwise; provided, however, that the Trustee shall exercise such powers at all times in a fiduciary capacity, primarily in the interest of the beneficiaries hereunder.

l)        **Bond**.  No bond shall ever be required of any Trustee hereunder, unless requested by either or both Trustors or, following the death or incapacity of both Trustors, a majority of the beneficiaries hereunder, in which event the Trust estate shall pay for such bond or shall reimburse the Trustee for any payment made by the Trustee for a bond.

m)        **Nevada Trustee**.  A Nevada Trustee is a person who/which is either (a) a natural person who resides in or is domiciled in the State of Nevada, **or** (b) a bank or trust company organized under federal law or under the laws of the State of Nevada or another state which maintains an office in the State of Nevada for the transactions of business.  "Nevada Trustee" is also defined to include any person which qualifies as a Nevada Trustee pursuant to Nevada Revised Statutes Chapter 166.

n)    **Distribution Trustees**.  Any Trustee designated as a Distribution Trustees shall only be allowed to exercise discretion over distributions of the Trust estate as explicitly provided for herein.  Said Trustee shall not be responsible for investment decisions for the Trust.  However, any provision in the Trust Agreement to the contrary notwithstanding, the Distribution Trustees shall also have primary authority and responsibility to maintain the records of the Trust, prepare all necessary accountings and prepare all tax returns of the Trust.  The Investment Trustees, by accepting the Investment Trusteeship, agree to indemnify and hold harmless the Distribution Trustees for all actions made by the Distribution Trustees in the capacity as Distribution Trustees, except for willful misconduct or actions of gross negligence.

o)    **Investment Trustee**.  The Investment Trustee(s) shall at all times have the exclusive custody of the entire Trust estate and shall be the legal owner(s) of the Trust estate.  The title to Trust properties need not include the name of the Distribution Trustees, and all Trustee powers, as set forth in Section 13.1 below, may be effected under the sole and exclusive control of the Investment Trustees, subject to the requirements for authorization of distributions to Trustors as set forth in Section 3.3 above, and as to the other powers vested in the Distribution Trustees as set forth in Article III, Article VI and Section 11.14 above.

## ARTICLE 12
## TRUST CONSULTANT'S LIMITED POWER OF AMENDMENT

a)    **Trust Consultant's Limited Powers**.  In the case of each separate trust at any time in existence hereunder, such trust's then Consultant, other than any (i) one who has ever made a gift transfer to such trust, or (ii) who is prohibited by the provisions of Section 12.2 below from participating in this amendment involved, from time to time may, notwithstanding any other provision of this Instrument, amend or restate this Instrument, including its dispositive, administrative and other provisions of all kinds, in order to permit such Trustees:

i)    To cope with tax and/or other circumstantial changes that may affect such trust and/or its beneficiaries; and/or

ii)   To remove from the governing trust instruments any provisions which have become "deadwood" (i.e., no longer operative in the ongoing administration of such trust due to changed circumstances) with respect to (i) such trust, and (ii) all trusts that are subsequently to come into existence under this Instrument to hold part or all of the assets of such trust, in whatever way or ways such Trustees, in the exercise of such Trustee's sole discretion, may deem appropriate in the best interests, as interpreted by such Trustee(s) alone, of the beneficiary(ies) of such trust(s) and of each beneficiary's family as a whole.  Such Trustees shall be guided by what, in the sole judgment of such Trustees alone, would apparently be the Trustors' original intent hereunder in the light of the changed circumstances.

      b)    **Limitation of Powers**.  Notwithstanding the foregoing, however, under no circumstances (i) shall any Consultant, who is also a beneficiary of any such trust, participate in any amendment which may result in such Consultant/beneficiary receiving any direct or indirect financial benefit from any such trust, nor (ii) shall any such amendment:

    i)      Extend the period of any such trust's existence beyond the already applicable rule against perpetuities limitation period specified herein;

    ii)    Diminish in any way (that is not controlled by the beneficiary) any enforceable right a beneficiary may already have (under the then terms of this Instrument) to receive the income of any trust, currently or at any time in the future (but, to the extent an amendment benefits or grants a power to a current beneficiary of that trust it may diminish the rights of one or more beneficiaries to receive in the future the income of that trust or of any trust subsequently to come into existence to hold part of all of the assets of that trust);

    iii)    Reduce in any way the restrictions and limitations on (i) Trustors and fiduciary actions as set forth herein (ii) the Consultant's limited powers of amendment under this Article and (iii) who (or what institutions) can qualify to fill any office of Trustee hereunder as set forth herein, unless such reduction of restrictions and/or limitations will not have any adverse tax effect on such trust or any of its beneficiaries (all of which provisions, referred to in (i), (ii) and (iii) above, however, may be amended, irrevocably and binding on successors, to increase such restrictions and limitations in any way such amending Consultant's may deem appropriate);

    iv)    Give (i) any Trustee any powers or discretion that are either granted exclusively to a Co-Trustee or from the exercise of which such Trustee is excluded for any reason, nor (ii) anyone acting in a nonfiduciary capacity any powers granted herein to fiduciaries unless, in either case, such amendment will not have any adverse tax effect on such trust or any of its beneficiaries;

    v)    Make any change that would have the effect of disqualifying any such trust insofar as such trust, prior to such amendment, otherwise qualified for and was in fact already taking advantage of, while such advantage otherwise will continue, (i) any exemption from a surviving spouse's elective right or from any creditor's right to levy on any beneficiary's interest in any such trust, or (ii) protection provided pursuant to the spendthrift provisions as set forth herein; and

    vi)    Any such amendment shall be by written instrument, executed by such amending Consultant, setting forth the trust or trusts hereunder to which the amendment applies and the effective date of such amendment.

## ARTICLE 13
## TRUSTEE POWERS AND LIMITATIONS

a)    **Trustee's Powers**.  No Trustee shall be liable to any beneficiary or heir of the Trustors for the Trustee's acts or failure to act, except for willful misconduct or gross negligence.

The Investment Trustees shall have the following powers, all of which are to be exercised in a fiduciary capacity:

i)    With respect to real property: to sell and to buy real property; to mortgage and/or convey by deed of trust or otherwise encumber any real property now or hereafter owned by this Trust (including, but not limited to any real property, the Trustee may hereafter acquire or receive) to lease, sublease, release; to eject, remove and relieve tenants or other persons from, and recover possession of by all lawful means; to accept real property as a gift or as security for a loan; to collect, sue for, receive and receipt for rents and profits and to conserve, invest or utilize any and all of such rents, profits and receipts for the purposes described in this paragraph; to do any act of management and conservation, to pay, compromise, or to contest tax assessments and to apply for refunds in connection therewith; to employ laborers; to subdivide, develop, dedicate to public use without consideration, and/or dedicate easements over; to maintain, protect, repair, preserve, insure, build upon, demolish, alter or improve all or any part thereof; to obtain or vacate plats and adjust boundaries; to adjust differences in valuation on exchange or partition by giving or receiving consideration; to release or partially release real property from a lien.

ii)    To register any securities or other property held hereunder in the names of Trustees or in the name of a nominee, with or without the addition of words indicating that such securities or other property are held in a fiduciary capacity, and to hold in bearer form any securities or other property held hereunder so that title thereto will pass by delivery, but the books and records of Trustees shall show that all such investments are part of their respective funds.

iii)    To hold, manage, invest and account for the separate Trusts in one or more consolidated funds, in whole or in part, as they may determine.  As to each consolidated fund, the division into the various shares comprising such fund need be made only upon Trustees' books of account.

iv)    To lease Trust property for terms within or beyond the term of the Trust and for any purpose, including exploration for and removal of gas, oil, and other minerals; and to enter into community oil leases, pooling and unitization agreements.

v)    To borrow money, mortgage, pledge or lease Trust assets for whatever period of time Trustee shall determine, even beyond the expected term of the respective Trust.

vi)    To hold and retain any property, real or personal, in the form in which the same may be at the time of the receipt thereof, as long as in the exercise of their discretion it

Page 16

may be advisable so to do, notwithstanding same may not be of a character authorized by law for investment of Trust funds.

vii)  To invest and reinvest in their absolute discretion, and they shall not be restricted in their choice of investments to such investments as are permissible for fiduciaries under any present or future applicable law, notwithstanding that the same may constitute an interest in a partnership.

viii)  To advance funds to any of the Trusts for any Trust purpose.  The interest rate imposed for such advances shall not exceed the current rates.

ix)  To institute, compromise, and defend any actions and proceedings.

x)  To vote, in person or by proxy, at corporate meetings any shares of stock in any Trust created herein, and to participate in or consent to any voting Trust, reorganization, dissolution, liquidation, merger, or other action affecting any such shares of stock or any corporation which has issued such shares of stock.

xi)  Except as limited in Section 3.3 above, to partition, allot, and distribute, in undivided interest or in kind, or partly in money and partly in kind, and to sell such property as the Trustees may deem necessary to make division or partial or final distribution of any of the Trusts.

xii)  To determine what is principal or income of the Trusts and apportion and allocate receipts and expenses as between these accounts.

xiii)  Except as limited by Section 3.3 above, to make payments hereunder directly to any beneficiary under disability, to the guardian of his or her person or estate, to any other person deemed suitable by the Trustees, or by direct payment of such beneficiary's expenses.

xiv)  To employ agents, attorneys, brokers, and other employees, individual or corporate, and to pay them reasonable compensation, which shall be deemed part of the expenses of the Trusts and powers hereunder.

xv)  To accept additions of property to the Trusts, whether made by the Trustors, a member of the Trustors' family, by any beneficiaries hereunder, or by any one interested in such beneficiaries.

xvi)  To hold on deposit or to deposit any funds of any Trust created herein, whether part of the original Trust fund or received thereafter, in one or more savings and loan associations, bank or other financial institution and in such form of account, whether or not interest bearing, as Trustees may determine, without regard to the amount of any such deposit or to whether or not it would otherwise be a suitable investment for funds of a trust.

xvii)   To open and maintain safety deposit boxes in the name of this Trust.

xviii)  Except as limited to by Section 3.3 above, to make distributions to any Trust or beneficiary hereunder in cash or in specific property, real or personal, or an undivided interest therein, or partly in cash and partly in such property, and to do so without regard to the income tax basis of specific property so distributed. The Trustors request but do not direct, that the Trustees make distributions in a manner which will result in maximizing the aggregate increase in income tax basis of assets of the estate on account of federal and state estate, inheritance and succession taxes attributable to appreciation of such assets.

xix)    Except as limited by Section 3.3 above, the powers enumerated in NRS 163.265 to NRS 163.410, inclusive, are hereby incorporated herein to the extent they do not conflict with any other provisions of this instrument.

xx)     The enumeration of certain powers of the Trustees shall not limit their general powers, subject always to the discharge of their fiduciary obligations, and being vested with and having all the rights, powers, and privileges which an absolute owner of the same property would have.

xxi)    To invest Trust assets in securities of every kind, including debt and equity securities, to buy and sell securities, to write covered securities options on recognized options exchanges, to buy-back covered securities options listed on such exchanges, to buy and sell listed securities options, individually and in combination, employing recognized investment techniques such as, but not limited to, spreads, straddles, and other documents, including margin and option agreements which may be required by securities brokerage firms in connection with the opening of accounts in which such option transactions will be effected.

xxii)   To sell any property in the Trust estate, with or without notice, at public or private sale and upon such terms as the Trustee deems best, without appraisement or approval of court.

xxiii)  To invest and reinvest principal and income in such securities and properties as the Trustees shall determine. The Trustees are authorized to acquire, for cash or on credit (including margin accounts), every kind of property, real, personal or mixed, and every kind of investment (whether or not unproductive, speculative, or unusual in size of concentration), specifically including, but not by way of limitation, corporate or governmental obligations of every kind and stocks, preferred or common, of both domestic and foreign corporations, shares or interests in any unincorporated association, Trust, or investment company, including property in which the Trustees are personally interested or in which the Trustees own an undivided interest in any other Trust capacity.

xxiv)   To deposit Trust funds in commercial savings or savings bank accounts in unlimited amounts for an unlimited period of time, with or without interest and subject to such

Page 18

restrictions upon withdrawal as the Trustees shall agree; any Trustee may sign on such account without any Trustee co-signature unless the signature card shall provide otherwise.

xxv)   To borrow money for any Trust purpose upon such terms and conditions as may be determined by the Trustees, and to obligate the Trust estate for the repayment thereof; to encumber the Trust estate or any part thereof by mortgage, deed of trust, pledge or otherwise, for a term within or extending beyond the term of the Trust.

xxvi)  To grant options and rights of first refusal involving the sale or lease of any Trust asset and to sell upon deferred payments, or to acquire options and rights of first refusal for the purchase or lease of any asset, to purchase notes or accounts receivable whether secured or unsecured.

xxvii) To employ and compensate, out of the principal or income or both, as the Trustees shall determine, such agents, persons, corporations or associations, including accountants, brokers, attorneys, tax specialists, certified financial planners, realtors, and other assistants and advisors deemed needful by the Trustees even if they are associated with a Trustee, for the proper settlement, investment and overall financial planning and administration of the trusts; and to do so without liability for any neglect, omission, misconduct, or default of any such person or professional representative provided such person was selected and retained with reasonable care.

(bb)   To invest and reinvest all or any part of the assets of any trust in any money management or registered investment advisory service which would provide for professional management of any such assets.  In this regard, the Trustors specifically allow the Trustees to authorize the advisory service to have the discretionary authority to invest and reinvest the assets transferred to such advisor by the Trustees without the requirement of prior approval of the Trustees on any transactions.

(cc)   Notwithstanding the prohibitions under N.R.S.  163.050 and any such Successor provisions, or notwithstanding any prohibitions against "self-dealing" as are provided under the laws of any other jurisdiction pursuant to which laws this Trust may be administered, any Trustees shall not be prohibited from engaging in acts of self-dealing with Trust property, either directly or indirectly, so long as such act of self-dealing is disclosed to the Distribution Trustees and so long as the Trustees, in selling his, her or their own property or selling other properties in an agency or other fiduciary capacity to the Trust or in purchasing Trust assets for his or her personal account or in purchasing Trust assets in an agency or other fiduciary capacity, gives fair consideration in exchange for all Trust properties received.  Where Trustees have engaged in acts of self-dealing for fair and adequate consideration, and has/have given notice to the Distribution Trustees and to the guardians of any minor beneficiaries, Trustees shall be relieved of any liability, sanction, and allegation of wrongdoing for such acts by any Court or other legal authority.

(dd)     To retain for any period of time any property which may be received or acquired, even though its retention by reason of its character or otherwise would not be appropriate apart from this provision.

(ee)     In the event the purchase, use or disposition of any trust property gives rise to either threatened or actual liability such that, in the sole opinion of the Trustees, the remaining assets of the Trust are thereby placed at risk of exposure to such liability, the Trustees shall be empowered to take such further and necessary steps as they deem prudent to protect and preserve the remaining assets of the trust, including but not limited to transferring such property giving rise to the threatened or actual liability to a separate trust formed to hold said property.  The Trustees shall be further empowered to appoint an independent third party to act as Trustee over the newly-formed trust, and such trust shall be administered according to, and governed by the terms of, this Trust Agreement.  The Beneficiaries of the new trust shall be the same beneficiaries as herein, and their interests in the new trust shall be in the same proportion as indicated herein.  The Trustees of the new trust shall maintain records and books of accounts which are independent of and separate from the records and accounts maintained hereunder.

(ff)     The Trustees shall have the power to deal with matters involving the actual, threatened or alleged contamination of property held in the Trust estate (including any interests in partnerships or corporations and any assets owned by such business enterprises) by hazardous substances, or involving compliance with environmental laws.  In particular, the Trustees may:

(1)     Inspect and monitor trust property periodically, as necessary, to determine compliance with any environmental law affecting such property, with all expenses of such inspection and monitoring to be paid from the income or principal of the trust;

(2)     Respond (or take any other action necessary to prevent, abate or "clean up") as it shall deem necessary, prior to or after the initiation of enforcement action by any governmental body, to any actual or threatened violation of any environmental law affecting any of such property, the cost of which shall be payable from trust assets;

(3)     Settle or compromise at any time any claim against the Trust related to any such matter asserted by any governmental body or private party;

(4)     Disclaim any power which the Trustees determine may cause it to incur liability as a result of any such matter, whether such power is set forth herein, or granted or implied by any statute or rule of law.

(gg)     The Trustees shall not be personally liable to any beneficiary or other party interested in the Trust, or to any third parties, for any claim against the Trust for the diminution in value of Trust property resulting from such matters, including any

reporting of or response to (1) the contamination of Trust property by hazardous substances; or (2) violations of any environmental laws related to the Trust; provided that the Trustees shall not be excused from liability for its or their own negligence or wrongful willful act.

(hh)    When used in this document the term "hazardous substance(s)" shall mean any substance defined as hazardous or toxic or otherwise regulated by any federal, state or local law(s) or regulation(s) relating to the protection of the environmental or human health ("environmental law(s)").

(ii)    Notwithstanding any contrary provision of this instrument, the Trustees may withhold a distribution to a beneficiary until receiving from the beneficiary an indemnification agreement in which the beneficiary agrees to indemnify the Trustees against any claims filed against the Trustees pursuant to any federal, state or local statue or regulation relating to clean up or management of hazardous substances.

b)    **"Prudent Person" Rule**.  In addition to the investment powers conferred above, the Trustees are authorized (but are not directed) to acquire and retain investments not regarded as traditional for trusts, including investments that would be forbidden by the "prudent person" rule. The Trustee may, in his or her sole discretion, invest in any type of property, wherever located, including any type of security or option, improved or unimproved real property, and tangible or intangible personal property, and in any manner, including direct purchase, joint ventures, partnerships, limited partnerships, corporations, mutual funds, or any other form of participation or ownership whatsoever.  In making investments, the Trustees may disregard all of the following factors:

i)    Whether a particular investment, or the trust investments collectively, will produce a reasonable rate of return or result in the preservation of principal.

ii)    Whether the acquisition or retention of a particular investment, or the trust investments collectively, is consistent with any duty or impartiality as to the different beneficiaries.  The Trustors intend no such duty shall exist.

iii)    Whether the trust is diversified.  The Trustors intend no duty to diversity shall exist.

iv)    Whether any or all of the trust investments would traditionally be classified as too risky or speculative for trusts.  The entire trust may be so invested.  The Trustors intend the Trustees to have sole discretion in determining what constitutes acceptable risk and what constitutes proper investment strategy.

The Trustors' purpose in granting the foregoing authority is to modify the prudent person rule insofar as the rule would prohibit an investment or investments because of one or more factors listed above, or any other factor relating to the nature of the investment itself. Accordingly, the Trustees shall not be liable for any loss in value of an investment merely because of the nature of the investment or the degree of risk presented by the investment, but shall be liable if the Trustees' procedures in selecting and monitoring the investment are proven by affirmative evidence to have been negligent, and such negligence was the proximate cause of the loss.

  c)   **Permitted Methods of Distribution**. Distributions will be permitted by using the following methods:

  i)   With respect to any sum or property, whether income or principal, which is required or permitted to be distributed out of any trust hereunder to or for the benefit of any person, whether or not such person is, at the time, a minor and whether or not the Trustees of such trust determine such person to be under any disability preventing such person from acting properly on such person's own behalf (irrespective of whether legally so adjudicated), such Trustees may make distribution or the same in any one or more of the following ways as such Trustee, from time to time, in his or her sole discretion, shall deem to be most expedient in the best interests of such person; namely, by paying, distributing or applying the same to:

  (1)   Such person directly;

  (2)   The duly appointed conservator, guardian or committee for such person, if any;

  (3)   An apparently qualified individual (other than any donor to such trust) or bank who, in taking the same "as custodian for" such person under the appropriate state's Uniform Transfers to Minors Act, indicates that such sum or property will be treated in all respects as "custodial property" for the benefit of such person in accordance with the provisions of such act of such state (whether or not such act permits custodial property of such an origin) or other uniform gifts to minors or similar act in that state;

  (4)   The parent, spouse or other individual having the care and custody of such person (other than any donor to such trust) who, as such person's natural guardian, shall agree to preserve the same for the immediate or ultimate benefit of such person (or such person's estate), but who shall not be obligated to qualify as a legal guardian or account to any probate court therefore;

  (5)   The Trustee or Trustees of any trust, all of the assets of which are then fully and unqualifiedly withdrawable by such person;

Page 22

(6)     The direct payment of any educational, medical or other property expense of such person (or any person to whose support or education such person would, in such Trustee's reasonable judgment, normally be expected to contribute), including expenses, such as taxes, repairs, etc., reasonably appropriate to preserving any assets belonging to such person, as long as such expense is not the legal obligation of any other person;

(7)     The purchase of stocks, bonds, insurance (the term "purchase" shall include any premium payment), or other properties of any kind, the ownership of which is registered in the sole name of such person; or

(8)     The making of a deposit into a bank, savings and loan association, brokerage or other similar account in the sole name of such person, provided that distribution shall be made in the manner described in subparagraphs (3) and (4) above only if legally enforceable indemnification in favor of such person is received against anyone other than such person (or such person's estate) benefiting thereby (even through the discharge of an obligation to support such person). The receipt of or evidence of any such payment, distribution or application shall be a complete discharge and acquittance of such Trustee to the extent of such payment, distribution or application and, except for enforcement of any above described indemnification, such Trustee shall have no duty to see to the actual application of amounts so paid or distributed to others.

ii)     Notwithstanding the foregoing, however, where distributions are required to be made to or for the "direct" benefit of a person, only distributions made in the manner described in subparagraphs (1), (5), (6) (except for its parenthetical provision), (7) or (8) above shall be considered to have been made for the "direct" benefit of such person.

d)      **Use and Enjoyment of Trust Owned Personally and Realty**. From time to time, the Trust estate may include residential real estate and/or tangible personal property. The Distribution Trustees shall have the sole and absolute discretion to determine the possession, use and enjoyment of (i) all of the tangible personal property at any time held by such trust and (ii) all real property that may at any time constitute an asset of the trust and that could be occupied or used by a beneficiary (or beneficiaries) for residential purposes, whether as a primary residence, seasonal residence or otherwise. Such use, possession and enjoyment may be without rent or other financial obligation and the Trustee of the Trust, to the extent of the Trust assets and except as they may be relieved of such obligation by such beneficiary (or beneficiaries), shall see to the timely payment of all taxes, insurance, maintenance, and repairs, safeguarding and other charges related to the preservation and maintenance of each and every such property.

e) **Compensation of Trustees**.  All Trustees may receive reasonable compensation for services rendered hereunder, plus extraordinary fees, if applicable, determined annually.  Each separate Trust hereunder shall be chargeable with and may pay without application to any court:

i)      The reasonable expenses of its Trustee(s) in the administration of such Trust, including the fees and expenses of such agents, attorneys, accountants and advisors as such Trustee(s) may employ in the administration of such Trust.

ii)      Compensation for a Corporate Trustee's services in the amount and at the time specified in its Schedule of Fees and Charges established from time to time for the administration of trusts of a character similar to the trust being administered and in effect when such compensation is payable.

iii)     Reasonable compensation for the services rendered and responsibilities assumed by each of such Trustee(s) in the administration of such Trust to be paid at reasonable intervals as incurred, with commencement and termination fees permitted only if agreed to by all of the Trustee(s) of such Trust in a written instrument approved by the Beneficiary of such Trust.

iv)     The employment of a person or firm and the payment of fees under Paragraph (a) above is specifically authorized notwithstanding the fact the person or firm so employed may be a Trustee or affiliated in business with any Trustee hereunder, provided the fees for the services rendered and responsibilities assumed in each capacity are reasonable and not duplicative.

f)      **Power to Appoint Agent**.  The Trustee is authorized to employ attorneys, accountants, investment managers, specialists, and such other agents as the Trustee shall deem necessary or desirable.  The Trustee shall have the authority to appoint an investment manager or managers to manage all or any part of the assets of the Trust, and to delegate to said investment manager the discretionary power to acquire and dispose of assets of the Trust.  The Trustee may charge the compensation of such attorneys, accountants, investment managers, specialists, and other agents against the Trust, including any other related expenses.

g)      **Broad Powers Of Distribution**.  After the death of either Trustors and both Trustors, upon any division or partial or final distribution of the Trust estate, the successor Trustee shall have the power to partition, allot and distribute the Trust estate in undivided interest or in kind, or partly in money and partly in kind, at valuations determined by the Trustee, and to sell such property as the Trustee, in the Trustee's discretion, considers necessary to make such division or distribution.  In making any division or partial or final distribution of the Trust estate, the Trustee shall be under no obligation to make a pro rata division or to distribute the same assets to beneficiaries similarly situated.  Rather, the Trustee may, in the Trustee's discretion, make non pro rata divisions between Trusts or shares and non pro rata distributions to beneficiaries as long as the respective assets allocated to separate trusts or shares or the distributions to beneficiaries have

Page 24

equivalent or proportionate fair market value. The income tax basis of assets allocated or distributed non pro rata need not be equivalent and may vary to a greater or lesser amount, as determined by the Trustee, in his or her discretion, and no adjustment need be made to compensate for any difference in basis.

h) **Trustees' Liability**. Except for the Trustees' own intentional and malicious breach of trust, bad faith, or gross negligence, the Trustees shall not be liable for any act, omission, loss, damage, or expense arising from the performance of the Trustees' duties under this Trust Agreement. The Trustees shall not be liable for making any investments or purchases on behalf of the Trust, nor shall the Trustees be required in any way to diversify investments nor shall the Trustees in any way be required to sell or otherwise dispose of speculative or non-productive property or assets owned or acquired by the Trust.

i) **Indemnity**. The Trustees (including the Distribution Trustees) shall, from the Trust assets, both principal and income, be indemnified and held harmless from and against any and all loss, cost, expense, and damage (including any attorney's fees) incurred by the Trustees arising out of or in any way connected with this Trust, the administration thereof, or related to any assets contained herein or for any other reason whatsoever.

j) **Corporate Trustee**. While there is a corporate Trustee acting, it shall have custody of all assets, books of account and records.

k) **Nondisclosure**. Trustees shall be under no obligation to disclose the contents of the Trust estate to anyone other than as may be required by law or lawful court order or as required pursuant to Section 11.9 above. Additionally, the Trustees shall be under no obligation to disclose the assets, investments, business, or affairs of this Trust. Furthermore, Trustees, when convenient or necessary, may give an abbreviated version of the Trust Agreement and/or a written memorandum of the pertinent provisions of this Trust to those persons needing such, so as to, for instance, open bank accounts, stock brokerage accounts, etc. or to title companies to show authority for Trustees to sell or purchase real estate.

l) **Undivided Interests**. The principal of the trusts created by this Trust Agreement may consist of undivided interests in the same property, and the Trustees may administer such trusts as one fund. The Trustees shall make a separate account for each of the separate trusts created under this Trust Agreement, but all of such trusts may be administered as a single fund. Joint investments or interests in investments may be assigned to such trusts, with each trust being credited with an undivided interest in all joint investments in the proportion which is assigned to it or in the proportion which its contribution to such investment bears to the whole.

*Remainder of Page intentionally left blank*

m) **Separate Property**. Any property held in trust and any income earned by the trusts created hereunder shall be the separate property (in distinction with community property, joint tenancy property, tenancy in common, marital property, quasi-community property or tenancy by the entirety) of the beneficiaries of such trusts.  Additionally, any distribution to or for the benefit of any beneficiary shall be and remain the sole and separate property and estate of the beneficiaries.

## ARTICLE 14
## MERGER OF TRUSTS

If at any time a Trustee of any Trust created pursuant to this Trust Agreement shall also be acting as Trustee of any other trust for the benefit of the same beneficiary or beneficiaries and upon substantially the same terms and conditions, the Trustee is authorized and empowered, if in the Trustee's discretion such action is in the best interest of the beneficiary or beneficiaries of the Trust created hereunder, to transfer and merge any part or all of the assets then held under such trust created pursuant to this instrument to and with such other trust.  The Trustee's power of merger shall include the power to change the situs of the Trust, including the power to move the Trust situs outside the jurisdiction of the United States of America.  The Trustee is further authorized to accept the assets of other trusts which may be transferred to the Trustee of the Trust created hereunder and to administer and distribute such assets and properties so transferred in accordance with the provisions of this instrument.

## ARTICLE 15
## GENERAL PROVISIONS

a)      **Controlling Law**.  This Trust Indenture is executed under the laws of the State of Nevada and shall in all respects be administered by the laws of the State of Nevada; provided, however, the Trust Consultant shall have the discretion, exercisable at any later time and from time to time, to change the governing law under which any trust created hereunder is administered to the laws of any domestic or foreign jurisdiction as the Trust Consultant sees fit, by executing a written instrument acknowledged before a notary public to that effect, and delivered to the then income beneficiaries.  If the Trust Consultant exercises the discretion, as above provided, this Trust Indenture shall be administered from that time forth by the laws of the other state or jurisdiction.

b)      **Spendthrift Provision**.  No property (income or principal) distributable under this Trust Agreement, whether pursuant to Articles III, IV and V or otherwise, shall be subject to anticipation or assignment by any beneficiary, or to attachment by or of the interference or control of any creditor or assignee of any beneficiary, or be taken or reached by any legal or equitable process in satisfaction of any debt or liability of any beneficiary, and any attempted transfer or

Page 27

encumbrance of any interest in such property by any beneficiary hereunder shall be absolutely and wholly void. No beneficiary or remainderman of any Trust shall have any right or power to sell, transfer, assign, pledge, mortgage, alienate, or hypothecate his or her interest in the principal or income of the Trust estate in any manner whatsoever. To the fullest extent of the law, the interest of each beneficiary and remainderman shall not be subject to the claims of any of his or her creditors or liable to attachment, execution, bankruptcy proceedings, or any other legal process. No beneficiary of any Trust created hereunder shall have any right or power to anticipate, pledge, assign, sell, transfer, alienate or encumber his or her interest in the Trust, in any way; nor shall any such interest in any manner be liable for or subject to the debts, liabilities, taxes or obligations of such beneficiary or claims of any sort against such beneficiary. The Trustee shall pay, disburse, and distribute principal and income of any trust only in the manner provided for in this Trust Agreement and will not make any attempted transfer or assignment, whether oral or written, to any appointee beneficiary or remainderman other than as herein provided. All Trusts created by this Trust Agreement shall be spendthrift Trusts as provided by the laws of the State of Nevada and shall be interpreted and operated so as to maintain such trusts as spendthrift trusts. Any beneficiary of any Trust created under this Trust Agreement may renounce or disclaim his or her interest in any Trust created under this Trust Agreement or any special or general power of appointment, in whole or in part, at any time; provided, however, such beneficiary shall not be treated as having died for the purpose of fiduciary appointments made in this Trust Agreement by reason of such disclaimer.

c)  **Perpetuities Savings Clause**. Unless terminated earlier in accordance with other provisions of this trust, any trust hereby created or created by the exercise of any power hereunder shall terminate Twenty-one (21) years after the death of the last survivor of the Trustors all named beneficiaries who are living at the death of the first Trustor to die, or, if later, upon the expiration of the maximum period authorized by the laws of the State of Nevada or the state by which the trust is then being governed. Upon such termination, the Trust estate, and any accumulations thereon, shall be distributed to those persons and in the same proportions as the income of the trust is then being paid. Notwithstanding the foregoing, it is the intent of the Trustors that this Trust last for the longest period possible by law. Therefore, the Trustees, pursuant to, and to the extent allowed by, N.R.S. Chapter 111, elect out of the Rule Against Perpetuities. Such Rule shall not apply to this Trust. If this election is not valid, then the preceding paragraph of this Section 15.3 shall apply.

d)  **No-Contest Provision**. The Trustors specifically desire that this Trust Indenture and these Trusts created herein be administered and distributed without litigation or dispute of any kind. If any beneficiary of these Trusts or any other person, whether stranger, relative or heir, or any legatee or devisee under the Last Will and Testament of either of the Trustors or the successors-in-interest of any such persons, including Trustors' estates under the intestate laws of the

State of Nevada or any other state lawfully or indirectly, singly or in conjunction with another person, seek or establish to assert any claim or claims to the assets of these Trusts established herein, or attack, oppose or seek to set aside the administration and distribution of the Trusts, or to invalidate, impair or set aside its provisions, or to have the same or any part thereof declared null and void or diminished, or to defeat or change any part of the provisions of the Trusts established herein, then in any and all of the abovementioned cases and events, such person or persons shall receive One Dollar ($1.00), and no more, in lieu of any interest in the assets of the Trusts or interest in income or principal.

e)    **Provision For Others**.  The Trustors have, except as otherwise expressly provided in this Trust Indenture, intentionally and with full knowledge declined to provide for any and all of their heirs or other persons who may claim an interest in their respective estates or in these Trusts.

f)    **Severability**.  In the event any clause, provision or provisions of this Trust Indenture prove to be or be adjudged invalid or void for any reason, then such invalid or void clause, provision or provisions shall not affect the whole of this instrument, but the balance of the provisions hereof shall remain operative and shall be carried into effect insofar as legally possible.

g)    **Distribution Of Small Trust**.  If the Trustee, in the Trustee's absolute discretion, determines that the amount held in Trust is not large enough to be administered in Trust on an economical basis, then the Trustee may distribute the Trust assets free of Trust to those persons then entitled to receive the same.

h)    **Headings**.  The various clause headings used herein are for convenience of reference only and constitute no part of this Trust Indenture.

i)    **More Than One Original**.  This Trust Indenture may be executed in any number of copies and each shall constitute an original of one and the same instrument.

j)    **Interpretation**.  Whenever it shall be necessary to interpret this Trust, the masculine, feminine and neuter personal pronouns shall be construed interchangeably, and the singular shall include the plural and the singular.

k)    **Definitions**.  The following words are defined as follows:

i)    **"Principal" and "Income"**.  Except as otherwise specifically provided in this Trust Indenture, the determination of all matters with respect to what is principal and income of the Trust estate and the apportionment and allocation of receipts and expenses thereon shall be governed by the provisions of Nevada's Revised Uniform Principal and Income Act, as it may be amended from time to time and so long as such Act does not conflict with any provision of this instrument; provided, however, that as used herein, the term "Trust income" for any taxable year shall also include the net amount received in such taxable year for the sale or exchange of capital assets.  Notwithstanding such Act, no allowance for depreciation shall be charged against income or net income payable to any beneficiary.

Page 29

ii)     **"Education"**.  Whenever provision is made in this Trust Indenture for payment for the "education" of a beneficiary, the term "education" shall be construed to include technical or trade schooling, college or postgraduate study, so long as pursued to advantage by the beneficiary at an institution of the beneficiary's choice and in determining payments to be made for such college or post-graduate education, the Trustees shall take into consideration the beneficiary's related living and travelling expenses to the extent that they are reasonable.

iii)    **"Child, Children, Descendants or Issue"**.   As used in this instrument, the term "descendants" or "issue" of a person means all of that person's lineal descendants of all generations.  The terms "child, children, descendants or issue" include adopted persons, but do not include a step-child or step-grandchild, unless that person is entitled to inherit as a legally adopted person.

l)     **Court Instructions**.  The Trustee may seek the assistance of the Courts in all matters affecting the administration of this Trust or its properties, including advice on the interpretation of the Trust or for settlement of any account by invoking the jurisdiction of any District Court with jurisdiction (including quasi-in-rem jurisdiction) over the Trust, the Trustee, or the Trust res, in a non-adversary ex parte proceeding.  The decision of the Court shall be binding upon all interested parties who were given written mailing notice of the proceedings to their last known address.

SIGNED AND WITNESSED by the Trustors and Trustee on the day and year first above written.

**WITNESSED BY:**                           **TRUSTORS:**

_____            _____
_____            Mary Lou Ray

**WITNESSED BY:**                           **INVESTMENT TRUSTEE:**

_____            _____
_____            Kelli Austin

**WITNESSED BY:**                              **DISTRIBUTION TRUSTEE:**

_____        _____

_____        Laura Imbach