Marc Jones (admitted pro hac vice)
Rua Kelly (admitted pro hac vice)
Amy Gwiazda*
**Attorneys for the Plaintiff**
**SECURITIES AND EXCHANGE COMMISSION**
Boston Regional Office
33 Arch Street, 24th Floor
Boston, MA 02110
617-573-8947 (Marc Jones)
*Not admitted in the U.S. District for the Southern District of New York

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, <br>                 **Plaintiff,** <br>    v. <br><br> HARRY ZHABILOV, <br> BILLY V. RAY, JR., <br> CHARLES DILLUVIO, <br> STEPHEN APOLANT, <br> DANNIE ZHABILOV, <br> JONATHAN FARBER, <br> CAMELOT NEVADA TRUST, <br> SEACOR CAPITAL, INC., <br> SKY-DIRECT LLC, and <br> WEXFORD INDUSTRIES LTD., <br>                 **Defendants,** <br><br> and <br><br> NY FARMS GROUP, INC. and <br> EQUITY MARKETS ADV LLC, <br>               **Relief Defendants.** | Civil Action No. 1:24-CV-7362 <br><br> **JURY TRIAL DEMANDED** |

### AMENDED COMPLAINT

Plaintiff, Securities and Exchange Commission ("Commission"), alleges the following

against defendants Harry Zhabilov ("Zhabilov"), Billy Ray, Jr. ("Ray"), Charles Dilluvio

("Dilluvio"), Stephen Apolant ("Apolant"), Dannie Zhabilov ("Dannie"), Jonathan Farber

("Farber"), Camelot Nevada Trust ("Camelot"), Seacor Capital, Inc. ("Seacor"), Sky-Direct LLC

("Sky-Direct"), and Wexford Industries Ltd. ("Wexford") (together, "Defendants"), and the

relief defendants NY Farms Group, Inc. ("NY Farms") and Equity Markets ADV LLC ("Equity

Markets") (together, "Relief Defendants"):

## SUMMARY

1.      Enzolytics, Inc. ("Enzolytics") is a Delaware public company with little (and

sometimes no) trading in its stock.  From no later than fall 2017 through at least summer 2022

("Relevant Period"), defendants Zhabilov, Ray, Dilluvio, and Apolant (collectively, "Control

Group"), along with entities Camelot, Seacor, and Sky-Direct engaged in a fraudulent scheme to

profit from accumulating Enzolytics stock while concealing their control of the company and the

stock, then selling that stock to retail investors.  Defendants shared about $92 million in stock

sale proceeds generated by their scheme.

2.      In 2018, Zhabilov (Enzolytics' CEO) and Ray (who purportedly consulted for the

company through Camelot) made a series of misrepresentations to transfer agents, attorneys, and

the public in the course of selling Enzolytics shares that allowed them to sell debt supposedly

owed by Enzolytics to Apolant and Dilluvio's associate ("Associate").  Associate bought the

debt owed to Ray for $100,000.  Ray shared those payments with Zhabilov.  In return, Enzolytics

issued over half a billion unrestricted shares to Associate.

3.      In 2020, the Control Group obtained unrestricted Enzolytics shares it could sell to

the public through agreements purportedly for consulting services with Dilluvio and with

Zhabilov's daughter, Dannie.  The Control Group then used a series of misrepresentations

relating to Dilluvio and Dannie's affiliate status to convert the debt from the unpaid consulting

agreements into unrestricted shares they could, and did, sell.

2

4.    Zhabilov and Dannie created phony documents and lied to the transfer agent used by Defendants to facilitate stock transactions ("transfer agent") and transfer 231 million unrestricted shares from Enzolytics to Dannie.  The misrepresentations were designed to avoid the stock sale limitations placed on insiders by federal securities laws.

5.    Ray had Dannie transfer the shares she received to Farber for Farber to sell.  For brokering this transaction, Ray received 1 million Enzolytics shares.  Farber sent Dannie $7.125 million for the transferred shares.  Dannie used that money to buy a home for herself, pay off her parents' mortgage, lease a luxury car for her father, and also sent Ray, via Camelot, over $726,000.

6.    While Farber was selling stock on behalf of the Control Group, they were funding a stock promotion campaign promoting Enzolytics stock.  The goal of the promotion campaign was to generate sufficient interest among retail investors to buy all the shares the Control Group was selling without severely depressing the prices of those shares.

7.    The Control Group also used a sham consulting agreement to get Dilluvio 200 million unrestricted Enzolytics shares.  Dilluvio then sold those shares to the public through intermediaries, including Wexford (by Farber).

8.    Apolant and Dilluvio converted Enzolytics debt into nearly 400 million unrestricted Enzolytics shares.  To get the shares issued without a restrictive legend (a designation intended to prevent shareholders from transferring ownership of otherwise restricted stock in violation of the federal securities laws), Apolant and Dilluvio provided attorney opinion letters falsely stating that their entities which held the stock were not affiliates of Enzolytics.  At the time, Apolant and Dilluvio (and thus the entities they controlled) were affiliates of Enzolytics.

9.      Farber was transferred at least 350 million Enzolytics shares controlled by the Control Group, most of which he then sold to the public.  In turn, Farber transferred at least $62 million of stock sale proceeds back to the Control Group.

10.      When the Control Group, through Farber, sold Enzolytics stock, there were no registration statements for those sales on file with the Commission or in effect for those transactions.  No exemption from the registration requirement applied.

11.      As a result of the conduct described below, Zhabilov, Ray, Dilluvio, Apolant, Dannie, Farber, Camelot, Seacor, Sky-Direct, and Wexford violated, and unless restrained and enjoined will continue to violate, Sections 5(a) and 5(c), and 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§77e(a), (c), 77q(a)], Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §78j(b)], and Rule 10b-5 thereunder [17 C.F.R. §240.10b-5].  As a result of the conduct described below, Farber and Wexford also violated, and unless restrained and enjoined will continue to violate, Section 15(a)(1) of the Exchange Act [15 U.S.C. §78o(a)(1)].

12.      The Commission seeks:

- a permanent injunction against Defendants, enjoining them from engaging in transactions, acts, practices, and courses of business of the type alleged in this Complaint;

- an order barring Defendants Dilluvio and Ray from directly or indirectly, including, but not limited to, through an entity owned or controlled by any of them, participating in the issuance, purchase, offer, or sale of any security; provided, however, that such injunction shall not prevent Dilluvio and Ray from purchasing or selling securities listed on a national securities exchange for their own personal accounts;

- disgorgement of all ill-gotten gains from the unlawful conduct set forth in this Complaint, together with prejudgment interest;

- civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. §77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. §78u(d)(3)];

- an order permanently barring Zhabilov, Apolant, Dannie, Farber, Camelot, Seacor, Sky-Direct, and Wexford from participating in any offering of a penny stock, pursuant to Section 20(g) of the Securities Act [15 U.S.C. §77t(g)] and Section 21(d) of the Exchange Act [15 U.S.C. §78u(d)];

- an order prohibiting Zhabilov, Dilluvio, and Apolant from acting as officers or directors of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. §78l], or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. §78o(d)]; and,

- such other relief as the Court may deem appropriate.

13.     The Commission seeks against Relief Defendants disgorgement of their ill-gotten gains together with prejudgment interest, and such other relief as the Court may deem appropriate.

**JURISDICTION AND VENUE**

14.     This Court has jurisdiction over this action pursuant to Section 22(a) of the Securities Act [15 U.S.C. §77v(a)] and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§78u(d), 78u(e), and 78aa].

15.     Venue lies in this Court pursuant to Section 22(a) of the Securities Act [15 U.S.C. §77v(a)] and Section 27 of the Exchange Act [15 U.S.C. §78aa].  Some of the acts, practices, transactions, and courses of business alleged in this Complaint occurred within the Southern

District of New York.  Some of the acts, practices, transactions and courses of business alleged in this Complaint were effected, directly or indirectly, by using means or instrumentalities of transportation or communication in interstate commerce, or the mails.  For example, several individuals residing in the Southern District of New York bought  Enzolytics stock during the time when Defendants were selling their stock.

## DEFENDANTS

16.     Harry Zhabilov, age 57, lives in Frisco, Texas.  Zhabilov was the Chief Executive Officer and sole board member of Enzolytics until it merged with another company.  After the merger, Zhabilov became the Chief Science Officer, and a second person was appointed to the board.

17.     Billy V. Ray, Jr., age 66, lives in Marietta, Georgia.  Ray controls Camelot Nevada Trust which purportedly provided consulting services to Enzolytics (and its predecessor).  In 2014, Ray was charged by the Commission for violating Section 17(a)(1) of the Securities Act and Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) thereunder.  *SEC v. Ray et al.*, 14-cv-61195-BB (S.D. Fla. filed May 22, 2014).  Ray consented to the entry of final judgment in that matter, which enjoined him from violating Section 17(a)(1) of the Securities Act and Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) thereunder.  Ray was also permanently barred from trading in an offering of penny stock, including engaging in activities with a broker, dealer, or issuer for purposes of issuing, trading, or inducing or attempting to induce the purchase or sale of any penny stock, as well as from serving as an officer or director of any issuer that has a class of securities registered with the Commission pursuant to Section 12 of the Exchange Act, or is required to file reports with the Commission pursuant to Section 15(d) of the Exchange Act.

18.     Charles Dilluvio, age 53, lives in Myrtle Beach, South Carolina.  Dilluvio controls

Seacor Capital, Inc. which received and transferred Enzolytics stock, and received back and distributed the proceeds from selling that stock. In 2001, Dilluvio was charged by the Commission for violating Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder. *SEC v. Spectrum Brands Corp.*, 01-cv-8257 (E.D.N.Y. filed December 11, 2001). Dilluvio consented to the entry of final judgment in that matter which enjoined him from violating Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder and ordered that he pay disgorgement. Dilluvio was also barred from trading in penny stocks pursuant to a follow-on administrative proceeding.

19.    Stephen Apolant, age 56, lives in Oyster Bay, New York. Apolant controls Sky-Direct LLC, Equity Markets ADV LLC, and New York Farms Group, Inc., which received and transferred Enzolytics stock. Apolant is a former registered representative who has been barred by state authorities in Georgia and New Jersey from participating in the sale of securities in those states, based on prior securities law violations.

20.    Dannie Zhabilov, age 27, lives in Plano, Texas. Dannie is the daughter of Harry Zhabilov.

21.    Jonathan Farber, age 58, lives in New York, New York. Farber controlled Wexford Industries Ltd. which held an account at a Canadian firm through which he deposited and sold shares. Farber used that account to trade shares on behalf of the Control Group and Dannie including about 347 million shares of Enzolytics. Farber sold these shares on behalf of his customers without either registering with the Commission as a broker or being associated with a registered broker, as required by U.S. federal securities laws. Farber has never been associated with any entity registered as a broker with the Commission.

22.    Camelot Nevada Trust is a Nevada trust operating in Georgia and controlled by Ray.  Debt owed to Camelot by Enzolytics was sold to generate unrestricted shares that the Control Group could sell.  Though Camelot documents were often signed by a close associate of Ray's, Ray controlled the Camelot activities alleged here.

23.    Seacor Capital, Inc. is a New York corporation controlled by Dilluvio.  Dilluvio, through Seacor, purportedly worked as a consultant for Enzolytics beginning in 2018.  In late 2020, Enzolytics issued Seacor over 400 million shares, most of which Dilluvio transferred to friendly entities so that they could be deposited and sold to the public.  Though Dilluvio's wife is identified as the sole officer in New York State filings, Dilluvio in fact controlled Seacor, deciding what agreements to enter when, negotiating compensation, and determining when to transfer shares.

24.    Sky-Direct LLC is a Nevada corporation controlled by Apolant.  Throughout 2020, Sky-Direct received about 260 million Enzolytics shares, transferring the majority to other Control Group affiliated entities, and ultimately selling millions of shares through Farber's Wexford.  Though Apolant often used his wife, who has a different surname, to sign documents, he had control over Sky-Direct throughout the relevant period.

25.    Wexford Industries Ltd. is a Wyoming company controlled by Farber.  Wexford held and sold Enzolytics stock on behalf of the Control Group and distributed the profits back to individuals and entities under their control.  Farber's relative ("Relative") is identified as Wexford's "President/Director" in Wyoming Secretary of State filings.  Though Relative continued to be identified in filings as the President of Wexford, Relative was in fact retired, and Farber operated Wexford, including finding investment opportunities.  Farber and Relative lived

together during intervals throughout the Relevant Period, in particular during the early months of the Covid-19 pandemic.

**RELIEF DEFENDANTS**

26.     NY Farms Group, Inc. is a New York entity controlled by Apolant which received over $14.5 million in Enzolytics stock sale proceeds from Wexford.

27.     Equity Markets ADV LLC is a New York entity controlled by Apolant which received at least $23 million of Enzolytics stock sale proceeds from Wexford.

**RELATED ENTITY**

28.     Enzolytics, Inc. is a Delaware corporation currently headquartered in Allen, Texas.  Enzolytics (stock ticker symbol: ENZC) is quoted and trades on OTC Link whose parent company is OTC Markets Group Inc. ("OTC Link").  In public filings with OTC Link, Enzolytics claims to be "in the development stage."  Enzolytics was originally incorporated in the United Kingdom in 2004 and underwent a series of name changes.  In 2012, it became Eco-Petroleum Solutions, and in September 2017 it became Immunotech.  (Here "Enzolytics" will refer to Enzolytics and its predecessors.)  Harry Zhabilov was the CEO throughout the Relevant Period until October 2020 when he became the Chief Science Officer.  Ray performed work for Enzolytics off and on throughout the Relevant Period, including drafting and editing OTC Link filings and obtaining financing for the company.

**RELEVANT DEFINITIONS**

29.     Before selling stock, persons who control the stock of public companies ("control persons") are required to:  (a) register the stock sales with the Commission pursuant to Section 5 of the Securities Act [15 U.S.C. §77e]; (b) sell the stock under an applicable exemption from registration; or (c) sell the stock pursuant to conditions set forth in SEC Rule 144 [17 C.F.R.

9

§240.144], including limitations on the amount of stock a control person can legally sell.  These registration requirements, sale restrictions, and disclosure obligations are safeguards designed to inform investors about the nature of the stock they are holding or considering buying, and about those from whom they would be buying that stock.

30.     An "affiliate" of a publicly traded company (also known as an "issuer") is a person or entity that, directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such issuer (i.e., a control person).  "Control" means the power to direct management and policies of the company.  Affiliates include officers, directors and controlling shareholders, as well as any person who is "under common control" with, or has common control of, an issuer.  Without registration of the stock, affiliates are only permitted to sell a small percentage of the outstanding shares of a stock according to SEC Rule 144 [17 C.F.R. §230.144].  A group of individuals or entities acting in concert may collectively be an "affiliate" of an issuer.

31.     "Restricted stock" is stock of an issuer acquired either from that issuer or an affiliate of that issuer, in a private transaction that is not registered with the Commission.  Absent an exemption under the federal securities laws and rules, restricted stock cannot legally be offered or sold to the public unless a securities registration statement has been filed with the Commission (for an offer) or is in effect (for a sale).  Those registration statements are submitted and filed with the Commission on Form S-1 and are known as "S-1 registration statements."  The S-1 registration statement contains important information about an issuer's business operations, financial condition, results of operation, risk factors, and management.

32.     "Unrestricted stock" is stock that may legally be offered and sold in the public marketplace by a non-affiliate, ordinarily having previously been subject to a registration

statement filed with the Commission.  Registration does not attach to the security itself, and registration at one stage for one party does not necessarily suffice to register subsequent offers and sales by the same or different parties.  Thus, when a control person buys publicly-traded or otherwise unrestricted shares in the company that person controls, those shares automatically become subject to the legal restrictions on sales by an affiliate, which strictly limit the quantity of shares that may be sold in the public markets absent registration.  Without registration, affiliates are prohibited from selling large quantities of an issuer's shares, no matter how the affiliates obtained those shares.

33.     The Over-the-Counter ("OTC") Markets is a stock quotation service that facilitates public trading of shares in public companies that are not otherwise listed on national securities exchanges (like NASDAQ or the New York Stock Exchange).  Public companies that do not have an obligation to file reports with the Commission may, nonetheless, choose to file public reports (such as quarterly and annual statements and other periodic disclosures) on the OTC Markets website for investors to review and consider when making investment decisions.

34.     A "beneficial owner" of a security is any person who, directly or indirectly, through any contract arrangement, understanding, relationship, or otherwise, has or shares investment power, which includes the power to dispose, or to direct the disposition of, such security.

35.     A "penny stock" is defined in Section 3(a)(51) of the Exchange Act and in Rule 3a51-1 thereunder as an equity security that does not meet certain exemptions—essentially, most stocks that do not trade on a national securities exchange, that trade under $5 per share, and whose issuers do not meet certain thresholds of tangible assets or revenue.  Enzolytics stock was a penny stock during the Relevant Period.

36.     A "transfer agent" is a business that facilitates certain types of securities transactions. Among other things, transfer agents issue and cancel certificates of a company's stock to reflect changes in ownership. Many companies that have publicly traded securities use transfer agents to keep track of the individuals and entities that own their stock.  Transfer agents routinely keep track of whether particular shares are restricted from resale.

## THE FRAUDULENT SCHEME

37.     In late 2017, Zhabilov and Ray, who had historically been the decision makers for Enzolytics, began working with Dilluvio and Apolant to issue and transfer unrestricted Enzolytics stock so that it could be sold to the public.

38.     In the summer of 2018, Ray sold debt purportedly owed to Camelot to Dilluvio and Apolant's associate.  Associate agreed to pay Camelot $100,000.  Despite pre-sale representations that he would not do so, Ray shared the proceeds from the sale with Zhabilov. Zhabilov had Enzolytics issue Associate over a half billion unrestricted shares in return for extinguishing the purported debt.  Associate sold those shares to the public.

39.     Later in 2020, the Control Group concealed their roles as Enzolytics' affiliates so that they could benefit from the acquisition and sale of hundreds of millions of unrestricted Enzolytics shares.

40.     In the fall of 2020, Apolant and Dilluvio (through Seacor and Sky-Direct) converted debt they held into nearly 400 million shares of unrestricted stock.  To do so, they provided the transfer agent with opinion letters which falsely stated that Seacor and Sky-Direct, entities they respectively controlled, were not affiliates of Enzolytics.  This was false because Dilluvio and Apolant were both involved in the day-to-day operations and management of Enzolytics.

12

41.     On top of the debt Sky-Direct converted, Apolant (through NY Farms) also received over 156 million unrestricted Enzolytics shares from Associate.

42.     In early 2021, Zhabilov and Dannie used a sham consulting agreement as the basis to transfer 231 million unrestricted shares to Dannie.  Dannie then transferred many of those shares to Farber (via Wexford) for $7.125 million and shared those profits with Zhabilov and Ray.

43.     Between Apolant, Dilluvio, and Dannie, they transferred Farber's Wexford about 350 million unrestricted shares.  Farber, through Wexford, sold nearly all these shares during 2021 and into the beginning of 2022.  Wexford sold over 347 million shares of Enzolytics stock for total proceeds of at least $78 million.  At least $62 million of those proceeds went back to the Control Group on whose behalf Farber had sold those shares.

44.     The Control Group, directly and through the entities they controlled, fraudulently avoided the stock sale limitations that limited affiliates from selling the stock by concealing their status as company affiliates and their stock ownership.

45.     To sell these Enzolytics shares, the Defendants needed investors willing to buy them.  To attract investors, Apolant, using funds from Sky-Direct, hired a stock promoter to tout Enzolytics stock in order to bring in investors who would buy the Defendants' stock.

**Defendants were Affiliates of Enzolytics**

46.     As detailed below, Zhabilov, Ray, Dilluvio, and Apolant were affiliates of Enzolytics because, as a group, they controlled both day-to-day operations of the company and strategic decision making, and because they held a significant portion of Enzolytics' unrestricted stock.

13

47.     Dannie and Farber worked with the Control Group to further their fraudulent scheme making Dannie and Farber affiliates of Enzolytics as well.

48.     Because Camelot, Seacor, Sky-Direct, and Wexford were all controlled by affiliates of Enzolytics, they too were affiliates of Enzolytics.

49.     Ray worked closely with Zhabilov at the time of each of the transactions described above (the Camelot debt sale, the sham consulting agreement, and the fraudulent debt conversions).  Ray played an integral role in running Enzolytics, assisting Zhabilov in most of the latter's CEO duties.  Ray operated much like a chief financial officer, performing functions such as liaising with Enzolytics' accountant, preparing filings, and soliciting funding.

50.     By no later than the fall of 2017, Dilluvio and Apolant were in communication with Zhabilov and Ray regarding Enzolytics.  Dilluvio and Apolant worked together.  Dilluvio was the main point of contact with Zhabilov and Ray.  Ray and Dilluvio had a particularly close relationship.  Ray recommended that Zhabilov engage Dilluvio as a "project manager." Apolant and Dilluvio's entities paid Ray about $25,000 between February 2017 and June 2018.

51.     Apolant and Dilluvio funded Enzolytics through their respective entities Sky-Direct and Seacor.  Between 2017 and 2020, Sky-Direct and Apolant purportedly loaned Enzolytics at least $120,000.  Between October 2020 and February 2021, Seacor and Sky-Direct wired Enzolytics over $1.3 million.

52.     In 2018, Sky-Direct and Seacor each had consulting agreements with Enzolytics purportedly to perform "business consulting and advisory services" for which they were to receive Enzolytics shares.

53.      During 2018, Dilluvio frequently communicated with Ray and Zhabilov on topics concerning Enzolytics, including: potential mergers; whether to make particular filings;

14

communications with the company's lawyer; liability the company faced by entering particular transactions; and general updates on the company.  Dilluvio even requested that Zhabilov move their communications from text message to the encrypted application, Signal.

54.     In 2019, a close associate asked Zhabilov whether he had gotten permission from "Steve, Charlie and [Associate]" to file an 8K.  Zhabilov responded, "[y]es I got email from there [sic] attorney and [Associate] will forward to you."

55.     By the fall of 2020, the Control Group was gearing up for the next wave of transactions that would put large quantities of unrestricted stock in their control.  Dilluvio continued to be closely involved in Enzolytics' operations.  For example, Dilluvio directed Zhabilov to sign notes and a consulting agreement that could be used to provide Seacor with additional unrestricted shares.  At the time, Zhabilov told colleagues that he was worried that funding would fall through if he did not sign the documents.

56.     Dilluvio was also copied on drafts of company disclosures, made substantive edits to those documents, and told Zhabilov to waive certain prerequisites for shares being transferred.

57.     When Ray complained that he did not have any series B shares, Dilluvio responded "ohh well, got us some B's," continuing their coordinated efforts.

58.     When Zhabilov identified a merger target, he presented the deal to Apolant and Dilluvio for their approval.  Zhabilov could not have completed the merger without Apolant and Dilluvio's funding.  They paid for Enzolytics to become current with its OTC filings, for the merger fees, and for attorneys' fees.

59.     Defendants were affiliates of Enzolytics not just because of their conduct, but also based on collectively holding large amounts of Enzolytics stock.  Ahead of selling off their holdings, Defendants had gained control of a large percentage of the unrestricted free trading

15

shares, known as the "float."  By the end of 2020, Apolant and Dilluvio alone controlled about 550 million unrestricted shares, constituting over 30 percent of the float.  In February 2021, 231 million additional unrestricted shares—more than 10 percent of the float—were transferred to Dannie.

60.     As detailed below, Defendants used their influence over Enzolytics to obtain a large number of shares that they then sold to the public.

### Zhabilov and Ray Made Multiple Misrepresentations in Debt Sale Transaction

61.     By at latest fall of 2014, Ray and Zhabilov were seeking sources of funding for Enzolytics.  Most of their ideas for funding involved shareholders selling their stock and putting the proceeds back into the company, whether done through an S-1 registration or a friendly debt holder converting that debt into unrestricted shares.

62.     Ray and Zhabilov were both aware of the restrictions on the sale of stock by company affiliates and that selling or converting debt held by an affiliate would be difficult.  In September 2014, when discussing ways to get more funding for the company, Ray emailed Zhabilov, "If we ca[n]'t use the Zhabilov Turst [sic] debt…we will have to go back and find a friendly lender that you trust and I can trust that loaned money to the company prior to 2012."

63.     In August 2017, Ray emailed at least three parties in an unsuccessful effort to sell Camelot purported debt.  In these communications Ray identified upcoming costs Enzolytics expected to incur and noted "Harry [Zhabilov] is expecting the funds generated from the investment by your company to be available for the overhead of $50K over the first 45 days…."

64.     In the fall of 2017, Ray and Zhabilov began discussions with Apolant and Dilluvio regarding purchasing debt that Enzolytics purportedly owed to Ray's Camelot.  Under the ultimate agreement that was reached, Associate's entity ("Entity A") was meant to pay

Camelot $100,000 for the debt, and Enzolytics would issue Entity A 525 million unrestricted shares.

65.    Zhabilov and Ray confirmed in contemporaneous emails that they expected that proceeds from selling Camelot's debt would be and in fact were used to fund Enzolytics. Ray also used the money he received from Entity A to pay Zhabilov.

66.    This scheme exploited a process conducted pursuant to Section 3(a)(10) of the Securities Act, which exempts from the registration requirements of the federal securities laws the offers and sales of securities in specified exchange transactions. In these exempted exchange transactions, securities can be issued for bona fide debts, claims, or property interests. As a prerequisite, a court or other governmental entity must hold a fairness hearing on the terms of the transaction and approve it. The hearing must be open to the public, and notice must be given to all parties. [15 U.S.C. § 77c(a)(10)]. Under Section 3(a)(10), an issuer can agree to discharge a bona fide debt it owes to a debt holder by exchanging it for unrestricted shares of its stock, which can be issued to the debt holder, if a court approves the transaction at a fairness hearing.

67.    Apolant and Dilluvio liaised with Ray and Zhabilov on behalf of Associate. They spent months discussing the purchase of the debt Enzolytics purportedly owed to Camelot.

68.    On May 23, 2018, Associate and Camelot executed a claims purchase agreement through which Entity A bought the $525,000 debt owed to Camelot ("Debt") for $100,000 ("Claims Purchase Agreement"). Though he did not himself sign the document, Ray authorized the signing of the Claims Purchase Agreement on behalf of Camelot.

69.    In May 2014, the Commission filed a complaint against Ray seeking to bar him from participating in an offering of penny stock and from serving as an officer and director of an SEC-registered company. In July 2014, he entered a one-year contract for services with

Enzolytics.  Rather than use his own name, the name used in this July 14, 2014, contract ("2014 Contract") was "Camelot Financial Group, LLC."  In September 2014, Ray was barred from participating in an offering of penny stock and from serving as an officer and director of an SEC registered company.

70.    Camelot Financial Group, LLC, unlike Camelot Nevada Trust, never existed as a corporate entity, which Ray discovered when trying to sell Camelot's debt in August 2017.

71.    The 2014 Contract covered the "business development and general business consulting services" Ray provided.  Compensation under the 2014 Contract was $8,500 and 2 million shares of Enzolytics.

72.    The 2014 Contract had lapsed by February 2015, and no contract covering Ray's services to Enzolytics from February 2015 to July 2017 exists.  A document purporting to amend the 2014 Contract is dated July 1, 2017 ("Amended Contract").  But the Amended Contract remained unsigned by either Camelot or Enzolytics as of January 2018.  Zhabilov was still negotiating with Ray regarding the applicable conversion rate under the Amended Contract in April 2018.

73.    Even though Ray had not learned that Camelot Financial Group, LLC was the wrong name until *August* 2017, the Amended Contract, purportedly entered in *July* 2017, used the correct name, Camelot Nevada Trust.

74.    The Amended Contract stated that Camelot would provide "general business consulting services" for $27,500 per quarter.

75.    The next month, Entity A and Ray's Camelot executed the Claims Purchase Agreement, which included the following false representations made by Camelot:

- "The claim is a bona fide outstanding claim against [Enzolytics]… for goods and/or services rendered to [Enzolytics] by [Camelot] in good faith."

18

- "[Camelot] did not enter into the transaction giving rise to the [Debt] in contemplation of any sale or distribution of [Enzolytics'] common stock or other securities."

- "[$525,000] is the total amount due to [Camelot] with respect to the [Debt]."

- "Within the past ninety (90) days, [Camelot] has not been directly or indirectly through one or more intermediaries in control, controlled by, or under common control with, [Enzolytics] and is not an affiliate of Enzolytics as defined under Rule 144."

- "[Camelot] has no present intention to utilize any of the proceeds to be received from [Entity A] to directly or indirectly, provide any consideration to or invest in any manner in [Enzolytics] or any affiliate of [Enzolytics]."

- "[Camelot] will not, directly or indirectly, receive any consideration from or be compensated in any manner by [Enzolytics], or any affiliate of [Enzolytics], in exchange for or in consideration for selling the [Debt]."

76. On June 25, 2018, Enzolytics entered into a settlement agreement with Entity A through which Entity A bought $563,000 worth of purported debt Enzolytics owed to two creditors (one of which was Camelot) in exchange for 563 million shares of Enzolytics stock. In the settlement agreement signed by Zhabilov, Enzolytics and Zhabilov falsely represented that it "did not enter into the transaction giving rise to the Claims in contemplation of any sale or distribution of [Enzolytics'] common stock or other securities."

77. The vast majority, $525,000, of the debt was purportedly owed to Camelot Nevada Trust for work performed from January 2015 to June 2018.

78. On July 3, 2018, Enzolytics provided an issuer representation letter to the placement agent being used for the Debt transaction. Zhabilov signed that letter and falsely represented, "[Enzolytics] has not solicited and does not intend to solicit [Camelot] for any portion of the funds paid to [Camelot] by [Entity A]."

79. On July 9, 2018, Entity A filed a complaint asking the court to hold a fairness hearing regarding the proposed settlement. Attached to the complaint was the Claims Purchase

Agreement as well as several invoices purportedly supporting the Debt.  The invoices reflected unpaid compensation of $37,500 per quarter, not the $27,500 per quarter used in the Amended Contract.  Uncompensated invoices were submitted for the fourteen quarters between January 2015 and April 2018.

80.    On August 21, 2018, the court approved the settlement which also had the effect of allowing the shares to be issued to Entity A unrestricted.

81.    Invoices purportedly dated April 1, 2015 to April 1, 2017, stated that they were compensation for Camelot's work "compiling the information and assisting[ing] in filing the necessary documents to maintain a current status on the OTC Market."  No disclosures were filed on OTC Markets between July 2015 and January 2017.

82.    Not only was there no operative contract between February 2015 and, at best, July 2017, but the invoices exceeded the highest rate of compensation used in either contract— $27,500 per quarter.  Even the $27,500 per quarter, or over $9,000 per month, was excessive.  At the time the work underlying the Debt was purportedly rendered, Enzolytics had no money.  Once Enzolytics finally received enough funding, Ray was only paid $5,500 per month for his work.  At that time, Zhabilov was being paid $8,000 per month.  When Zhabilov received a raise to $11,000 per month, Ray's compensation increased to $7,000 per month, never to the $9,000 per month at which Ray's services were purportedly valued under the Amended Contract, let alone the $12,500 per month specified by the invoices purportedly underlying the Debt.

83.    Camelot used the Debt which had purportedly been extinguished when Entity A bought it for $100,000 as the basis to be issued 70 million Enzolytics shares in October 2020.

84.    After Camelot could not deposit those shares, Apolant (through Equity Markets) bought 150,000 of the shares from Camelot for $50,000 to provide Camelot with cash.

85.     As shown below, Camelot received transfers to pay for the Debt and then sent a portion of those payments to Enzolytics.

| Date of Transfer to Camelot | Amount Transferred to Camelot | Date of Transfer(s) to Enzolytics | Amount Transferred to Enzolytics |
| --- | --- | --- | --- |
| 9/27/18 | $5,000 | 10/3/18-10/9/18 | $1,700 |
| 2/6/19 | $5,000 | 2/7/19 | $3,350 |
| 3/4/19 | $10,000 | 3/12/19-3/13/19 | $6,000 |
| 4/1/19 | $20,000 | 4/3/19-4/16/19 | $9,100 |
| 10/16/20 | $56,000 | | [1] |

**Zhabilov and Ray Fraudulently Transferred Stock to
Dannie Zhabilov to Avoid Affiliate Stock Sale Limitations**

86.     Wishing to make more money from the sale of Enzolytics stock, Ray and Zhabilov fraudulently schemed to transfer stock to Dannie, to circumvent limitations placed on the sale of stock by affiliates.  Ray and Zhabilov planned to, and did, share in the stock sale proceeds, which exceeded $7 million.

87.     In the fall of 2020, Enzolytics was in merger negotiations with another company. As part of those negotiations, the two parties discussed how shares would be allocated between the two groups.  As of October 2020, Zhabilov held 50 million common shares in his name, and 412 million in a trust called "the Zhabilov Trust," for a total of 462 million.  The parties agreed that the common stock would be split, with Zhabilov keeping 231 million shares, and the group associated with the merger target getting 231 million shares.

88.     On December 7, 2020, Zhabilov told the transfer agent that half of the 462 million common shares would go to Dannie individually.

---

[1] Though Camelot does not appear to have transferred any portion of the October 2020 transfer to Enzolytics, the company received two $25,000 transfers, one from Apolant and one from Dilluvio (via Seacor and Sky-Direct) that same month.

89.    The split was accomplished on December 31, 2020.  The merger group shared 231 million shares and the Zhabilov Trust retained 231 million shares.

90.    Though Zhabilov knew that his wife was the trustee of the Zhabilov Trust, Zhabilov falsely represented to the transfer agent that Dannie was the trustee and that both she and the trust were not affiliated with Enzolytics.  Zhabilov failed to fix this error until February 2021, despite receiving several physical stock certificates held by the Zhabilov Trust that prominently bore Dannie's name as the trustee.

91.    On February 12, 2021, Zhabilov had the 231 million shares held by the Zhabilov Trust cancelled and reissued to Dannie individually.  The indemnification sent to the transfer agent stated, "[t]hese shares were incorrectly issued in the name of Dannie Zhabilov TTEE Zhabilov Trust.  Company requests that these shares be cancelled and that the shares be correctly registered in the name Dannie Zhabilov."

92.    Also included in the materials provided to the transfer agent was a Contractor Agreement between Dannie and Enzolytics purportedly dated March 9, 2018 ("Dannie Agreement").

93.    The Dannie Agreement was a one-year contract under which Dannie Zhabilov, then 21 years old and still in college, would "perform analytical work tied to the biological activity of ITV-1.  This work includes HPLC fragmentation, electrophoretical binding reactions, and Biacore plasmon resonance."  In return, Dannie would earn 462 million Enzolytics shares. But those shares were never actually issued to Dannie.

94.    The 412 million shares held by the Zhabilov Trust in the fall of 2020 consisted of 275 million shares issued to the Zhabilov Trust in March and July 2018 in exchange for an

22

"Exclusive License Agreement" and 137 million that were meant to have gone to Dannie individually.

95.    Dannie was compensated at a far higher amount than at least one other individual who performed work comparable to that identified in the Dannie Contract during the same time frame.  A biochemist that "assisted [Enzolytics] in developing a new application of the Immunotherapy in the Nutraceutical market as well as assisted with the manufacturing of the validation order with the cGMP manufacturer" was compensated with only 10 million shares in September 2018.

96.    On August 22, 2018, Zhabilov, on behalf of the Enzolytics board, authorized the issuance of 137 million shares to his daughter for assisting Enzolytics "in developing a new application of the Immunotherapy in Veterinarian market."  This would have been in the middle of the one-year term purportedly covered by the Dannie Agreement.

97.    Unlike the Dannie Agreement, Zhabilov immediately provided the board resolution to the transfer agent so that the shares could be issued.  Zhabilov again affirmed that Dannie was not affiliated with the company.  The 137 million shares were issued to the Zhabilov Trust on August 24, 2018.

98.    On February 6, 2021, Dannie retained Camelot as a "consultant and financial advisor."  Camelot contracted to receive one million unrestricted Enzolytics shares for these purported services.  To aid her in selling the Enzolytics shares, Ray and Dilluvio connected Dannie with Farber.  Farber, through Wexford, sold shares on her behalf and Camelot took one million shares for commission.

99.    Zhabilov repeatedly (and falsely) advised the transfer agent that Dannie was not an affiliate.  But when she sought an opinion letter to lift the restrictive legend from her shares in

February 2021, the attorney immediately flagged that her relationship with the company and her father could make her an affiliate.  Dannie stated that she was "currently separate" from her father and that she did "not work with my family or ENZC." At that time, however, Dannie still worked for Enzolytics.

100.    The attorney also asked why the shares had not been issued until December 2021. Dannie replied falsely that the shares were issued in 2018.  Though the shares held by the Zhabilov Trust had been issued in 2018, the shares that were the subject of the Dannie Agreement were never issued.

101.    Between April 2021 and January 2022, Dannie transferred about 140 million Enzolytics shares to Wexford, at a time when Farber, through Wexford, was selling a lot of Enzolytics shares to the public.  Between June 2021 and January 2022, Wexford transferred at least $7.125 million to Dannie.

102.    Dannie used these stock sale proceeds to buy a house, which her parents lived in for at least several months while they completed renovations on their own home.  Dannie also leased a Mercedes for her father, paid off his outstanding home mortgage of around $100,000, and paid for Zhabilov's mother's condominium in Bulgaria.  Finally, Dannie overpaid her taxes and her tax refund of $726,372 was sent to Ray's Camelot.

**Dilluvio Used a Sham Consulting Agreement to Obtain Additional Unrestricted Shares**

103.    In April 2018, Zhabilov signed a consulting agreement on behalf of Enzolytics with Dilluvio's Seacor ("Seacor 2018 Agreement").  The Seacor 2018 Agreement and a parallel agreement between Enzolytics and Apolant's Sky-Direct were meant to provide compensation following an unsuccessful merger attempt the two worked on.  Ray wrote to Zhabilov in May 2018, "[t]hey were both supposed to get 25 million [shares] from that transaction…. Doesn't

make it any more pleasent [sic] because they will eventually want the shares from the original consulting agreement as well, but that's down the road and we can always tell them no.  Object here is to get funding."  Ray's email then makes clear that, in exchange for signing the "consulting agreements," Apolant and Dilluvio would provide Enzolytics with funding.

104.    According to the Seacor 2018 Agreement, Enzolytics wanted to "retain [Seacor] to provide a variety of business consulting and advisory services."  The Sky-Direct agreement had the same language.

105.    In May 2018, Zhabilov signed an Enzolytics Board resolution referencing the Seacor 2018 Agreement that authorized the issuance of 20 million shares of common stock to Seacor.  Those shares were not issued until 2020.

106.    In 2023, Zhabilov could not identify what the consulting agreement with Seacor was for, though he has described Dilluvio's services as the same as those provided by Ray, and that working with Dilluvio had been Ray's recommendation.

107.    For two years, little happened with the Seacor 2018 Agreement.  Then, beginning in mid-September 2020, Dilluvio asked Zhabilov to sign a series of notes and a consulting agreement.  This consulting agreement was purportedly dated January 3, 2019 ("Seacor 2019 Agreement"),  and again sought to retain Seacor "to provide certain business consulting and advisory services."

108.    On September 17, 2020, Zhabilov forwarded the Seacor 2019 Agreement to Ray and said, "my understanding is if I not sign this contract with Charlie the deal with arena is not going to happen."  It appears that the "deal with arena" was a deal to get funding for Enzolytics.

109.    Two weeks later, Dilluvio emailed Zhabilov an unsigned copy of the Seacor 2018 Agreement and said, "shares from this agreement were never received."  That same day,

25

Zhabilov contacted the transfer agent and instructed them to issue 20 million Series B preferred shares to Seacor.

110.    On October 7, 2020, Ray circulated a draft disclosure statement to Dilluvio and Zhabilov.  The draft disclosure statement did not show any entry for the issuance of 20 million Series B shares being issued to Seacor.  The next day Dilluvio emailed Ray, "need to include, 20m B's were issued" and attached the Seacor 2018 Agreement.

111.     The next day, Zhabilov forwarded Seacor's conversion notice to the transfer agent.  Seacor sought to convert their 20 million Series B shares into 200 million unrestricted common shares.

112.    On October 9, 2020, Zhabilov received an email from "SEACOR CAPITAL INC" saying, "$25000 is being transferred electronically to your account at Bank of America." The same day, $25,000 was wired to an Enzolytics bank account.

113.    On October 12, 2020, Zhabilov sent the transfer agent:  (1) a share issuance and transfer agent instruction resolution signed by Zhabilov on behalf of Enzolytics, authorizing the issuance of 200 million unrestricted common shares to Seacor; (2) an attorney opinion letter falsely stating that Seacor was not a present or former affiliate of Enzolytics; and (3) a letter from Dilluvio's wife on behalf of Seacor falsely stating that neither she nor Seacor were affiliates of Enzolytics.

114.    As a result of this submission to the transfer agent, Seacor was issued 200 million unrestricted shares on October 16, 2020.

115.    On October 27, 2020, Dilluvio emailed Ray a paragraph describing the Seacor 2018 Agreement.  A week later, Enzolytics published a disclosure covering 2018 to OTC Link. This disclosure included verbatim the paragraph that Dilluvio had emailed Ray.

**Dilluvio and Apolant Concealed Their Affiliate Status in Order
to Convert Debt into Additional Unrestricted Shares**

116.    On top of the 200 million shares Dilluvio (through Seacor) fraudulently obtained in the fall of 2020, Apolant and Dilluvio used debt conversions to illegally obtain an additional almost 400 million unrestricted Enzolytics shares.

117.    On September 17, 2020, using an email address in his wife's name, Apolant emailed Zhabilov a conversion notice to convert the debt Sky-Direct held into over 195 million shares.  Later that same day, Zhabilov provided the transfer agent with the share issuance and transfer agent instruction resolution (signed by Zhabilov on behalf of Enzolytics) that authorized the issuance of 195,795,288 unrestricted common shares to Sky-Direct.

118.    As a result, on September 18, 2020, Enzolytics issued Sky-Direct over 195 million unrestricted shares as part of a debt conversion.  In order to have the shares issued unrestricted, Apolant (on behalf of Sky-Direct) obtained an attorney opinion letter that falsely stated that Sky-Direct, which he controlled, was not an affiliate of Enzolytics.

119.    Similarly, on September 18, 2020, Dilluvio emailed Zhabilov the conversion notice for converting the Enzolytics debt Seacor held into over 203 million shares.  The notice of conversion contained an error where "SKY-DIRECT LLC" had not been replaced by "Seacor Capital Inc."  As before, Zhabilov provided the transfer agent with the necessary share issuance and transfer agent instruction resolution signed by Zhabilov on behalf of Enzolytics which authorized the issuance of 203,149,447 unrestricted Enzolytics common shares to Seacor.

120.    As Apolant had done, Dilluvio (on behalf of Seacor) obtained and provided to the transfer agent an attorney opinion letter which falsely stated that Seacor was not an affiliate of Enzolytics.  As a result, Seacor was issued over 203 million unrestricted shares on September 22, 2020.

27

121.    Between September 24, 2020 and October 28, 2020, Seacor transferred over 313 million shares to a Canadian entity.  That same Canadian entity then sold a portion of those shares and ultimately transferred cash to Seacor totaling $11.3M. Dilluvio transferred another 110 million shares to a different entity in November 2020, which then sent 55 million shares to the Canadian entity and 30 million to Wexford.  Between December 2020 and October 2021, Wexford sent Seacor over $23 million.

122.    Sky-Direct transferred more than 95 million shares to NY Farms in October and November 2020.  NY Farms does not appear to have paid Sky-Direct for the shares.  During that same period, Seacor paid $385,000 to Sky-Direct.

123.    Equity Markets never held Enzolytics shares.  Nor did it transfer any shares to Wexford.  But from January 2020 to January 20212, it received more than $23 million from Wexford.

124.    Both Apolant and Dilluvio, through Seacor and Sky-Direct, reinvested portions of their Enzolytics stock sale proceeds back into Enzolytics.  Between October 2020 and November 2022, entities controlled by Apolant and Dilluvio sent Enzolytics at least $2.3 million.

**Apolant Paid to Have Enzolytics Stock Promoted to Retail Investors**

125.    To persuade enough retail investors to buy the hundreds of millions of shares of Enzolytics stock the Control Group intended to sell (and to do so without greatly depressing the stock price), the Control Group, mostly through Apolant's Sky-Direct, paid a stock promoter ("Promoter") to increase investor interest in Enzolytics stock.

126.    Apolant had worked before with Promoter to increase investor interest in other stock.  Promoter's role was to generate investor interest so that the volume of trading would go

up, allowing Apolant and his partners to sell large quantities of stock without driving down its price.

127.    Apolant approached Promoter towards the end of 2020 to promote Enzolytics. Volume (how much stock was being traded) had been very low, and at times almost non-existent throughout 2020, and the price remained low until it began to creep up in October.  During October and November 2020 Sky-Direct and Wexford paid Promoter a total of around $109,000.

### Farber and Wexford Sold Stock on Behalf of the Control Group

128.    Farber (via Wexford) sold stock on behalf of Dannie (who was sharing proceeds with Zhabilov, Camelot, and Ray), Seacor (for Dilluvio) and NY Farms (for Apolant), keeping a share of the proceeds for their efforts.  From January 2021 to January 2022, the Control Group, Seacor, and Sky-Direct transferred at least 350 million shares to Wexford. Farber (through Wexford) then deposited the transferred shares into an account in Wexford's name that he controlled in Canada.  He then sold the shares to the public from that account.

129.    To effectuate these sales, Farber, through Wexford, took possession of his customers' shares through stock purchase agreements.  But these agreements did not reflect the economic reality of the transactions.  Rather, the "seller" remained the beneficial owner of the shares.  This is evident because nearly every incoming transfer to Wexford with Enzolytics stock sale proceeds is followed by outgoing transfers to Seacor, Equity Markets, or NY Farms.

130.    From at least January 2021 through February 2022, Farber sold $78 million worth of Enzolytics stock to retail investors.  Wexford transferred about $70 million back to the Control Group and Dannie, keeping about $6 million for himself.

131.    Neither Farber nor Wexford have ever been registered as a broker-dealer with the Commission or associated with a registered broker-dealer.

132.    On top of effectuating the sales of Enzolytics shares for the other Defendants, Farber and Wexford have effectuated transactions in other securities for their affiliates and shared the stock sale proceeds.

**The Defendants' Unregistered Offers and Sales**

133.    Zhabilov, Ray, Dilluvio, and Apolant are Enzolytics affiliates because of their roles in the management, funding, and operations of the company, and their control of the Enzolytics stock float.  Dannie and Farber are also affiliates of Enzolytics because they worked together with the Control Group to accomplish their fraudulent scheme.  Defendants offered and sold Enzolytics stock.

134.    At the time that Defendants offered and sold Enzolytics stock, there was no registration statement for those sales on file with the Commission or in effect for those transactions, as required by Section 5 of the Securities Act.  No exemption from the registration requirement applied.

**FIRST CLAIM FOR RELIEF**
**FRAUD IN CONNECTION WITH THE PURCHASE OR SALE OF SECURITIES**
**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5**
**thereunder by Zhabilov, Ray, Dilluvio, Apolant, Dannie, Farber, Camelot, Seacor, Sky-Direct, and Wexford)**

135.    Paragraphs 1 through 134 above are re-alleged and incorporated by reference as if fully set forth here.

136.    During the Relevant Period, the stock of Enzolytics was a security under Section 3(a)(10) of the Exchange Act [15 U.S.C. §78c(a)(10)].

137.    Through the conduct described above, defendants Zhabilov, Ray, Dilluvio, Apolant, Dannie, Farber, Camelot, Seacor, Sky-Direct, and Wexford, directly or indirectly, in connection with the purchase or sale of securities, by the use of the means or instrumentalities of

interstate commerce or of the mails, or of any facility of any national securities exchange, intentionally, knowingly or recklessly, (i) employed devices, schemes, or artifices to defraud; (ii) made untrue statements of material fact or have omitted to state material fact(s) necessary to make the statements made not misleading; and (iii) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any persons, including purchasers or sellers of the securities.

138.    Through the conduct described above, defendants Zhabilov, Ray, Dilluvio, Apolant, Dannie, Farber, Camelot, Seacor, Sky-Direct, and Wexford violated Exchange Act Section 10(b) [15 U.S.C. §78j(b)] and Rule 10b-5 [17 C.F.R. §240.10b-5] thereunder and will continue to violate those sections unless enjoined.

**SECOND CLAIM FOR RELIEF**
**FRAUD IN THE OFFER OR SALE OF SECURITIES**
**(Violations of Section 17(a) of the Securities Act by Zhabilov, Ray, Dilluvio, Apolant, Dannie, Farber, Camelot, Seacor, Sky-Direct, and Wexford)**

139.    Paragraphs 1 through 138 above are re-alleged and incorporated by reference as fully set forth here.

140.    During the Relevant Period, the stock of Enzolytics was a security under Section 2(a)(1) of the Securities Act [15 U.S.C. §77b(a)(1)].

141.    Through the conduct described above, defendants Zhabilov, Ray, Dilluvio, Apolant, Dannie, Farber, Camelot, Seacor, Sky-Direct, and Wexford, in connection with the offer or sale of securities, by the use of the means or instrumentalities of interstate commerce or of the mails, directly or indirectly, (i) acting intentionally, knowingly, or recklessly, employed devices, schemes, or artifices to defraud; (ii) acting intentionally, knowingly, recklessly, or negligently obtained money or property by making untrue statements of material fact or omitting facts necessary to make the statements made not misleading; and (iii) acting intentionally,

31

knowingly, recklessly, or negligently engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon any persons, including purchasers or sellers of the securities.

142.    Through the conduct described above, defendants Zhabilov, Ray, Dilluvio, Apolant, Dannie, Farber, Camelot, Seacor, Sky-Direct, and Wexford violated Securities Act Section 17(a) [15 U.S.C. §77q(a)] and will continue to violate those sections unless enjoined.

**THIRD CLAIM FOR RELIEF**
**<u>UNREGISTERED OFFERINGS OF SECURITIES</u>**
**(Violations of Sections 5(a) and 5(c) of the Securities Act by**
**Zhabilov, Ray, Dilluvio, Apolant, Dannie, Farber, Camelot, Seacor, Sky-Direct, and**
**Wexford)**

143.    Paragraphs 1 through 142 above are re-alleged and incorporated by reference as if fully set forth here.

144.    During the Relevant Period, the stock of Enzolytics was a security under Section 2(a)(1) of the Securities Act [15 U.S.C. §77b(a)(1)].

145.    Through the conduct described above, defendants Zhabilov, Ray, Dilluvio, Apolant, Dannie, Farber, Camelot, Seacor, Sky-Direct, and Wexford, directly or indirectly: (i) used the means or instruments of transportation or communication in interstate commerce or of the mails to sell, through the use or medium of a prospectus or otherwise, securities as to which no registration statement has been in effect and for which no exemption from registration has been available; and/or (ii) used the means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell, through the use or medium of a prospectus or otherwise, securities as to which no registration statement has been filed and for which no exemption from registration has been available.

32

146.    As a result, defendants Zhabilov, Ray, Dilluvio, Apolant, Dannie, Farber, Camelot, Seacor, Sky-Direct, and Wexford violated Sections 5(a) and (c) of the Securities Act [15 U.S.C. §§77e(a) and (c)] and will continue to violate those sections unless enjoined.

**FOURTH CLAIM FOR RELIEF**
**ACTING AS AN UNREGISTERED BROKER**
**(Violation of Section 15(a)(1) by Farber and Wexford)**

147.    Paragraphs 1 through 146 above are re-alleged and incorporated by reference as if fully set forth here.

148.    By engaging in the conduct alleged above, Farber and Wexford acted as brokers within the meaning of Section 3(a)(4) of the Exchange Act [15 U.S.C. §78c(4)] and made use of the mails or any means or instrumentality of interstate commerce to effect transactions in, or to induce or attempt to induce the purchase or sale of, securities.

149.    For the securities transactions at issue, Farber and Wexford were not registered with, or associated persons of a firm registered with, the Commission.

150.    Farber and Wexford did not qualify for an exemption from the registration requirements.

151.    Because of the foregoing, Farber and Wexford violated, and unless enjoined will continue to violate, Section 15(a)(1) of the Exchange Act [15 U.S.C. §78o(a)(1)].

**FIFTH CLAIM FOR RELIEF**
**OTHER EQUITABLE RELIEF, INCLUDING UNJUST ENRICHMENT AND CONSTRUCTIVE TRUST**
**(against Relief Defendants NY Farms and Equity Markets)**

152.    Paragraphs 1 through 151 above are re-alleged and incorporated by reference as if fully set forth here.

153.    Section 21(d)(5) of the Exchange Act states, "In any action or proceeding brought or instituted by the Commission under any provision of the securities laws, the Commission may

33

seek, and any Federal court may grant, any equitable relief that may be appropriate or necessary for the benefit of investors."

154.    Relief Defendants received ill-gotten funds through a fraudulent scheme.  Relief Defendants have no legitimate claim to this property.  In equity and good conscience, Relief Defendants should not be allowed to retain such funds.

155.    As a result, Relief Defendants are liable for unjust enrichment and should each be required to return their share of ill-gotten gains, in an amount to be determined by the Court. The Court should also impose a constructive trust on the ill-gotten gains in the possession of Relief Defendants.

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court:

A.    Permanently restrain Defendants, their officers, agents, servants, employees and attorneys, and those persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, from violating Sections 5(a) and (c) and 17(a) of the Securities Act [15 U.S.C. §§ 77e(a) and (c), 77q], and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. 240.10b-5];

B.    Permanently restrain defendants Farber and Wexford and their officers, agents, servants, employees and attorneys, and those persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, from violating Section 15(a)(1) of the Exchange Act [15 U.S.C. § 78o(a)];

C.    Enter an order permanently enjoining Defendants Dilluvio and Ray from directly or indirectly, including, but not limited to, through an entity owned or controlled by any of them, participating in the issuance, purchase, offer, or sale of any security; provided, however, that

such injunction shall not prevent Dilluvio and Ray from purchasing or selling securities listed on a national securities exchange for their own personal accounts;

D.      Order the Defendants to disgorge, with prejudgment interest, all ill-gotten gains obtained through the unlawful conduct alleged in this Complaint;

E.      Order the Defendants to pay civil monetary penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)];

F.      Enter an order barring Defendants Zhabilov, Apolant, Dannie, Farber, Camelot, Seacor, Sky-Direct, and Wexford from participating in any offering of a penny stock, pursuant to Section 20(g) of the Securities Act [15 U.S.C. § 77t(g)] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)];

G.      Enter an order barring Defendants Zhabilov, Dilluvio, and Apolant from acting as officers or directors of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l], or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)];

H.      Order the Relief Defendants to disgorge, with prejudgment interest, all ill-gotten gains obtained through the unlawful conduct alleged in the Complaint;

I.      Retain jurisdiction over this action to implement and carry out the terms of all orders and decrees that may be entered; and

J.      Grant such other and further relief as this Court may deem just and proper.

## JURY DEMAND

The Commission demands a jury for all claims so triable.

DATED this 10th day of April, 2026.

Respectfully submitted,

*s/ Marc J. Jones*
Marc Jones (admitted pro hac vice)
Rua Kelly (admitted pro hac vice)
Amy Gwiazda*

Attorneys for the Plaintiff
SECURITIES AND EXCHANGE COMMISSION
Boston Regional Office
33 Arch Street, 24th Floor
Boston, MA 02110
617-573-8947 (Marc Jones)

*Not admitted in the U.S. District for the Southern District of New York